IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 10-1402

NATIONAL ASSOCIATION OF SMALL TRUCKING COMPANIES, ET AL.,

Petitioners,

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

**RESPONDENT'S OPPOSITION
TO PETITIONERS' EMERGENCY STAY MOTION**

MICHAEL JAY SINGER
(202) 514-5432
JEFFREY CLAIR
(202) 514-4028
Attorneys, Civil Division
Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530

ROBERT S. RIVKIN
 General Counsel
PAUL M. GEIER
 Asst. General Counsel
 for Litigation
PETER J. PLOCKI
 Deputy Asst. General
 for Litigation
Department of Transportation

ALAIS L. M. GRIFFIN
 Chief Counsel
CHARLES J. FROMM
 Asst. Chief Counsel,
 Enforcement and Litigation
HEATHER RABER
 Federal Motor Carrier Safety Adm.

## INTRODUCTION AND SUMMARY

Petitioners seek to stay pending appeal the Secretary's implementation of a revised system for compiling and analyzing safety performance data on commercial motor vehicle carriers. Once implemented, the data system will afford the Secretary a crucial tool for identifying carriers that pose the highest safety risk, efficiently allocating the agency's limited enforcement resources, and providing the public with accurate data on a carrier's safety performance record.

Petitioners have not met any of the criteria for a stay. First, petitioners err in asserting that the Secretary must go through notice and comment rulemaking. The Secretary's action does not establish or amend any law, standard, or rule concerning the federal determination of whether a carrier is sufficiently safe to operate a motor vehicle. It instead establishes a procedure for concentrating the agency's limited enforcement resources where they are needed most. Circuit law makes plain that such measures do not constitute a legislative rule requiring notice and comment rulemaking. *American Hosp. Ass'n* v. *Bowen*, 834 F.3d 1037, 1049-50 (D.C. Cir. 1987).

Second, petitioners' claim that small carriers will be irreparably harmed by the disclosure of safety performance data is meritless. Similar data has been publicly available for more than a decade without producing the ruinous consequences forecast by petitioners, and petitioners' various contentions that the new

data is misleading and inaccurate do not withstand scrutiny.

Finally, the balance of harms and public interest weigh heavily against a stay. A stay would deprive the entire industry of better information on safety performance and impair the Secretary's ability to implement procedures proven to be successful in targeting enforcement resources where they are needed most.

## STATEMENT

1. <u>Statutory and Regulatory Scheme</u>.

Congress has determined that it is in the public interest to enhance commercial motor vehicle safety and has further concluded that "improved, more uniform commercial motor vehicle safety measures and strengthened enforcement" would reduce fatalities, injuries, and property damage related to commercial motor vehicle operations. 49 U.S.C. 31131(b)(1) & (2). It has accordingly authorized the Secretary of Transportation to prescribe minimum safety standards for commercial motor vehicles (49 U.S.C. 31136(a)), and to "determine whether an owner or operator is fit to operate safely commercial motor vehicles, utilizing among other things the accident record of an owner or operator * * * and the accident record and safety inspection record of such owner or operator."[1] 49 U.S.C. 31144.

---

[1] The authority pertinent here has been delegated to the Administrator of the Federal Motor Carrier Safety Administration ("FMCSA"), an agency within the Department of Transportation. *See* 49 C.F.R. 1.73. For convenience and clarity, however, we will refer solely to the Secretary in this pleading.

To carry out these objectives, the Secretary has for more than a decade compiled, analyzed, and made available for public inspection a broad array of data on the safety performance of commercial motor vehicle carriers. This serves two important purposes. First, it affords the Secretary a vitally necessary basis for allocating scarce enforcement resources. Though the Secretary is broadly charged with promoting motor vehicle safety, the number of owners and operators dwarfs the number of government safety inspectors. As a result, the Secretary is able to actively investigate the fitness of only a small fraction of regulated carriers. Exh. A, Decl. of Assoc. Administrator William Quade, ¶ 2. By marshaling safety data drawn from accident reports, state level roadside inspections, and other sources, the Secretary can identify which operators and owners are most likely to require further safety and better allocate the government's limited enforcement resources.

Second, the public disclosure of safety performance data in and of itself promotes motor vehicle safety. Accessible, accurate, and transparent reporting of safety data affords shippers, freight brokers, and others within the industry an important tool for evaluating carrier performance. And that in turn creates strong economic incentives for motor vehicle owners and operators to improve and maintain their safety record.

The Secretary previously employed a system known as "SafeStat" to perform these functions. SafeStat was first implemented in 1997 and has since

been used as the agency's primary tool for identifying high risk motor carriers for further review.  75 Fed. Reg. 18257 (2010).  It uses available federal motor carrier safety data drawn from roadside inspections reports, reported moving violations, and crash data to measure the relative safety status of motor carriers in four safety evaluation areas.  *See* Exh. B, *Safety Measurement System Methodology*, § 2.5 (August 2010).  For each evaluation area in which there is sufficient information, the SafeStat system calculates a value that reflects the carrier's safety performance relative to other comparable carriers.  The resulting  percentile rankings are then used to determine which carriers should be subject to further evaluation.

SafeStat data has been made freely available to the public since 1999.  Exh. C, 75 Fed. Reg. 18258 (2010).  By accessing the appropriate agency web site, any member of the public can obtain detailed SafeStat results for all interstate motor carriers, including the specific safety data used to assess the safety scores and percentile rankings of individual motor carriers.[2]  Thus, currently and well before the agency action challenged here, shippers, insurers, freight brokers, safety advocates, and the carriers themselves have had ready access to information profiling an individual carrier's safety record.  The public has made wide and

---

[2] Though the public has had unfettered access to most SafeStat data, in 2004 the Secretary suspended access to accident evaluation data after determining that state-reported crash data did not indicate whether the carrier had caused or could have prevented the accident.  75 Fed. Reg. 18258 (2010).

frequent use of this data.  Indeed, in 2009 alone, the SafeStat online web site recorded nearly 4 million user sessions.  75 Fed. Reg. 18258 (2010).

2.  The Challenged Agency Action:  The Secretary's Revised Carrier Safety Measurement System.

On April 9, 2010, the Secretary published in the Federal Register an announcement that the FMCSA would replace SafeStat with an improved carrier safety measurement system later in 2010.[3]  75 Fed. Reg. 18256 (2010).   The Federal Register notice explained that the purpose of the new system is to enable the FMCSA to "better identify high-risk motor carriers, make more efficient and effective the Agency's and its State partners' allocation of compliance and enforcement resources[,] and provide the motor carrier industry and other safety stakeholders with more comprehensive, informative, and regularly updated safety performance data."  *Ibid*.   The notice advised the public that details of the new data system were available on the agency's web site, explained how individual carriers could obtain a preview of their own safety performance scores under the new system,  and invited public comment.  75 Fed. Reg. 18256-58 (2010).

The revised carrier safety measurement system affords several important improvements in the utility of the safety data compiled and analyzed by the

_____

[3] Absent a stay, the Secretary now intends to implement the system on or after December 12, 2010.

Secretary.   First, the revised system will draw on a wider range of safety data.

SafeStat compiles data pertaining only to moving traffic violations or safety

violations that require a driver or vehicle to be taken out of service.  The revised

system, in contrast, will include data on all safety violations uncovered during a

roadside safety inspection.  75 Fed. Reg. 18258 (2010); Exh. A, ¶¶ 5 & 6.

Second, the revised system classifies safety violations into a new set of

more focused categories based on a driver or carrier's safety-related behavior.

These categories, termed Behavioral Analysis Safety Improvement Categories or

"BASICs," sort safety violations by whether they pertain to unsafe driving,

fatigued driving, driver fitness, substance abuse, vehicle maintenance or cargo.

The system will also collect data on the carrier's crash record and history.  *Ibid*.

Finally, unlike SafeStat, safety violations will be weighted according to the

risk that the violation may cause, contribute to, or exacerbate a crash.  Measures of

safety performance within each safety category will now take account of differ-

ences in the crash risk posed by each safety violation, thus affording the Secretary

a more accurate picture of each carrier's relative safety risk.  *Ibid*.

Once the revised system is operational, it will, like SafeStat, generate for

each data category a safety score designed to show how the carrier's safety

performance compares to the performance of other carriers within a comparable

peer group.  A safety score for each category will first be determined by consider-

ing the number of adverse safety events, weighted by both the relative safety risk

of the violation and the recency of the safety violation.   The carrier will be placed

in a peer group composed of  carriers that have been subject to a similar number of

safety inspections.  Carriers within each peer group will then be ranked by their

safety score for each pertinent data category.  *See* Exh. B, §§ 3.1 - 3.16.

The Secretary intends to use these measurements as a means of determining

whether a regulatory intervention to improve safety performance is necessary.

Thus, if a carrier's score in a BASIC data category is above an established thresh-

old for regulatory intervention, the system will indicate that the carrier is in "alert"

status for that category, and the  Secretary will consider whether to take enforce-

ment action to improve the carrier's safety performance.  Because the new BA-

SICs provide a clearer picture of the specific areas in which a carrier has safety

problems, safety investigators can tailor enforcement measures to specific safety

concerns, without conducting time-consuming, on site compliance reviews on

every carrier.  These graduated enforcement measures may include warning letters

that identify the safety deficiency and outline possible consequences of continued

safety problems, targeted roadside inspections focused on safety issues identified

by the safety measurement system, or the selection of the carrier for a more

intensive, on-site safety inspection.  Exh. A, ¶ 8.  The revised system thus enables the Secretary to deploy limited enforcement resources more effectively.

The Secretary also intends to make the safety performance data and measures compiled in this revised safety measurement system broadly available to the public.  As with SafeStat, the Secretary will continue to bar public access to crash data pending further study of whether the utility of the data can be improved.  75 Fed. Reg. 18258 (2010).   In addition, the Secretary will bar public access to the carrier's percentile rankings and "alert" status for the cargo-related data category.  Public comment raised concerns that the percentile rankings in this category were unfairly skewed against certain industry segments.  In response, the Secretary decided to limit public access to cargo-related data.  *See* Exh. D, FMCSA Announcement of November 18, 2010.  Apart from these limitations, however, the Secretary intends to continue the SafeStat policy of making the compiled safety data broadly available to the public.  75 Fed. Reg. 18258 (2010).

Petitioners assert that changes in the data collection and measurement system amount to a new "legislative" rule that may be promulgated only through "notice and comment" rulemaking.  They now seek a stay pending appeal.

## ARGUMENT

The factors to be considered in determining whether a stay is warranted are: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal, (2) the likelihood that the moving party will be irreparably harmed absent a stay, (3) the prospect that others will be harmed if the court grants the stay, and (4) the public interest in granting the stay.  *Wisconsin Gas Co.* v. *FERC*, 758 F.2d 669, 673-74 (D.C. Cir. 1985) (*per curiam*).  *See also Washington Metro.  Area Transit Comm'n* v. *Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir.1977).

It is the movant's obligation to demonstrate that a stay is warranted under these stringent standards.  *Cuomo* v. *U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985).   Petitioners have failed to carry this burden here.

I.     The Challenged Agency Action Is Not A Legislative
       Rule Requiring Notice And Comment Rulemaking, And
       Petitioners Therefore Have Not Demonstrated A Likeli-
       hood Of Success On The Merits.

The Administrative Procedure Act mandates that rules be issued after general notice of proposed rulemaking and an opportunity for public comment but exempts from this requirement "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."  5 U.S.C. 553(b).   The Court, in clarifying the scope of this APA exemption, has held that an agency

pronouncement must be treated as a "legislative" rule subject to notice and comment rulemaking if:  (1) in the absence of the rule there would not be adequate legislative basis for enforcement action, (2) the rule is published in the Code of Federal Regulations, (3) the agency has explicitly invoked its general legislative authority, or (4) the rule effectively amends a prior legislative rule.  *American Mining Congress* v. *MSHA,* 995 F.2d 1106, 1112 (D.C. Cir. 1993).

As the agency has neither published this action in the CFR nor explicitly invoked its legislative authority, petitioners' APA claim necessarily turns on the first and fourth prongs of the *American Mining* standard:  whether the action establishes new bases for an enforcement action or amends a prior legislative rule. Petitioners principally contend in this regard that the revised carrier safety measurement system establishes a new means of determining carrier safety ratings and thus prescribes a new legislative basis for taking enforcement action against carriers.  *See* Pet. Mot. at 10-11.

Contrary to petitioners' contentions, however, the standards and procedures for making a federal determination of a carrier's safety fitness derive from separate statutory and regulatory authority that is not amended or supplemented by the agency action challenged here.  As noted above, Congress has vested the Secretary with statutory authority to determine the safety fitness of motor vehicle operators.

49 U.S.C. 31144.   The Secretary has accordingly established, in regulations

wholly unaffected by the action challenged here, federal safety standards (49

C.F.R. Parts 390 - 399), procedures for conducting a review of whether a carrier is

in compliance with these safety standards (49 C.F.R. Part 385), and criteria for

assigning the carrier a specific safety rating (49 C.F.R. 385.3).   At the conclusion

of this federal compliance review process, carriers may be rated as:  (1) "satisfac-

tory" – indicating that management controls are sufficient to ensure compliance

with federal safety standards, (2) "conditional" – indicating that safety controls are

inadequate but have not yet resulted in violation of a federal safety standard, or (3)

"unsatisfactory" – indicating that management controls are inadequate and have

resulted in safety violations.  49 C.F.R. 385.3.  Generally, a motor carrier rated

"unsatisfactory" is prohibited from operating a commercial motor vehicle.  49

C.F.R. 385.13(a).

     The revised motor carrier safety measurement system does not alter this

process in any way.  The safety measurement system will compile safety data.  But

it does not establish or modify any federal safety standard.   And though the

system will rank carriers' safety performance, the  percentile rankings merely

reflect a carrier's performance relative to other carriers and emphatically do *not*

reflect a federal determination as to whether the carrier is safe enough to operate a

commercial motor vehicle.[4]  *See* Exh. A, ¶ 18.

This readily distinguishes the case on which petitioners' chiefly rely:  *MST Express* v. *Dep't of Transp.*, 108 F.3d 401 (D. C. Cir. 1997).   There, the Court held that the agency erred in not promulgating through notice and comment rulemaking a document providing government inspectors  "detailed guidelines for deriving a motor carrier's safety rating from the data obtained from a compliance review."  *Id*. at 403.  The guidelines thus effectively directed how the agency was to exercise its authority, under 49 U.S.C. 31144 and implementing regulations, to determine  a carrier's safety fitness.

The data system revisions at issue here are fundamentally different.  They do not establish, modify, or even purport to interpret any substantive safety standard.  They do not prescribe or alter the means by which the Secretary exercises statutory authority to determine the safety fitness of a motor vehicle operator. And they do not alter a carrier's right to  administratively appeal an adverse safety determination, thereby leaving in place regulations that satisfy an aggrieved

---

[4] The Secretary does, in the future, intend to consider a new methodology for determining safety fitness that would be based on performance data compiled by the carrier safety management system.  The Secretary has made clear, however, that such potential changes in the procedures for determining carrier fitness will be considered in the course of a future notice and comment rulemaking and are not part of the carrier safety measurement system challenged here.  75 Fed. Reg. 18257 (2010).

carrier's right to due process. *See* 49 C.F.R. 385.15. Rather, the revised system will merely guide the Secretary's allocation of the agency's limited enforcement resources.

Petitioners contend that this alone is sufficient to require notice and comment rulemaking. They thus assert (without any elaboration) that agency actions setting standards or "metrics" for inspections are also subject to the rulemaking requirement. Pet. Mot. at 12. The cases petitioners cite, however, do not support this assertion, and it is plainly incorrect.

In *Chamber of Commerce* v. *Dep't of Labor*, 174 F.3d 206 (D.C. Cir. 1999), for example, the Court held that the agency was required to go through notice and comment before promulgating a rule that required regulated parties to choose between adopting a comprehensive program of safety standards and self-inspection, or submitting to the agency's own safety inspection. The Court held such action requires rulemaking, reasoning that the agency had used the prospect of onerous inspections as a means of compelling employers to adopt new safety standards and procedures. *Id*. at 211-12. The action here is not comparable. It merely flags carriers for further investigation, without any similar effort to induce carriers to adopt safety procedures or standards not already required by law.

Petitioners' reliance on *Prometheus Radio Project* v. *FCC,* 373 F.3d 372

(3d Cir. 2004), is similarly misplaced.  The agency decision in that case was not the adoption of internal investigation and enforcement criteria, but rather the publication of new, substantive standards on permissible cross-media ownership. The question of whether such substantive rules must go through notice and comment has no bearing on the issue presented here.

The controlling Circuit law is instead set forth in *American Hospital Ass'n* v. *Bowen*, 834 F.3d 1037 (D.C. Cir. 1987).  At issue in *Bowen* was a Medicare manual provision setting specific standards governing when government enforce-ment agents would review the quality and appropriateness of hospital services billed to Medicare.  *See id.* at 1049.  The Court reasoned that the manual provi-sions merely established the frequency and focus for enforcement review, thereby allowing enforcement agents "to concentrate their limited resources" on areas where further scrutiny was apt to prove most fruitful.  *Id*. at 1050.  It held that such provisions were a  procedural rule not subject to notice and comment require-ments.  *Ibid*.; *accord United States Dep't of Labor* v. *Kast Metals Corp.*, 744 F.2d 1145, 1152-56 (5th Cir. 1984) (OSHA provisions governing when employers would be subject to safety inspection establish procedural rules not subject to notice and comment rulemaking).  The action challenged here is similarly intended to guide the agency's enforcement discretion.  *See* Exh. A, ¶¶ 6-9.  It is therefore

similarly exempt from notice and comment requirements.

Finally, petitioners' conclusory assertion (Pet. Mot. at 12) that notice and comment is required for agency decisions that "change the handling of data about a regulated industry" is without merit. Data handling does not involve the prescription of substantive standards, exercise of legislative authority, amendment of a prior legislative rule, or any other action that would rise to a legislative rule under the *American Mining* standards. Nor does *P.A.M. News Corp.* v. *Hardin*, 440 F.2d 255 (D.C. Cir. 1971), compel a different result. *P.A.M.* involved the establishment by the USDA of a news service that would operate in direct competition with private parties, an action infringing on substantive rights, and one that is not remotely similar to the collection of safety data for use in guiding an agency's inspection and enforcement decision. *P.A.M.* has no relevance here.

II.   Petitioners Will Not Be Irreparably Harmed By Implementation Of The Carrier Safety Measurement System.

Petitioners argue that once safety data and percentile rankings are made public, low-ranking carriers will suffer "devastating" economic losses as shippers, freight brokers, and other potential customers take their business elsewhere for fear of incurring vicarious liability in the event of an accident.

This contention premises a claim of harm on mere speculation as to the

-15-

voluntary actions of third parties and is at odds with the historical record. The Secretary has made similar information available to the public for more than a decade without causing the disastrous economic consequences feared by petitioners. The SafeStat system already in effect also collects safety performance data, also ranks carriers in relation to their peers, and also makes this data available to the public. Potential customers have used this information for years in making business decisions, and the availability of such information has not led to the dire economic harm forecast by petitioners. The revised system, though expanding and refining the Secretary's data collection analysis, does not amount to a substantial, material change in the status quo.

Moreover, the Secretary has taken great care to bar public disclosure of data that is not fairly indicative of a carrier's safety performance . The Secretary is thus continuing the SafeStat policy of barring public access to accident data because such information, in its current form,  does not indicate whether the carrier should be accountable for a particular crash.   Similarly, the Secretary, in response to concerns raised by public comment, concluded that the percentile rankings in the cargo-related data category may be skewed against certain industry segments and will, for that reason, bar public access to this information as well.  In addition, the Secretary continues to make available the "DataQ" process through which carriers

-16-

can review underlying reports of safety violations and request that any error be corrected.  *See* Pet. Mot., Exh. C, Appendix D.

Petitioners maintain that there are nonetheless certain systemic errors that will unfairly portray a carrier's safety performance record and irreparably harm their business.  These contentions are also meritless.   First, contrary to petitioners' contentions (Pet. Mot. 8), the system's peer grouping procedures do not distort a carrier's record of compliance with safety standards limiting a driver's hours of service.  An inability to accurately log the time spent driving indicates that the carrier lacks management controls necessary to ensure compliance with hours of service limitations and is in and of itself a matter of substantial safety concern. Moreover, the revised system employs the same peer grouping method long used by SafeStat, and effectiveness testing shows that poor safety scores in the driver fitness category pertaining to hours of service violations are in fact strong predictors of future crashes.  Exh. A, ¶¶ 19-20.

Second, petitioners' assertion (Pet. Mot. 15) that the system will unfairly portray a safety problem in circumstances where there is not a large enough pool of data to draw statistically meaningful conclusions is incorrect.  The new system specifically employs data sufficiency standards designed to ensure that there are enough inspections or crashes to produce statistically meaningful measures of

safety. *See* Exh B, § 2.4.7.

Finally, petitioners err in asserting that the revised system is inherently biased against carriers that operate in states with more vigorous inspection policies. As petitioners concede (Pet. Mot. at 9), SafeStat has historically collected the same data, and there is no evidence that it has placed certain carriers at a ruinous competitive disadvantage. Moreover, the agency has already addressed this issue by promoting more uniform and consistent enforcement policies. *See* Exh. E, Administrator's Response to Minn. Trucking Ass'n.

Petitioners' extravagant assertion (Pet. 18) that their members "fac[e] extinction due to vicarious liability fears stoked by defective * * * data" is thus unfounded. There is no evidence that disclosure of accurate safety information will devastate a carrier's business, and no basis for petitioners' contention that the revised system will distort a carrier's relative safety performance.

III.    A Stay Will Harm The Industry's Interest In Accurate,
        Focused Data On Carrier Safety.

Shippers, freight brokers, insurers, and carriers themselves have a strong interest in access to focused and accurate data on a carrier's safety performance. Such information promotes sound business decision-making. It also aids carriers in identifying and rectifying safety problems. Though similar information is

already available through SafeStat, the revised system focuses on more specific

areas of driver or carrier behavior and thus has greater utility.  Exh. A, ¶¶ 14-15.

Indeed, many carriers have found that the new system provides a fairer and more

useful picture of their own safety record.  *See* Pet. Mot., Exh. C, Appendix C,

"CSA Revisions Improve Most Scores but Worsen Others, Carrier Execs Say."

All these improvements would be postponed by a stay.

IV.    The Public Interest In Improved Motor Vehicle Safety
       Would Be Harmed By A Stay.

Experience shows that improvements in safety enforcement reduce motor

vehicle fatalities, injuries, and property damage.  The safety improvements at issue

here are no exception.   In January 2008, the Secretary began testing an opera-

tional model of the system.  Test results  have been highly encouraging.  They

show that the new system enables enforcement agents to calibrate interventions

and remedial measures to a carrier's specific safety problem, to reach more carriers

with the same enforcement resources, and to better identify carriers that have the

highest risk of a crash.   Exh. A., ¶¶ 9, 17.

Petitioners do not dispute the strong public interest in realizing these

benefits at the earliest opportunity.  They accordingly suggest that the Court

merely stay the public release of the newly compiled safety data while allowing

the Secretary to continue use of the data for "internal enforcement purposes."

Pet. Mot. at 19.   That, however, would not cure the harm to the public interest.  It would deprive the public of improved safety performance information for the duration of the appeal.   Moreover, it would sow confusion by publicizing safety performance scores that are not based on the same data made available to enforcement agents, not broken down into the same data categories used by the Secretary, not scored or percentile-ranked in the same manner, and not indicative of whether the agency will select the carrier for a regulatory intervention or other enforcement action.   Exh. A, ¶ 16.  Thus, the "solution" proposed by petitioners would require the Secretary to choose between forgoing the substantial safety enforcement enhancements of the new system, operating a two-tiered information system bound to create public confusion as to the Secretary's enforcement policies, or removing all public access to safety performance data, thus crippling the industry's ability to use safety performance data to make important business decisions.  This Hobson's choice manifestly harms the public interest.

## CONCLUSION

Petitioners' motion for a stay pending appeal should be denied.

Respectfully submitted,

_____/s/ Jeffrey Clair_____

MICHAEL JAY SINGER

JEFFREY CLAIR

Attorneys, Civil Division

U.S. Department of Justice

## CERTIFICATE OF SERVICE

I certify that on December 6, 2010, in addition to filing paper copies with the Court, I electronically filed the foregoing response in opposition to a stay. As counsel for petitioners are registered with the Court's Electronic Case Filing system, the electronic filing of the response constitutes service upon them under the Court's Administrative Order Regarding Electronic Case Filing, ECF-7 (May 15, 2009).

<div style="margin-left:40%">

  /s/ Jeffrey Clair

Room 7243, Civil Division

Department of Justice

950 Pennsylvania Ave., NW

Washington, D.C.  20530

jeffrey.clair@usdoj.gov

(202) 514-4028

</div>

# EXHIBIT A

# DECLARATION OF WILLIAM A. QUADE,
## ASSOCIATE ADMINISTRATOR FOR ENFORCEMENT
## AND PROGRAM DELIVERY
## FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

**Declarant's Title, Job Responsibilities and Basis of Personal Knowledge**

1.      I am the Associate Administrator for Enforcement and Program Delivery for the Federal Motor Carrier Safety Administration (FMCSA), an agency within the Department of Transportation.  I have served in this position since June, 2008.  In that capacity, I have personal knowledge of all FMCSA enforcement programs relating to motor carriers and commercial motor vehicle operations.  I am responsible for ensuring that the development and implementation of these programs comply with statutory directives and effectively and efficiently utilize Agency resources.  In particular, I have thorough knowledge of the Compliance, Safety and Accountability Operational Model discussed below.

**Genesis of the Compliance, Safety and Accountability Operational Model**

2.      FMCSA regulates the safety performance of approximately 500,000 motor carriers and over 7 million commercial motor vehicle (CMV) drivers.  Each year nearly 40,000 new companies enter the motor carrier industry.  By contrast, there are only approximately 800 Federal and State Safety Investigators to perform on-

site compliance reviews on problem carriers.  In addition, the States employ nearly

12,000 inspectors qualified to perform roadside CMV inspections, however, not all

of the inspectors routinely perform CMV inspections.  Given these limited Federal

and State resources, FMCSA determined that it must adopt a more effective and

efficient enforcement model to better monitor existing carriers and keep pace with

the expanding industry.

3.     The Compliance Safety and Accountability Operational Model (CSA)[1] is

designed to advance FMCSA's safety first mission by reducing large truck and bus

crashes, injuries, and fatalities on our nation's highways. This new business model

will improve targeting of high risk motor carriers for early and more effective

intervention and achieve improved levels of compliance with Federal safety and

hazardous materials regulations. Through increased operational efficiencies, CSA

will enable FMCSA and its State partners to address the safety deficiencies of a

much larger segment of the motor carrier industry than the Agency currently does.

---

[1] FMCSA launched the CSA initiative in 2004 under the project name
"Comprehensive Safety Analysis 2010" and recently changed the name to reflect
the upcoming implementation.   FMCSA uses the term "CSA" to refer to both
previous work on the initiative and the Operational Model going forward.

**The Safety Measurement System Enables FMCSA to More Effectively and Efficiently Fulfill its Safety Mission**

4.    FMCSA currently uses compliance reviews, on-site comprehensive reviews of a motor carrier's safety program, as its primary investigative tool.  The compliance review typically involves one or more investigators dedicating hours or days, dependent on the size of the carrier, to reviewing documents, inspecting vehicles, and interviewing employees at the motor carrier's principal place of business.  Although analysis shows that compliance reviews do have a safety benefit, they are very labor intensive – 2 to 4 days or more per carrier – and often require investigators to spend valuable time reviewing operational areas where there is no reason to suspect the motor carrier has a safety problem.  The current enforcement model uses the Motor Carrier Safety Status Measurement System (SafeStat) to identify and prioritize motor carriers for compliance reviews.

5.    CSA replaces SafeStat with a new measurement system, Safety Measurement System (SMS).  The differences between how SafeStat and SMS quantify motor carrier safety performance demonstrate why FMCSA must implement CSA, utilizing SMS, as soon as practicable.  SafeStat measures the relative safety performance of motor carriers in four broad categories, called Safety Evaluation Areas (SEAs): (1) Driver, (2) Vehicle, (3) Crash, and (4) Safety Management. The data that feed the Agency's measurement system derive from the safety violations discovered through the over three million roadside inspections

3

conducted annually by State enforcement personnel, as well as from the motor carrier crash reports they provide.  In measuring a motor carrier's safety performance, SafeStat looks at only those roadside violations that result in Out-of-Service Orders, even though many more violations are discovered during these safety checks and even though that data  are available in FMCSA's Motor Carrier Management Information System (MCMIS).  Also included are certain moving violations and crash reports. In SafeStat, none of the violations are weighted based on their relationship to crash risk.

6.     The new SMS, by contrast, includes all safety violations discovered at roadside.  It also weights each violation based on its crash risk.  SMS also measures safety performance in seven Behavior Analysis Safety Improvement Categories (BASICs), as opposed to the four SEAs under SafeStat. The seven BASICs are: (1) Unsafe Driving, (2) Fatigued Driving (Hours-of-Service), (3) Driver Fitness, (4) Controlled Substances/Alcohol, (5) Vehicle Maintenance, (6) Cargo-Related, and (7) Crash Indicator.  By looking at all of the safety violations and grouping them into more categories related to unsafe behavior, SMS provides a more comprehensive, robust and granular view of the specific violations incurred by motor carriers and individual drivers.  SMS enables FMCSA to obtain a clearer carrier safety profile and more readily identify high risk carriers, and specific safety problems that are not identified today through SafeStat.

4

7.     Pursuant to section 4138 of the Safe, Accountable, Flexible, Efficient

Transportation Equity Act:  A Legacy for Users, Pub. L. 109-59 (Aug. 10, 2005)

(SAFETEA-LU), FMCSA is obligated to conduct compliance reviews on those

motor carriers whose performance data demonstrates that they pose the highest

safety risk.  To establish a concrete metric within the current enforcement model,

Congress required FMCSA to conduct compliance reviews on carriers that

appeared on the SafeStat category A or B list, the highest risk categories in

SafeStat, for two consecutive months.

8.     The new SMS continues to identify and prioritize motor carriers for

compliance reviews, but it more effectively identifies those motor carriers that

pose the highest crash risk and ensures that FMCSA is able to intervene with those

carriers first.  In addition, SMS provides investigators with a wider array of

intervention tools, including warning letters, direct notices of violation, off-site

compliance reviews, focused compliance reviews, and full on-site compliance

reviews.  Because the new BASICs provide a clearer picture of the specific areas in

which a carrier has performance problems, safety investigators will be able to

target the types of intervention actions they take, and will no longer need to

conduct time-consuming, full compliance reviews on every carrier.  Not only will

this allow the agency to better use its limited resources and reach many more

carriers, the process will identify carriers for earlier intervention, often obviating

the need for a full compliance review, and ultimately allowing a carrier to correct potential safety deficiencies before the motor carrier becomes a high crash risk.

9.      The new SMS enables FMCSA to identify for closer examination and early intervention a whole new set of motor carriers with potential safety problems – those with limited on-road performance deficiencies that are not identified today through SafeStat. Most importantly, SMS enables FMCSA to identify carriers with the highest crash risk as demonstrated by the Effectiveness Study slides attached as "Attachment 1." The effectiveness study results, gathered during the operational model test,[2] reveal that SMS identifies 25% more high risk carriers and those carriers have 56% more crashes than the carriers identified on the SafeStat A or B lists today.  In a recent op-ed piece (see "Attachment 2" attached), the Commercial Vehicle Safety Alliance (CVSA), an international not-for-profit organization composed of local, state, provincial, territorial and federal motor carrier safety officials and industry representatives from the United States, Canada, and Mexico, declared SMS a significant improvement over SafeStat for purposes of identifying high risk carriers.  SMS is thus a key tool that will enable the Agency to more effectively accomplish its mission of reducing large truck and bus crashes.

---

[2] In 2008 the Agency embarked upon a 30-month field test of the new operational model.  The preliminary results of the Op-Model Test are discussed in greater detail in paragraph 17, *infra.*

**FMCSA Retains Enforcement Discretion Within SMS Prioritization Scheme**

10.     Under CSA implementing policies, FMCSA and State enforcement personnel retain necessary operational flexibilities and discretion with respect to both carrier prioritization and assignment of the appropriate intervention (e.g., Full Compliance Review or Focused Compliance Review).

11.     For example, motor carriers with BASICs that reach a certain level Alert status are assigned 1 of 3 possible investigation prioritization listings (Investigate 1, 2 or 3) based, in part, on the length of time since their last compliance review. Motor carriers listed on the Investigate 1 prioritization lists receive the highest priority for intervention.  Field personnel are directed to intervene with these carriers before reaching motor carriers on the Investigate 2 and 3 lists "to the extent practical" while taking into consideration factors such as the geographic proximity of motor carriers and travel expenses.  Field managers exercise discretion and judgment in determining the order in which motor carriers will be scheduled for compliance reviews.

12.     Similarly, established FMCSA enforcement policies allow field managers discretion to decide whether to perform a focused or full compliance review.

13.     Lastly, and perhaps most importantly, field personnel are also afforded discretion in interpreting the SMS results overall. In some instances, field

personnel may choose to forgo assignment of a compliance review even when a

carrier has BASICs at Alert status based upon factors such as an observed

downward trend or improvement in a motor carrier's status over recent inspections.

**Necessity for Public Availability of Safety Performance Data**

14.    Another important distinction compelling prompt implementation of CSA

utilizing SMS is the difference in the appearance and relevance of publicly

disseminated safety performance data between the two systems.  When FMCSA

transitions to SMS for enforcement prioritization, the SafeStat results upon which

the public relies will no longer be available.  FMCSA freely acknowledges that

public display of safety performance data creates an incentive for the motor carrier

industry to comply with safety regulations and to sustain compliance, and it has

used this incentive for over a decade.[3]   In the past year alone, FMCSA recorded

nearly 4 million hits on the SafeStat public site.  The information provided assists

motorcoach passengers, shippers, individuals moving household goods, schools,

tour groups and myriad other consumers in weighing the relative risks involved in

selecting transportation for themselves or their goods against the cost of the

_____

[3] The Agency has displayed the SafeStat information to the public since 1999, with the exception of the Accident SEA, which will continue to be withheld from public display until further notice.  Currently, the accident data FMCSA receives from the states does not include information relevant to whether the motor carrier was responsible for the accident.  FMCSA decided to withhold accident data until a more satisfactory means for determining accountability is developed.

transportation.  Insurance companies also rely upon the data to assist company underwriters in assessing the risk associated with insuring a particular motor carrier.

15.     The new SMS will provide the public with a more accurate view of a motor carrier's on-road performance using the same underlying data used today in SafeStat today.  SafeStat, however, uses older data in its evaluation of a motor carrier's current on-road safety performance.  And SMS calculates BASIC scores by weighing the information available from crash and inspection reports over the preceding 24 months and compliance review data from the past 12 months.  In contrast, the enforcement data used to calculate SEA scores in SafeStat go back as far as 6 years.  The crash and inspection data used in SafeStat is from the previous 30 months, and compliance review data are retained for 18 months.  The data evaluated in SMS are thus more recent and better reflect the carrier's current on-road performance and status.

16.     In the event FMCSA is prohibited from making the SMS data publicly available as scheduled, the Agency would be faced with one of two unfavorable options.  It could either maintain the current public SafeStat system while keeping the SMS scores from public view, or it could pull down all motor carrier safety performance data.  From a strictly technical standpoint, the Agency cannot actively operate both the SMS and SafeStat systems in its enforcement systems information

9

technology environment.  The internal enforcement information technology system can support only one measurement system.  In order to use SMS internally for enforcement identification and prioritization, while allowing the public to view SafeStat results, the Agency would have to separately run and process SafeStat results.  As a consequence, the Agency would be producing artificial data for public view.   Because the Agency would be using SMS for enforcement purposes, the SafeStat scores would have no significance other than as an outdated safety performance measure for the public to consider when weighing risks.  The measure would not reflect the likelihood of FMCSA or State investigation or enforcement action against the carrier.  Further, the Agency would be creating public reliance on "performance" data that does not accurately reflect the Agency's best knowledge and analysis regarding the carrier's current on-road safety performance.  Alternatively, if the Agency were to shut down the public view of the data entirely, it would take a vital public resource away from the millions who currently view and use the data.

## **Enforcement Efficiencies Gained through the CSA Op-Model Test**

17.    June 30, 2010 marked the successful completion of the CSA Op-Model Test, a 30 month field test that FMCSA undertook in 9 States.  Initial results of the test indicate gains in enforcement efficiency, and research has demonstrated that

efficiency improvements led to measureable safety improvements later on. Notable efficiency gains from the Op-Model Test are as follows:

- FMCSA issued more than 6,600 warning letters, and 51% of recipients logged in to review their safety data and analysis.

- Safety Investigators conducted up to 35% more carrier investigations per Safety Investigator by employing the full array of safety investigations:

  - Onsite Investigation – Comprehensive: 30%

  - Onsite Investigation– Focused: 45%

  - Offsite Investigation: 25%

- FMCSA followed up on investigation findings with more carriers and drivers:

  - Nearly 50% of investigations resulted in a Notice of Claim, Notice of Violation  or Cooperative Safety Plan, compared to approximately 35% using the existing enforcement model.

  - The number of driver enforcement actions per Safety Investigator has increased.

## Improvements and Refinements to the Safety Management System

18.     FMCSA initially intended to maintain SMS terminology similar to the

terminology used in SafeStat.  For example, if a motor carrier's performance

exceeds the Agency's predetermined threshold in SafeStat the public will see that

the motor carrier is "Deficient" in that SEA.  In response to public comments

indicating that the "Deficient" label could be perceived as a safety fitness

determination, however, FMCSA decided to change the SMS term to "Alert."

Further, the Agency added more prominent disclaimer language to the SMS public

site than what is currently used in SafeStat.  The proposed disclaimer language

guides the public on how SMS data or information should be interpreted.  Upon

release of the public SMS site no sooner than December 12 the public will be

cautioned with the following disclaimer:

> The Federal Motor Carrier Safety Administration's Safety
> Management System (SMS) is an automated data system used by
> FMCSA to monitor motor carrier on-road safety performance.
> FMCSA analyzes safety performance by grouping carrier data in the
> SMS into seven Behavioral Analysis and Safety Improvement
> Categories (BASICS) which are, in turn, used to identify potential
> safety problems with individual carriers and determine when an
> enforcement intervention might be appropriate.  The data and
> BASICS are used by the enforcement community to prioritize
> investigations and roadside inspections.  The SMS data system is not a
> Safety Fitness Determination (SFD), is not a Safety Rating pursuant to
> 49 C.F.R. Part 385, and does not represent FMCSA's final
> determination regarding the accuracy of the data contained in the
> SMS.  Use of the SMS data system for purposes other than those
> identified above may produce unintended results and inaccurate

conclusions.  FMCSA highly recommends that all motor carriers
periodically review the SMS data system and when necessary verify
the accuracy of their SMS data through DataQs, an electronic data
correcting system in which carriers can file challenges to the data
accuracy.  The DataQ system is available online at
https://dataqs.fmcsa.dot.gov/login.asp.

The Agency also adjusted severity weights for several violation types and adjusted

the exposure metrics for Unsafe Driving, Crash, and Drug and Alcohol BASICs.

Recently, the Agency responded to data submitted by members of the industry and

made the decision to withhold the Cargo Securement BASIC score.  FMCSA made

these important changes to balance the interest of the public in motor carrier safety

against the concerns of the motor carrier industry about terminology.

19.     The Agency has considered how the move from public display of safety

performance on SafeStat to SMS will impact both large and small carriers.

FMCSA determined that the number of carriers with a ***deficient*** SEA score under

the current SafeStat system is approximately 50,000.  Similarly, the number of

motor carriers with a BASIC ***alert*** status under SMS is approximately 51,000.

Further, FMCSA found that there was no disproportionate impact on any particular

sized carrier group between the two systems. (See Tables below):

13

| Group | Power Unit | Percentage of motor carriers in this group with 1 or more SEAs "deficient" under current SafeStat system | Percentage of motor carriers in this group with 1 or more BASICs at "alert" status under the CSMS |
|---|---|---|---|
| 1 | 0< PU<=5 | 7.1% | 7.4% |
| 2 | 5<PU<=15 | 22.2% | 20.7% |
| 3 | 15<PU<=50 | 29.4% | 30.0% |
| 4 | 50<PU<=500 | 28.7% | 39.4% |
| 5 | 500<PU | 22.1% | 51.4% |
| | Overall Percentage of carriers with deficient SEA or BASIC at Alert status | 10.1% | 10.3% |

| Group | Power Units | Number of motor carriers with 1 or more SEAS identified as "deficient" under the current SafeStat system | Number of motor carriers with recent activity that have 1 or more BASICs identified as being at "alert" status under the CSMS |
|---|---|---|---|
| 1 | 0< PU<=5 | 29,488 | 30,553 |
| 2 | 5<PU<=15 | 12,162 | 11,338 |
| 3 | 15<PU<=50 | 6,071 | 6,184 |
| 4 | 50<PU<=500 | 2,069 | 2,840 |
| 5 | 500<PU | 139 | 323 |
| | Overall Number of Carriers with deficient SEA or BASIC at Alert status | 49,929 | 51,238 |

20.     In developing the SMS algorithm the Agency considered formulas most likely to produce scores that would assist the Agency in identifying those motor carriers with the highest crash risk.  As is the case with the SafeStat Driver SEA, motor carriers whose drivers must maintain records of duty status and motor carriers whose drivers are not subject to this requirement grouped together in the

SMS Driver Fatigue BASIC. Effectiveness testing has demonstrated, however, that motor carriers with problematic scores in the Driver Fatigue BASIC have much higher future crash rates than carriers that score well. This correlation likely exists because a motor carrier's failure to document driving and on-duty time tends to reflect a general lack of safety management controls. Even "record keeping" violations, if habitual, are often clues of a more substantive hours-of-service problem. The SMS Driver Fatigue BASIC thus creates an overall effective indicator of carriers most likely to have crash problems.

## Public Engagement was a Cornerstone of the Development of CSA

21.     The Agency has actively engaged the motor carrier industry, safety organizations, shipping groups, other stakeholders and the general public regarding CSA for over 6 years. Some of the safety gains realized during the Op-Model Test of CSA can be attributed in part to the partnership between FMCSA, industry and the public in the program's development. From the outset, the Agency has been transparent with its development of CSA.

22.     On August 20, 2004 the Agency announced a series of listening sessions and provided an overview of the operational model in the Federal Register (69 Fed. Reg. 51748). Over the course of the following two months FMCSA held listening sessions in San Diego, Dallas, Atlanta, Chicago, Falls Church, VA and Springfield,

MA.  The Agency followed these initial listening sessions with additional listening sessions and webinars in 2006, 2007, 2008, and 2009.

23.     In response to public comments received as a result of the listening sessions, FMCSA changed course on some of its regulatory efforts.  In particular, on November 7, 2005, FMCSA withdrew a 1998 advance notice of proposed rulemaking related to the future evolution of the safety fitness rating system.  (70 Fed. Reg. 67405).  FMCSA started planning to publish a rulemaking proposing a new and improved safety compliance methodology based on more recent information in conjunction with CSA 2010.  FMCSA plans to publish a notice of proposed rulemaking in the near future proposing a new safety fitness rating methodology.

24.     The Agency has also undertaken an extensive outreach program, targeting specific stakeholder groups, including small trucking companies and other interested parties.  In the past 18 months, FMCSA Leadership and officials from the CSA 2010 Development Team and other offices have given over 350 live presentations.  The Agency has also mailed 375,000 fact sheet fliers directly to motor carriers.  FMCSA is currently using two radio spots on SIRIUS/XM radio to get the facts out and answer questions from truckers directly.  FMCSA is producing pocket cards, tent cards, and signs to be placed in truck stops to describe

CSA.  The Agency also has a website filled with information from FAQs, Factsheets, Presentations, and "What's New" releases.   FMCSA has also responded to numerous letters from drivers, carriers, and associations where we have been able to explain the program.

25.    FMCSA described the SMS methodology in detail in a Federal Register notice over two years ago.  73 FR 53483, 53485 (Sept. 16, 2008).  The methodology has also been posted on the Agency's Website since June 2009.  On April 9, 2010, FMCSA published in the Federal Register an announcement advising the public that details of the new data system were available on the Agency's Website.  The notice also explained how individual carriers could obtain a preview of how their own safety performance data would be reflected in the new system before the system went public, and it invited public comment.  75 Fed. Reg. 18256-18258.  The Agency also posted notice of the SMS data preview on the separate CSA 2010 website and announced the preview in stakeholder meetings and to the trade press.  To date, however, only approximately 5 percent of motor carriers have accessed the SMS to preview their scores.

## CSA Has Garnered Full Support from the Regulated Community and Law Enforcement

26.    As evidenced by recent comments from the American Trucking Associations ("Attachment 3") and the Commercial Vehicle Safety Alliance ("Attachment 2"),

and Congressional testimony of Todd Spencer, Executive Vice President, Owner-Operator Independent Drivers Association ("Attachment 4") last summer, CSA enjoys full support from both the regulated community and law enforcement. Hundreds of individual motor carriers have also reacted positively to CSA warning letters by logging into the system to review their performance data or by calling enforcement officials to discuss their plans for concrete steps to improve their safety performance. In some instances, motor carriers have written unsolicited letters to demonstrate their corrective action as illustrated by the examples attached as "Attachment 5".

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 5, 2010.


/s/   William A. Quade_____

William A. Quade

Associate Administrator for

Enforcement and Program Delivery

**ATTACHMENT 1
QUADE DECLARATION**

**SMS Fatigue Driving BASIC Percentile and Crash Rate**



**Effectiveness SMS High Risk vs. SafeStat High Risk**

## Effectiveness Study

| High Risk Results | SafeStat AB List | CSMS-Based High Risk List | % Improvement over AB |
|---|---|---|---|
| # Carriers | 5,755 | 7,205 | 25% |
| # Crashes | 6,783 | 10,561 | 56% |
| Straight Segment Crash Rate* | 6.4 | 9.7 | 52% |
| Combo Segment Crash Rate* | 18.1 | 19.2 | 6% |

¹ Weighted Crashes per 100 Adjusted PU

- Identifies 25% more carriers with 56% more crashes than the SafeStat AB List
- Higher crash rate in both carrier segments

2    Training Presentation – Fall 2010
CSA 2010







## Op-Ed

Government and law enforcement agencies at the state and local levels are continuing to be fiscally challenged with respect to resources being made available for highway safety activities. The public — and rightly so — has an expectation that a basic responsibility of government is to keep our citizens traveling the roadways safe and secure. The challenge unfortunately is all too often public safety is one of the first areas of government to be cut when budgets are tight.

Using performance data to reveal which motor carriers and drivers are not complying with safety rules allows inspectors and other law enforcement personnel to more effectively focus on and remove the most unsafe drivers, vehicles and carriers from the nation's roadways, saving countless lives in the process.

The Commercial Vehicle Safety Alliance (CVSA) is a strong advocate of the Federal Motor Carrier Safety Administration's Compliance, Safety and Accountability (CSA) program's use of performance data to identify the nation's most high-risk carriers. There is clear evidence that links the CSA Behavior Analysis and Safety Improvement Categories (BASICs) and its associated Safety Measurement System (SMS) with increased crash risk. Providing enforcement the ability to use this data is common sense and allows them to keep an eagle eye on those that do not comply.

CSA helps to prioritize carrier interventions through the use of additional metrics more so than in the past, including all safety-based roadside inspection violations, enforcement actions, crash data and violation histories and will update these data more frequently. This is good news as it will allow interventions on high-risk operators to occur sooner than what had been the case in the past, ultimately saving more lives in the process.  On August 16, 2010, FMCSA began providing carriers with information about where they stand with the new CSA SMS based on roadside inspection data and investigation findings. To date, only 5 percent of the motor carrier population has viewed their data (access can be gained online at http://csa2010.fmcsa.dot.gov).

While SafeStat has been an effective safety tool for public and private stakeholders alike — and the data has been publicly available for more than a decade — CSA goes even farther at helping to identify those carriers with the most severe compliance and performance problems and in need of further attention. The CSA effectiveness study has revealed that the SMS high-risk carrier list has identified 25% more high-risk carriers who have been involved in 56% more crashes than what was the case with the SafeStat high-risk list.

By implementing CSA federal and state inspectors and investigators are improving on their ability to proactively address the issues that are most likely to contribute to crashes and cause injuries and deaths related to large truck and bus crashes. The pilot program experience in the states (CO, DE, GA, KS, MD, MN, MO, MT, NJ) has shown that we can effectively "reach" more carriers, which is a good thing and is an improvement over what has been the case in the past. The experience in the pilot states by both enforcement and industry has by and large been very positive. We wholeheartedly applaud FMCSA for their leadership and for being as transparent as they have with CSA and appreciate the level of engagement throughout the development of CSA. They have brought everyone into the tent to create an environment to help promote government, law enforcement and industry's common goal of saving lives — it has been and will continue to make a difference.

- ■   Stephen A. Keppler, Executive Director
    Commercial Vehicle Safety Alliance

*CVSA is an international not-for-profit organization comprised of local, state, provincial, territorial, and federal motor carrier safety officials and industry representatives from the United States, Canada, and Mexico. Our mission is to promote commercial motor vehicle safety and security by providing leadership to enforcement, industry and policy makers. The Alliance actively monitors, evaluates, and identifies solutions to potentially unsafe transportation processes and procedures related to driver and vehicle safety requirements most often associated with commercial motor vehicle crashes. In addition, CVSA has several hundred associate members who are committed to helping the Alliance achieve its goals; uniformity, compatibility and reciprocity of commercial vehicle inspections, and enforcement activities throughout North America by individuals dedicated to highway safety and security. For more on CVSA, visit www.cvsa.org.*

**ATA**
AMERICAN TRUCKING ASSOCIATIONS

**TRUCKLINE**
Special Edition

USCA Case #10-1402     Document #1281854     Filed 12/06/2010     Page 45 of 173

Monday, November 29, 2010

**ATA CONTINUES TO SUPPORT IMPLEMENTATION OF CSA 2010**
As FMCSA prepares to implement the first phase on CSA 2010 on Monday of next week, ATA reiterates its support for the program and its objectives. However, many ATA members and affiliated organizations have been encouraged to join initiatives led by two transportation attorneys who hope to block public availability of carriers' CSA 2010 scores. If not successful in persuading FMCSA to do so, the groups have pledged to file suit in D.C. Circuit Court later this week.

While ATA continues to have some concerns with the CSA 2010 methodology, we will not be joining these groups in their efforts. ATA Vice President and Chief Counsel Bob Digges and outside counsel have evaluated the merits of the attorneys' legal arguments and believe those arguments have a very limited chance of being successful. Further, ATA believes greater gains can and have been made by working with the agency to make needed improvements to ensure that scores are both fair and accurate. In those categories where the accuracy of scores is questionable (the *Crash Indicator* and *Cargo-Related* BASIC) scores should appropriately be kept from public view.

FMCSA has demonstrated a willingness to respond to ATA's concerns with CSA 2010. In August, the agency announced that it will use vehicle mileage (rather than only power unit counts) as a measure of exposure. Earlier this month, the agency also announced that it will keep the *Cargo-Related* BASIC scores from public view until the system has been modified to ensure that the scores are more fair and accurate. ATA had strongly advocated for both of these changes. Contact: Rob Abbott at rabbott@trucking.org.

*Truckline is an exclusive benefit for ATA members and may be reproduced for internal distribution only.*
*Direct questions or comments to Susan King at 703-838-1925.*

**ATA**

ATTACHMENT 4
QUADE DECLARATION

Testimony of

**TODD SPENCER**
**EXECUTIVE VICE PRESIDENT**
**OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION**

Before the

**UNITED STATES HOUSE OF REPRESENTATIVES**
**SUBCOMMITTEE ON HIGHWAYS AND TRANSIT**

Regarding

**"COMPREHENSIVE SAFETY ANALYSIS 2010: UNDERSTANDING**
**FMCSA's NEW SYSTEM OF MOTOR CARRIER OVERSIGHT"**

**JUNE 23, 2010**

∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗

Submitted by



**Owner-Operator Independent Drivers Association**
**1 NW OOIDA Drive**
**Grain Valley, Missouri 64029**
**Phone: (816) 229-5791**
**Fax: (816) 427-4468**

Good morning Chairman DeFazio, Ranking Member Duncan and distinguished members of the Subcommittee. Thank you for inviting me to testify this morning on the Federal Motor Carrier Safety Administration's Comprehensive Safety Analysis 2010 initiative. To say the least, that program is of great interest to the small business trucking professionals and professional truck drivers that comprise the membership of the organization I am here to represent.

My name is Todd Spencer. I have been involved with the trucking industry for more than 30 years, first as a truck driver and an owner-operator, and then as a representative for small-business trucking professionals. I am currently the Executive Vice President of the Owner-Operator Independent Drivers Association (OOIDA).

OOIDA is a not-for-profit corporation established in 1973, with its principal place of business in Grain Valley, Missouri. OOIDA is the national trade association representing the interests of independent owner-operators and professional drivers on all issues that affect small-business truckers. The more than 156,000 members of OOIDA are small-business men and women in all 50 states who collectively own and operate more than 200,000 individual heavy-duty trucks. The Association actively promotes the views of small business truckers through its interaction with provincial, state and federal regulatory agencies, legislatures, the courts, other trade associations and private entities to advance an equitable business environment and safe working conditions for commercial drivers.

The majority of trucking in this country is small business, as 96% of all carriers have less than 20 trucks in their fleet and 86% of carriers have fleets of just 6 or fewer trucks. In fact, one-truck motor carriers represent nearly half of the total number of motor carriers operating in the United States. These small business motor carriers have an intensely personal and vested interest in highway safety as any safety-related incident may not only affect their personal health, but also dramatically impact their livelihood. As such, OOIDA sincerely desires to see further improvements in highway safety and significant progress towards the highway safety goals of the Subcommittee and the U.S. Department of Transportation.

OOIDA believes that the Comprehensive Safety Analysis 2010 (CSA 2010) initiative has the potential to be a major step in the right direction for FMCSA's safety and enforcement efforts. As the program is currently being proposed, we believe it will help the agency to identify motor carriers whose operations are not in line with appropriate safety practices and to apply necessary corrective actions.

For too long, FMCSA's enforcement priorities focused primarily on targeting truck drivers at roadside inspections. While truck drivers certainly should be held accountable for their actions, roadside enforcements alone will not raise the level of safety in the trucking industry. Under CSA 2010, the agency is shifting its main focus from the driver to other stakeholders in the industry and recognizing that drivers often are not the principal decision makers in the shipment of goods. The idea of shared responsibility for safety represents a more accurate reflection of how the industry should function. While motor carriers are subject to tremendous pressures to meet unrealistic demands from the shipping

community, they are in a far better position to control factors that may result in regulatory noncompliance than are truck operators. By expanding the focus of enforcement activities to hold motor carriers more accountable, positive changes in the industry are certain to occur. CSA 2010 has the potential to help bring about these changes.

Unfortunately, numerous myths have been circulating within the trucking community concerning CSA 2010 and the supposed dire effect it will have on drivers, motor carriers and the industry as whole. For example, some in this room may have heard the popular myth that more than 200,000 drivers will lose their jobs as a result of the program's implementation. OOIDA does not share this Chicken Little "sky is falling" concern. However, we do believe as with any new initiative the devil will be in the final details and that there is room for improvement. That said, FMCSA should be commended for their genuine efforts to work with stakeholders and to keep those stakeholders fully informed of the developing details of the CSA 2010 program.

**Headed in the right direction**

For motor carriers who choose to continue with a "business as usual" attitude by insufficiently training newly hired drivers and failing to implement adequate preventive maintenance programs on equipment, CSA 2010 will quickly bring them under scrutiny and further differentiate those who truly care about safety from those who are indifferent. This is a significant improvement over the current system which really amounts to a "catch me if you can" or "catch and release" enforcement model. Currently, motor carriers may face a compliance review as infrequently as once in a decade or two, if at all. Annually, FMCSA only conducts complete compliance reviews on fewer than 2% of the regulated motor carrier population. FMCSA only issues a safety fitness determination after a complete compliance review is conducted. The chances of a motor carrier being audited and having its operating authority revoked are very slim. That fact helps to foster indifference toward a meaningful safety culture within some carrier operations.

Once CSA 2010 is fully implemented, a motor carrier's safety fitness determination will be automatically tied to actual data from roadside inspections and accidents. It will be adjusted monthly based on the collected data. This is a significant game changer for our industry. Increasingly, shippers, receivers and freight brokers are beginning to stipulate that they will not contract with motor carriers with less than a "satisfactory" rating. We look forward to this becoming the industry standard. In order for FMCSA to alter how they designate a safety fitness determination, the agency will need to go through the rulemaking process and they have indicated to industry that we can expect that process will begin later this year.

In its current status of development CSA 2010 does have some problems, however FMCSA has altered its timeline for implementation in an attempt to not only gain more support from the industry, but to also to "work out the bugs" before the program is fully implemented. We applaud FMCSA's diligence in this matter and believe the implementation timeline should not be set in stone, but rather reflect when the program is truly ready for its full implementation. Otherwise, it will be a failed attempt and create

more chaos, mistrust, and animosity in an already stressed industry. If the program is launched before the agency and the industry are truly ready, we could lose an opportunity to achieve the significant safety improvements the program has the potential to foster.

While CSA 2010 promises to finally hold motor carriers to a much greater level of accountability, as it currently stands it also contains some flaws that can unfairly penalize both a driver and a motor carrier for incidents beyond either's control.

<u>Accident determination</u>.

The CSA 2010 initiative is supported by a new Safety Measurement System (SMS) which is made up of six Behavior Analysis and Safety Improvement Categories (BASICs) and a Crash Indicator. Data, collected from inspections and crashes, is first processed through the SMS which then applies an algorithmic calculation to assign the motor carrier a numerical and percentile ranking amongst a peer group of similar motor carriers. However, the old saying "garbage in, garbage out" can apply to improperly vetted data and unfairly affect a motor carrier's business. For example, if a driver has properly stopped his truck at a stop light, but is then rear-ended by another vehicle resulting in a tow-away, injury or fatality, under FMCSA's current methodology, all parties would be entered into the system regardless of fault. Absent proper accountability for accident causation, the innocent are convicted alongside the guilty solely because of their involvement. This deficiency will have significant consequences for both the driver and the motor carrier including potential loss of transportation contracts, loss of employment opportunities and an increase in insurance costs.

Without an "at fault" designation, it is highly probable that drivers involved in crashes, regardless of fault, will not be able to obtain future work. This is a major issue for our industry, an industry that according to the government's own data has never been safer[1]. Crashes unfortunately happen, however, the trucking industry is often unfairly blamed for accidents in which the truck driver was not at fault. In fact statistics show that truck drivers are not at fault in the overwhelming number of accidents in which they are involved.

<u>Challenging incorrect data</u>.

Because CSA 2010 relies upon information retrieved during roadside inspections, it must be a priority that all information entered into the system is timely and accurate. In an attempt to ensure data integrity, FMCSA makes the DataQ system available to drivers and motor carriers so that inaccuracies may be challenged. This system is necessary and should be further developed as OOIDA has reviewed many instances where drivers have received invalid violations. For instance, we have seen drivers cited for hours-of-service violations (falsification) because their logs did not match the time zone they were

---

[1]The key metric, fatalities per hundred million miles traveled has steadily declined from a peak of over 5 in 1980 to 1.86 in 2008. Source: Federal Highway Administration and "Large Truck and Bus Crash Facts – 2007" provided by U.S. DOT Analysis Division.

operating in.  Under the regulations (§395.8(8)(i)), a driver's "duty status record shall be prepared, maintained, and submitted using the time standard in effect at the driver's home terminal."  While it is necessary to have a system allowing for data challenges, the current problem with the DataQ system is that the challenge is referred back to the police agency that originally issued the violation and if that agency refuses to correct a mistake there is no additional appeals process to remove erroneous violations from the public record.

Warnings versus citations.

The concern by some in the industry is that CSA 2010 will change the current law enforcement system which relies on the issuance of "warnings" to drivers during inspections in favor of a system where citations are issued regularly even for the most minor and routine violations.  Under the current system, many law enforcement officers issue a warning as a way to document the stop or inspection although technically they have the right to issue citations for any infraction.  Officers typically exercise their discretion with an understanding that issuing citations for every penalty is excessive and unnecessary.  However, CSA 2010 documents both the issuance of warnings and the issuance of citations.  A warning cannot be appealed, whereas a citation can disappear from public record through due process.  Therefore, warnings will stay in the system in perpetuity while citations at least have the potential to be purged.  On its face this seems inequitable but the fear is that officers, who need to document the stop, will issue a citation in an effort to at least allow for an appeal.  CSA 2010 should differentiate between warnings and citations.

## Trucking community myths about CSA 2010

As previously mentioned, FMSCA should be applauded for attempting to dispel myths running rampant through the industry about their initiative.  The agency has reached out to stakeholder organizations, distributed flyers such as "CSA 2010: Just the Facts"[2] and engaged in a media campaign in an effort to get correct information in the hands of drivers and trucking companies.  Despite their efforts some myths continue to circulate in the trucking community.

Establishing a driver safety rating system.

One of the biggest fallacies surrounding CSA 2010 implementation is that drivers have already been assigned a specific safety rating by FMCSA that will be publically available, similar to carrier SafeStat scores.  This is patently false and has spawned an entire cottage industry of software providers purporting to be able to predict how a driver will rank.  Many motor carriers are using these software programs to "rate" drivers, which is not accurate because there is not a database of drivers nationwide.  A motor carrier can certainly develop a driver rating profile applicable to their own company, but not based on the entire driver pool.  While CSA 2010 does contain a Driver Safety Measurement System, this is not a ranking system.  Moreover, FMCSA lacks the authority to establish

---

[2] *See*: http://csa2010.fmcsa.dot.gov/documents/JustTheFacts.pdf

such a safety rating system of commercial truck drivers. If Congress ever pursued granting FMCSA with the authority to create such a system, OOIDA would certainly oppose for a variety of reasons including personal privacy. Drivers and motor carriers are being misinformed about this mythical rating system and further efforts should be made to put an end to that misplaced fear.

**Conclusion**

There has been much misinformation communicated within the trucking industry concerning FMCSA's Comprehensive Safety Analysis 2010 initiative or "CSA 2010." Much of the information seems to have purposely distorted the basic goal of this initiative – improving highway safety.

For too long, drivers seem to have been the sole focus of enforcement at roadside. The large motor carrier community actually encouraged this one dimensional view because it allowed them to shirk their shared responsibility for having adequate safety management practices in place.

CSA 2010 will hold a motor carrier immediately responsible for actions of their drivers on the highway. Once the initiative is fully implemented, motor carriers' safety ratings will be tied to actual data from roadside inspections as opposed to the current practice where they may face an introspective review of their safety practices once in a decade – if even then.

For motor carriers that choose to continue with business as usual through insufficient training of their new drivers and failure to implement genuine preventive maintenance programs on equipment for which they own, CSA 2010 will very quickly be able to determine their indifference to good safety management practices. This is a significant improvement over the current system which really amounts to a "catch me if you can" enforcement model.

Thank you for this opportunity. I will be happy to respond to any questions.

**STC**

Sage Telecommunications Corp.

Mr. John Van Steenburg
Director, Office of Enforcement and Compliance
U.S. Department of Transportation
Federal Motor Carrier Safety Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

July 9, 2009

Dear Mr. Steenburg:

We am writing in response to your letter dated June 12, 2009. Please refer to USDOT
Number 1591067, PIN 1E55RA6R, Sage Telecommunications Corp. of Colorado, LLC.
Your letter expressed concern regarding our safety data record. We are aware of our
safety data record and would like to share the following information with you.

On October 30, 2008, representatives from Sage including both of us, met with Trooper
Alan Rice from the Colorado State Patrol for a Safety Audit. As a result of the Safety
Audit, we became very aware of areas where the Company needed improvement. Since
that time we have taken the actions to improve, including:

- Joined the Colorado Motor Carriers Association (CMCA) to receive access to
  DOT training, regulatory changes, etc.
- Trained various employees in CMCA seminars for Files and Recordkeeping,
  Brake Certification and Out of Service Criteria
- Trained Sage drivers on proper vehicle inspection procedures including load
  securement; please note this training was provided by the Colorado State Patrol,
  Troopers Alan Rice and Cody Abernathy
- Certified Sage drivers (except CDL drivers) by road testing with a professional,
  third party
- Improved the company's process for Driver's Vehicle Inspection Report so that
  information flows better between driver and mechanic
- Hired a fleet mechanic with inspector qualifications per regulation 396.19; this
  individual has implemented an improved systematic and periodic inspection and
  maintenance program
- Increased the number of CDL drivers on staff from 8 to 11
- Implemented a driver incentive program for successfully passing Level I
  inspections
- Joined a consortium for random drug testing of CDL drivers

*Telecommunications Construction, Engineering and Technical Services*

**SAGE TELECOMMUNICATIONS CORP. OF COLORADO, LLC.    5790 EUDORA STREET, COMMERCE CITY, COLORADO 80022**
**PHONE 303.227.0986    FAX 303.227.0991**

**STC**

Sage Telecommunications Corp.

We sincerely believe that we have taken appropriate steps and improved our program significantly. However, we are frustrated that these actions are not reflected on our safety data record. Our drivers have stopped at ports, but do not receive Level I inspections. Instead, a short review of the vehicle is conducted, but no passing grade is input to the system. If a violation is found, we receive a ticket and negative input. Therefore, our safety record does not show improvement.

I have discussed this issue at length with several people including Trooper Rice, Alan Rutledge (Department of Revenue, which oversees the Motor Carrier Services and State Patrol) and Ray Gassaway (Federal Motor Carrier Safety Administration, Colorado Division). Your assistance or advice as to how we can solve this problem would be appreciated.

Sincerely,

Betsy Hoaglund
Co-Owner

Roger Hoaglund
Co-Owner

Cc: Trooper Alan Rice via email at Alan.Rice@cdps.state.co.us

*Telecommunications Construction, Engineering and Technical Services*

**SAGE TELECOMMUNICATIONS CORP. OF COLORADO, LLC.   5790 EUDORA STREET, COMMERCE CITY, COLORADO 80022**
**PHONE 303.227.0986   FAX 303.227.0991**



# METRO ALLOYS INC.

**1024 Sampler Way. East Point, Georgia 30344. (404) 753-6063. Fax (404) 753-5409**

June 24, 2008

U.S Department of Transportation
Federal Motor Carrier Safety Administration
1200 New Jersey Ave., S.E.
Washington, DC 20590

Attention:     William A Quade
                Associate Administrator for Enforcement and Program Delivery

Re:           Improper Loading/Cargo Securement USDOT# 307156

Dear Mr. Quade:

I am writing you in regards to the letter that I had received from your department concerning our safety performance record, specifically in the area of improper loading/cargo securement. Metro Alloys, Inc. takes great pride in our safety standards within the company, and our saferstat record with the FMCSA. Upon receiving this letter we immediately met with senior management and began to formulate an Action Plan to alleviate this disheartening safety record.

Metro Alloys, Inc. is in the scrap recycling industry, which makes it difficult to control how our customers fill the scrap containers provided on site. In some cases, we do not know the weight of the load until our truck leaves the customer and proceeds over to a nearby public scale to check if it is legal or not. By all means, Metro Alloys, Inc. is not trying to make excuses. Our entire team here at Metro Alloys will work together with our customer base to determine which customers need attention in terms of scheduling more frequent pick-ups or utilize different types of equipment to haul scrap loads at a safe and legal operating standard.

We are asking the FMCSA to grant Metro Alloys, Inc. time to work on this matter. Metro Alloys, Inc. will make every effort to rectify this safety sensitive issue.

Sincerely,

Robert Woljevach
Fleet & Safety Director

cc:     Neil Berman, President
        Bruce Berman, Vice President
        Ozzie Berman, Vice President
        Marvin Fish, General Manager
        Michael Jefferson, Logistics Manager



DEPARTMENT OF TRANSPORTATION
FEDERAL MOTOR CARRIER
SAFETY ADMINISTRATION

SEP 0 9 2008

**RECEIVED**
JEFF. CITY, MO

August 7, 2008

U.S. Department of Transportation
Federal Motor Carrier Safety Administration
1200 New Jersey Ave., S.E.
Washington, DC 20590

RE: USDOT 422109

Dear Sir or Madam:

I am in receipt of your letter dated June 10, 2008. I have reviewed the findings from your website, and wonder if the "no violation" inspections are also included in your records:

In 2006 I see that we had 11 Vehicle Inspections with only 2 out of service.
In 2007 I see that we had 7 Vehicle Inspections with only 1 out of service.
In 2008 thus far we have had 6 Vehicle inspections with 2 out of service.

**With respect to the out of service drivers counting both unsafe and fatigued:**

We had a total of five different drivers in eight counts (some being the same), we now only employ one driver. That one driver had an unsafe violation back on 5/23/06 and nothing since.

In 2006 we had two speeding tickets (we do govern our truck speed), and two log book violations (one of those was not having the shipper information written on the log). One was put out of service for driving over 10 hours.
In 2007 we had one speeding, one seatbelt (driver had already unhooked his seatbelt to reach around for his log book for the officer), one over hours, and one duty status not current.
In 2008 – We have had no unsafe driver violations

**TRUCK LINES, INC.**



*Corporate Office*
P.O. Box 1387 • Blue Springs, Missouri 64013 • 816-229-6071
*Terminal*
16519 E. Truman Road • Independence, Missouri 64050 • (816) 257-2042 • Fax (816) 257-4807



**With respect to the out of service vehicles:**

In 2006 – One vehicle had brake violations.

In 2007 – We had a vehicle that had air suspension pressure loss. This was in a particularly cold part of the winter and on his initial pre-trip inspection all was working properly. A piece of ice lodged into the air valve and caused the air bags to deflate about the time he arrived at the state scales. This was resolved by warming the ice blockage and it performed normally from there on.

In 2008 – We were stopped locally (Kansas City DOT) and found to have a low air warning device not working – with the truck turned off. The light came on, just not the audible alarm. This same truck had just a couple of days earlier had new brakes installed. They had been adjusted, but apparently came out of adjustment.

My concern is that it appears to us that our safety is improving with less out of service vehicles and drivers per amount of no violation inspections over the last 30 months.

We strive to have only safe vehicles and safe drivers on the road. **We, under no circumstances, would knowingly place an unsafe truck, trailer or driver on the road and place our employee, and those sharing the road in harms way.**

Please advise how we can improve this situation.

Sincerely,

Allyson Nutt
Operations Manager

# WARD
# ELECTRIC
# COMPANY, INC.     Powerline Construction

February 2, 2009

William A. Quade
Associate Administer for Enforcement and Program Delivery
U.S. Department of Transportation
Federal Motor Carrier Safety Administration
1200 New Jersey Ave. S.E.
Washington D.C. 20590

Dr. Mr. Quade:

This letter is in response to the notice Ward Electric Company received in regards to the
company's vehicle maintenance program. Ward Electric takes safety very seriously and
has made the following adjustments to our vehicle maintenance program:

- Hired a second mechanic who has a background in vehicle maintenance
- Developed a checklist similar to the Annual Vehicle Inspection Report to use
  when inspecting vehicles
- Implemented a three month inspection program for all vehicles
- Vehicles not meeting maintenance guidelines will be placed out of service

Ward Electric Company will continue to strive for compliance with all DOT and FMCSA
regulations. We thank you for bringing this matter to our attention and welcome any
further suggestions.

Sincerely,

Joyce M Ward

Joyce M. Ward, President
Ward Electric Company Inc.

P.O. Box 1057 • Longmont, CO 80502 • 303-682-0066 • Fax 303-682-6443



June 23, 2008

William A. Quade
Associate Administrator for Enforcement and Program Delivery
U.S. Department of Transportation
Federal Motor Carrier Safety Administration
1200 New Jersey Ave., S.E.
Washington, DC 20590

Re: USDOT Number 278049
     Eastern Fresh Freight, Inc.

Dear Mr. Quade:

We have received your letter dated June 10, 2008 regarding the performance of Eastern Fresh Freight in the areas of Unsafe Driving and Fatigued Driving.  We have always recognized the importance of putting safe drivers and equipment on our national highways.

In review of the statistics contained in the website noted in your letter, we find the following:
a.) Fatigued Driving:
There were 34 inspections which tracked 24 of our drivers.  Of the 24 drivers, we had terminated 14 prior to receiving your letter.  Of the 10 that are still employed, all are under both verbal and written warnings pertaining to safe driving habits.
b.) Speeding Violations:
There were 27 violations which tracked 23 of our drivers.  Of the 23 drivers, 16 had been terminated prior to receiving your letter, which included all multiple offenders.  Of the 7 remaining drivers, they all have received both verbal and written warnings pertaining to their safe driving habits.

We have taken aggressive actions to improve our performance and ensure our trucking operations are in full DOT compliance.   Prior to receiving your letter, the following had been implemented:

- We recently hired a new Director of Transportation who has over 40 years of trucking experience in both front line and upper management. He has been in the for hire side of the trucking industry and now brings his expertise into our private fleet operation.
- We have mandated proper driving under the hours of service rules and regulations, and any violators are subject to disciplinary action up to and including termination. A Keller Training film is being shown to all current and prospective drivers to instruct them on proper completion of driver logs and allotted drive time which will further enhance our safety training.
- All of our trucks have had their speed set to run at 65mph on the foot and 68mph on cruise control. This will certainly help reduce our speeding violations.
- We have implemented more stringent requirements for hiring drivers. In addition to the clean MVR requirement, our new Director has now set the standard of a minimum of three years over the road experience. He has processed over 100 applicants and has hired 8 new drivers that meet these requirements and understand their safe driving responsibilities. As you can see, we are being very selective.

Mr. Quade, as you may determine by your website, we maintain our equipment. Our out of service record is very low. We are determined to bring our driver rating well below 50%. We want our rating to be Satisfactory, not Conditional, and we will not rest until that is accomplished.

Our Director of Transportation, Ronald Hettrick, will be our new point of contact person, and he can be reached at (404) 765-9000 extension 1200.

Sincerely,

Jerry Greene
President

# EXHIBIT B

# COMPREHENSIVE SAFETY ANALYSIS 2010



## SAFETY MEASUREMENT SYSTEM (SMS) METHODOLOGY

### Version 2.0

**August 2010**

Prepared for:
Federal Motor Carrier Safety Administration
1200 New Jersey Avenue, SE
Washington, DC  20590

Prepared by:
John A. Volpe National Transportation
Systems Center
55 Broadway
Cambridge, MA 02142





# Preface

This report documents the Safety Measurement System (SMS) methodology developed to support the Comprehensive Safety Analysis 2010 (CSA 2010) Initiative for the Federal Motor Carrier Safety Administration (FMCSA).  The SMS is one of the major tools for measuring the safety of individual motor carriers and Commercial Motor Vehicle (CMV) drivers.  Such measures help identify and monitor safety problems as part of the CSA 2010 safety improvement process.

Many of the concepts used to construct the SMS originated from the SafeStat measurement system.  SafeStat was developed at the U.S. Department of Transportation's John A. Volpe National Transportation Systems Center (the Volpe Center) in Cambridge, MA, under a project plan agreement with the Federal Highway Administration's Office of Motor Carriers, FMCSA's predecessor.  It was designed and tested under the Federal/State Performance & Registration Information Systems Management (PRISM) program in the mid 1990s.  Since then, SafeStat has been implemented nationally to prioritize motor carriers for on-site Compliance Reviews (CRs).  SafeStat output has been made available to the public via the Internet on the Analysis & Information (A&I) website at http://www.ai.fmcsa.dot.gov.

The SMS design builds on the lessons learned from developing and implementing SafeStat for CR prioritization.  However, the SMS also incorporates new CSA 2010 requirements for identifying specific types of unsafe behaviors that the entities exhibit.  A more specialized set of interventions will now address these unsafe behaviors and the system will also expand the use of on-road safety violation data.  In January 2008, FMCSA started an Operational Model (OM) Test of the CSA 2010 Initiative, which includes using the SMS to identify and monitor unsafe carrier and CMV driver behavior in nine states.  Version 2.0 of the Methodology incorporates feedback from the OM Test and was implemented as part of the CSA 2010 Data Preview in August 2010 which provided SMS results to carriers nationally.   Future SMS development will be part of a continuous improvement process based on results and feedback.

The Volpe Center Technical Project Manager for developing the SMS is David Madsen of the System Measurement and Analysis Division of the Center for Safety Management Systems.  Eran Segev, also of the System Measurement and Analysis Division, headed the analysis leading to the SMS design and methodology.  Further technical support was provided by the following Volpe Center staff: Lee Biernbaum, Kevin Gay, Gustaf Lawson, Richard (Kha) Nguyen, Amy Olanyk, Jonathan Pearlman and Scott Smith.

# Table of Contents

List of Figures ................................................................................................................. iii

List of Tables .................................................................................................................. iii

Glossary ........................................................................................................................... v

Glossary ........................................................................................................................... v

1. Introduction ............................................................................................................. 1-1

2. Design of the SMS .................................................................................................. 2-1

    2.1 Description of BASICs and Crash Indicator ................................................. 2-1

    2.2 Data Sources ................................................................................................. 2-2

    2.3 Carrier BASICs Rankings in SMS ............................................................... 2-3

    2.4 SMS Design Features .................................................................................... 2-4
        2.4.1 Violation Severity ............................................................................ 2-4
        2.4.2 Crash Severity ................................................................................. 2-4
        2.4.3 Time Weights ................................................................................... 2-4
        2.4.4 Normalization ................................................................................. 2-4
        2.4.5 Segmentation ................................................................................... 2-5
        2.4.6 Safety Event Groups ....................................................................... 2-5
        2.4.7 Data Sufficiency ............................................................................. 2-5
        2.4.8 Percentile Rank ............................................................................... 2-5

    2.5 Differences Between SafeStat and the SMS ................................................ 2-5

3. CSMS Methodology ................................................................................................ 3-1

    3.1 Unsafe Driving BASIC Assessment ............................................................ 3-1
        3.1.1 Calculation of BASIC Measure ...................................................... 3-1
        3.1.2 Calculation of BASIC Percentile Rank ........................................... 3-3

    3.2 Fatigued Driving (HOS) BASIC Assessment .............................................. 3-4
        3.2.1 Calculation of BASIC Measure ...................................................... 3-5
        3.2.2 Calculation of BASIC Percentile Rank ........................................... 3-6

    3.3 Driver Fitness BASIC Assessment .............................................................. 3-6
        3.3.1 Calculation of BASIC Measure ...................................................... 3-7
        3.3.2 Calculation of BASIC Percentile Rank ........................................... 3-8

    3.4 Controlled Substances/Alcohol BASIC ...................................................... 3-9
        3.4.1 Calculation of BASIC Measure ...................................................... 3-9
        3.4.2 Calculation of BASIC percentile rank ........................................... 3-10

    3.5 Vehicle Maintenance BASIC Assessment ................................................... 3-11
        3.5.1 Calculation of BASIC Measure ...................................................... 3-11
        3.5.2 Calculation of BASIC Percentile Rank ........................................... 3-12

    3.6 Cargo-Related BASIC Assessment .............................................................. 3-13
        3.6.1 Calculation of BASIC Measure ...................................................... 3-13

3.6.2 Calculation of BASIC Percentile Rank............................................3-14

3.7 Crash Indicator Assessment ...............................................................3-15
3.7.1 Calculation of Crash Indicator Measure .......................................3-15
3.7.2 Calculation of Crash Indicator Percentile Rank...........................3-18

4. DSMS Methodology .................................................................................4-1

4.1 Unsafe Driving BASIC and Controlled Substances/Alcohol BASIC Assessment 4-1
4.1.1 Calculation of BASIC Measure .....................................................4-2
4.1.2 Calculation of BASIC Percentile Rank..........................................4-2

4.2 Fatigued Driving (HOS) BASIC and Driver Fitness BASIC Assessment .........4-3
4.2.1 Calculation of BASIC Measure .....................................................4-3
4.2.2 Calculation of BASIC Percentile Rank..........................................4-4

4.3 Vehicle Maintenance BASIC and Cargo-Related BASIC Assessment..............4-5
4.3.1 Calculation of BASIC Measure .....................................................4-5
4.3.2 Calculation of BASIC Percentile Rank..........................................4-6

4.4 Crash Indicator Assessment ...............................................................4-7
4.4.1 Calculation of Crash Indicator Measure .......................................4-7
4.4.2 Calculation of Crash Indicator Percentile Rank...........................4-8

5. Sample SMS Output .................................................................................5-1

6. SMS Report – Summary/Next Steps .........................................................6-4

Appendix A.....................................................................................................A-1

Appendix B.....................................................................................................B-1

## List of Figures

Figure 1-1. CSA 2010 Operational Model.................................................1-1

Figure 2-2-1. BASICs Ranking Process ...................................................2-3

Figure 5-1. CSMS Screenshot...................................................................5-2

## List of Tables

Table 3-1. VMT per PU for Combo Segment.............................................3-3

Table 3-2. VMT per Average PU for Straight Segment ............................3-3

Table 3-3. Safety Event Group Categories for Unsafe Driving BASIC........................3-4

Table 3-4. Safety Event Group Categories for the Fatigued Driving (HOS) BASIC.....3-6

Table 3-5. Safety Event Group Categories for the Driver Fitness BASIC ....................3-8

Table 3-6.  Safety Event Group Categories for Controlled Substances/Alcohol BASIC ..3-10

Table 3-7.  Safety Event Group Categories for the Vehicle Maintenance BASIC ........3-12

Table 3-8.  Safety Event Group Categories for the Cargo-Related BASIC..................3-15

Table 3-9.  Crash Severity Weights for Crash Indicator...............................................3-16

Table 3-10.   VMT per PU for Combo Segment............................................................3-17

Table 3-11.  VMT per Average PU for Straight Segment ............................................3-18

Table 3-12.  Safety Event Group Categories for Crash Indicator ................................3-18

Table 4-1.  Safety Event Group Categories for Fatigued Driving (HOS) and Driver
          Fitness BASICs.............................................................................................4-5

Table 4-2.  Safety Event Group Categories for Vehicle Maintenance and Cargo-Related
          BASICs .........................................................................................................4-7

Table 4-3.  Crash Severity Weights for Crash Indicator...............................................4-8

# Glossary

| | |
|---|---|
| BASIC | Behavior Analysis and Safety Improvement Categories |
| CMV | Commercial Motor Vehicle |
| CR | Compliance Review |
| CRWG | Compliance Review Work Group |
| CSA 2010 | Comprehensive Safety Analysis 2010 |
| CSMS | Carrier Safety Measurement System |
| DIR | Driver Information Resource |
| DSMS | Driver Safety Measurement System |
| FMCSA | Federal Motor Carrier Safety Administration |
| FMCSR | Federal Motor Carrier Safety Regulations |
| HAZMAT | Hazardous Materials |
| HMR | Hazardous Materials Regulations |
| HOS | Hours-Of-Service |
| LTCCS | Large Truck Crash Causation Study |
| MCMIS | Motor Carrier Management Information System |
| MCSAP | Motor Carrier Safety Assistance Program |
| NGA | National Governors Association |
| NTSB | National Transportation Safety Board |
| OOS | Out-Of-Service |
| OM | Operational Model |
| PU | Power Unit |
| PRISM | Performance and Registration Information Systems Management |
| SafeStat | Motor Carrier Safety Status Measurement System |
| SEA | Safety Evaluation Area |
| SFD | Safety Fitness Determination |
| SMS | Safety Measurement System |
| USDOT | U.S. Department of Transportation |
| VSAS | Violation Severity Assessment Study |
| VMT | Vehicle Miles Travelled |

## 1.  Introduction

The Federal Motor Carrier Safety Administration (FMCSA) is developing a new OM through its Comprehensive Safety Analysis 2010 (CSA 2010) Initiative.  The goal of CSA 2010 is to develop and implement more effective and efficient ways for FMCSA, its state partners, and the trucking industry to reduce CMV crashes, fatalities, and injuries. CSA 2010 will help FMCSA and its state partners to impact the safety behavior of more carriers and drivers, use continually improving data to better identify high-risk carriers and drivers, and apply a wider range of interventions to reduce high-risk behavior.[1]

As part of this effort, FMCSA has identified the attributes of a model for safety oversight that it considers ideal: flexibility, efficiency, effectiveness, innovation, and equity.  The CSA 2010 OM, shown below, features continuous monitoring and tracking of entities' safety performance.  Entities may be either carriers or drivers.  All entities found with problematic safety behavior will be subject to the intervention process.



**Figure 1-1.  CSA 2010 Operational Model**

---

[1] FMCSA CSA2010 website, http://csa2010.fmcsa.dot.gov

**The Safety Measurement System**

Within the CSA 2010 OM, the Safety Measurement System (SMS) quantifies the on-road safety performance of individual entities to:

- Identify entities for interventions. The SMS will be a key component in determining the inclusion of entities with significant safety problems into the CSA 2010 intervention process.

- Determine the specific safety problems an entity exhibits. The SMS allows enforcement officers to identify the specific safety problems the system highlights and to surgically address them through a tailored set of interventions.

- Monitor safety problems throughout the intervention process. The SMS will continuously monitor on-road performance to assess whether an entity's safety performance has improved enough for it to exit the intervention process, or if further intervention is warranted.

- Support FMCSA's proposed Safety Fitness Determination (SFD) process. The SMS results can be an important factor in determining the safety fitness of entities. The SMS will identify the entities demonstrating the worst safety performance so they can be considered for an ―Unfit" safety determination. Details on the proposed process will be available as for public comment as part of upcoming Notice of Proposed Rulemaking.

In addition to supporting the CSA 2010 OM, the SMS results can provide other stakeholders with valuable safety information. The SMS results will be easily accessible via the Internet to encourage improvements in motor carrier safety. Findings from the SMS will allow the evaluated entities an assessment of their weaknesses in various safety areas. Thus, the SMS will empower carriers and other firms (e.g. shippers, insurers) involved with the motor carrier industry to make safety-based business decisions.

## 2.   Design of the SMS

The SMS is a tool for assessing available roadside performance data.  These data are used to rank an entity's relative performance in any of six Behavior Analysis and Safety Improvement Categories (BASICs) as well as crash involvement (Crash Indicator).  Law enforcement will use rankings within these BASICs and the Crash Indicator to select entities for appropriate interventions.

### 2.1   Description of BASICs and Crash Indicator

The CSA 2010 team developed the BASICs under the premise that CMV crashes can be traced to the behavior of motor carriers and/or drivers.  The behavior categories are derived based on information from a number of sources: Large Truck Crash Causation Study (LTCCS);[2] CSA 2010 Driver History Study; the existing FMCSA regulatory structure; and analysis conducted under FMCSA's Compliance Review Workgroup (CRWG), the predecessor to CSA 2010.  The BASICs are defined as follows:

- Unsafe Driving BASIC—Operation of CMVs in a dangerous or careless manner. Example violations: speeding, reckless driving, improper lane change, and inattention.

- Fatigued Driving (Hours-Of-Service) BASIC—Operation of CMVs by drivers who are ill, fatigued, or in non-compliance with the Hours-Of-Service (HOS) regulations.  This BASIC includes violations of regulations surrounding the complete and accurate recording of logbooks as they relate to HOS requirements and the management of CMV driver fatigue.  Instances related to the Fatigued Driving (HOS) BASIC are distinguished from incidents where unconsciousness or an inability to react is brought about by the use of alcohol, drugs, or other controlled substances.  Example violations: HOS, logbook, and operating a CMV while ill or fatigued.

- Driver Fitness BASIC—Operation of CMVs by drivers who are unfit to operate a CMV due to lack of training, experience, or medical qualifications.  Example violations: failing to have a valid and appropriate commercial driver's license and being medically unqualified to operate a CMV.

- Controlled Substances/Alcohol BASIC—Operation of CMVs by drivers who are impaired due to alcohol, illegal drugs, and misuse of prescription or over-the-counter medications.  Example violations: use or possession of controlled substances or alcohol.

- Vehicle Maintenance BASIC—Failure to properly maintain a CMV.  Example violations: brakes, lights, and other mechanical defects, and failure to make required repairs.

---

[2] Daniel Blower and Kenneth L. Campbell, *Large Truck Crash Causation Study Analysis Brief*, February 2005. Available:  http://www.ai.fmcsa.dot.gov/ltccs/

- Cargo-Related BASIC—Failure to properly prevent shifting loads, spilled or dropped cargo, and unsafe handling of hazardous materials on a CMV. Example violations: improper load securement, cargo retention, and hazardous material handling.

Additionally, the SMS evaluates an entity's crash history. Crash history is not specifically a behavior. Rather, it is a consequence of a behavior and may indicate a problem with the entity that warrants intervention. The Crash Indicator is defined as follows:

- Crash Indicator—Histories or patterns of high crash involvement, including frequency and severity. It is based on information from state-reported crash reports.

The SMS will initially focus on the two types of entities most likely to impact the BASICs and Crash Indicator: motor carriers and CMV drivers. Therefore, two measurement systems were designed for CSA 2010:

- Carrier Safety Measurement System (CSMS)

- Driver Safety Measurement Systems (DSMS)

## 2.2   Data Sources

Both CSMS and DSMS assess an individual entity's performance by BASIC and Crash Indicators calculated from information collected during on-road safety inspections and state-reported CMV crash records. These data are recorded in the Motor Carrier Management Information System (MCMIS). In addition, motor carrier Census data, also recorded in MCMIS, are used for the identification and normalization of safety event data. Below are more detailed descriptions of each data source:

- Roadside Inspections are examinations a Motor Carrier Safety Assistance Program (MCSAP) inspector conducts on individual CMVs and drivers to determine if they are in compliance with the Federal Motor Carrier Safety Regulations (FMCSRs) and/or Hazardous Materials Regulations (HMRs).

- Violations are recorded during inspections and are entered into the MCMIS database. A subset of these violations results in driver or vehicle Out-of-Service (OOS) orders. These OOS violations must be corrected before the affected driver or vehicle is allowed to return to service. The SMS assessments are based on the safety violations listed in Appendix A. These assessments, however, do not include those violations that are: (1) a result of a crash[3] or (2) assigned to another entity such as a shipper or Intermodal Equipment Provider.

  *Note:* Some roadside inspections are performed following a traffic enforcement stop for a moving violation. Violations reported during such stops do not always

---

[3] Only pre-existing violations from post-crash inspections are used in the SMS. Violations recorded in MCMIS as being attributed to the crash are not used.

result in the issuance of a citation to the driver, but are used in the SMS whether or not a citation is issued.

- <u>State-Reported Commercial Vehicle Crash Data</u> are taken from MCMIS and provide information on crashes as reported by state and local police officials. The reporting of these crashes follows National Governors Association (NGA) standards.

- <u>Motor Carrier Census Data</u> are first collected when a carrier obtains a USDOT number. The Census data are primarily collected from: (1) Form MCS-150, filled out by the carrier, and (2) Form MCS-151, filled out by law enforcement as part of an investigation. Carriers are required to update their MCS-150 information biennially. Carriers domiciled in states participating in Performance and Registration Information Systems Management (PRISM) Program update their Census data as part of the CMV registration process. The CSMS uses Census data for identification and normalization of safety-related data. Examples of Census data include USDOT number, carrier name, number and type of Power Units (PUs), annualized vehicle miles travelled (VMT), physical location, current status, and types of cargo hauled.

## 2.3    Carrier BASICs Rankings in SMS

Four principal steps are used to assess an entity's performance in each BASIC and the Crash Indicator. First, relevant inspection, violation, and crash data obtained from MCMIS are attributed to an entity to create a safety event history for the entity. Each entity's violations are classified into a BASIC and are then time weighted, severity weighted, and normalized to form a quantifiable measure for an entity in each BASIC. Based on a comparison of each entity's BASIC measure to other entities with a similar number of safety events, a rank and percentile are assigned. These steps are illustrated in Figure 2-1. The SMS applies similar steps to crash data to calculate carrier Crash Indicator percentiles.



**Figure 2-2-1.  BASICs Ranking Process**

## 2.4    SMS Design Features

The conversion of an entity's safety data into a BASIC measure, and rank/percentile involves the application of several SMS design features as discussed below.

### 2.4.1    Violation Severity

All roadside inspection violations that pertain to a BASIC are assigned severity weights that reflect their association with crash occurrence and crash consequences. The severity weights help differentiate the levels of crash risk associated with the various violations attributed to each BASIC.  The violation severity weights are assigned on a 1 to 10 scale, where 1 represents the lowest crash risk and 10 represents the highest crash risk relative to the other violations in the BASIC.  Within certain BASICs, additional severity weight is applied to violations that resulted in driver or vehicle OOS orders. The severity weighting is based on analysis that quantified the extent of these associations between violation and crash risk, as well as on input from enforcement subject matter experts. Because the weights reflect the relative importance of each violation within each particular BASIC, they cannot be compared meaningfully across the various BASICs. See Appendix A for more information about the severity weights.

### 2.4.2    Crash Severity

Crashes are assigned severity weights according to their impact.  Greater weight is attributed to crashes involving injuries, fatalities, and/or crashes involving the release of hazardous materials than to crashes only resulting in a vehicle tow-away.

### 2.4.3    Time Weights

All safety events are assigned a time weight.  The time weight of an event decreases with time.  This decline results in more recent events having a greater impact on an entity's BASIC and Crash Indicator measures than events from the more distant past.  When safety events become older than two years, they are no longer used to assess a carrier's safety in the SMS.

### 2.4.4    Normalization

BASIC and Crash Indicator measures are normalized to reflect differences in exposure among entities.  The normalization approach varies depending on what is being measured.

The SMS normalizes for the number of driver inspections with driver-related BASICs, whereas vehicle inspections are used for normalization within vehicle-related BASICs. Therefore, the number of driver inspections normalizes the Fatigued Driving (HOS), Driver Fitness and Controlled Substances/Alcohol measures, while the number of vehicle inspections normalizes the Vehicle Maintenance and Cargo-Related measures.

While violations of the above BASICs are discovered during an inspection, a distinction is made for behaviors that usually prompt an inspection.  For this reason, the SMS normalizes the Unsafe Driving BASIC measure by carrier size (i.e., a hybrid power unit (PU) and vehicle miles travelled (VMT) measure), instead of by number of inspections. Similarly, the Crash Indicator is also normalized by carrier size.

### 2.4.5   Segmentation

The Unsafe Driving BASIC and Crash Indicator account for carrier differences by segmenting the carrier population into two groups based on the types of vehicles operated.  The segmentation of the carriers means companies that have fundamentally different types of vehicles/operations are not compared to each other.  The two segments are: ―Combo‖ or combination trucks/motor coach buses constituting 70% or more of the total power units and ―Straight‖ or straight trucks/other vehicles constituting more than 30% of the total power units.

### 2.4.6   Safety Event Groups

To further account for the differences among carriers, the SMS places carriers in safety event groups based on the number of safety events (e.g., inspections, crashes) in which the carriers have been involved.  This tiered approach accounts for the inherent greater variability in rates based on small samples or limited levels of exposure and the stronger level of confidence in measures based on larger levels of exposure.  The safety event grouping also allows the CSMS to handle the widely diverse motor carrier population, while ensuring that similarly situated carriers are treated with the same standards.

### 2.4.7   Data Sufficiency

The SMS employs data sufficiency standards to ensure that there are enough inspections or crashes to produce meaningful measures of safety for carriers.  In instances where the safety performance of an entity can potentially lead to incursion of CSA 2010 interventions or detrimental SFD outcome, additional data sufficiency tests are employed. These tests ensure a ―critical mass‖ of poor performance data or a pattern of violations before adverse action is taken upon an entity.

### 2.4.8   Percentile Rank

The SMS uses the measures to assign a percentile ranking to each BASIC and Crash Indicator.  Each measure is a quantifiable determination of safety behavior.  Percentile ranking allows the safety behavior of a carrier to be compared with the safety behavior of carriers with similar numbers of safety events.  Within each safety event group, a percentile is computed on a 0–100 scale for each entity that receives a non-zero measure, with 100 indicating the worst performance.

Carriers with percentiles above a certain threshold and meeting minimum data sufficiency requirements in a BASIC or Crash Indicator can be deemed poor safety performers. These entities will be identified for CSA 2010‘s Intervention process.

## 2.5   Differences Between SafeStat and the SMS

The SMS offers several improvements over FMCSA‘s existing carrier measurement system, SafeStat.  Some of the key differences are listed below.

**The SMS is organized by specific behaviors whereas SafeStat is organized into four general Safety Evaluations Areas (SEAs).**

SafeStat assesses carriers in four Safety Evaluation Areas (SEAs)—Accident, Driver, Vehicle, and Safety Management—whereas the SMS measures each entity in six

behavioral categories (i.e., the BASICs) and the Crash Indicator.  The specific behavioral metrics in the SMS provide a more detailed level of measurement that can be used to describe, evaluate, and address entity safety.  For example, SafeStat indicates that an entity has general driver issues according to its Driver SEA value, while the SMS provides information on the specific driver behavior (i.e., Controlled Substances/Alcohol, Fatigued Driving (HOS), Unsafe Driving, and Driver Fitness) that needs modification and/or attention.  The more specific organization of the SMS's BASICs often allows the discovery of serious safety problems that go undetected under SafeStat's more generalized SEA structure.  This is particularly important for BASICs related to driver behavior given that recent research (e.g. the LTCCS) has highlighted driver behavior as increasingly relevant to crash occurrence.

**The SMS identifies specific safety problems so that CSA 2010 interventions can address them in a surgical manner; the SafeStat score is based on grouping safety problems together to identify carriers for a one-size-fits-all CR.**

Through the measurement of an entity's safety performance by behavior, and the targeting of an intervention to the entity's specific behavior, the CSA 2010 OM provides an integrated approach to measuring and improving CMV safety.  The alignment of both the SMS and intervention selection through BASICs and the Crash Indicator allows FMCSA to identify both the entity for intervention as well as the specific safety problem that should be surgically addressed.  This approach will lead to more efficient and effective use of enforcement resources directed towards improving motor carrier safety.

**The SMS uses all safety-based inspection violations while SafeStat uses only OOS violations and selected moving violations from inspections.**

The inclusion of all safety-based inspection violations in the SMS fully leverages the results of the roadside inspection program (3.5 million inspections annually) and provides a more comprehensive evaluation of an entity's on-road safety performance.

**The SMS utilizes risk-based violation weightings while SafeStat does not.**

Although the SMS utilizes all safety-based inspection violations in the SMS, it is recognized that not all violations pose the same crash risk.  Therefore, violations in the SMS are weighted according to the relationship that the violation may cause, contribute to, or exacerbate the outcome of CMV crash.  Violations shown to have a larger impact on crash risk will have a stronger detrimental impact on an entity's BASIC measure.  The risk-based weighting of violations will provide a risk-based assessment of an entity's performance in each BASIC.

**The SMS will feed the Safety Fitness Determination (SFD) of an entity while SafeStat has no impact on an entity's safety rating.**

Currently SafeStat prioritizes carriers for CRs.  Based strictly on the results of the CR, FMCSA provides a SFD in the form of a safety rating to a carrier.  Under CSA 2010, FMCSA will consider the results of the SMS along with the results of interventions in

generating a carrier's SFD. With this approach, all violations can be considered when determining safety fitness, not just the more severe ones from CRs as is now done with SFD. Carrier SMS results can impact the SFD in two ways. First, poor CSMS results can prompt further examination through the CSA 2010 Intervention Process. Major violations found during the Intervention Process can adversely impact a carrier's SFD. Secondly, the SFD can be calculated solely on the basis of on-road performance by comparing a carrier's absolute BASIC measures, not relative percentiles, to a pre-set BASIC measurement standard. Adverse SFD can occur when a carrier's measures do not meet or exceed the standard. This new SFD procedure places strong emphasis on carrier on-road performance in determining overall carrier safety fitness. This approach addresses one of the National Transportation Safety Board's (NTSB) long-standing recommendations that a carrier's poor on-road performance alone should have a detrimental impact on its SFD.

**The SMS assesses individual drivers and carriers while SafeStat assesses only carriers.**

Currently, most of the focus of FMCSA safety programs and enforcement has been on motor carriers. In the future, the DSMS will allow FMCSA to identify unsafe drivers for interventions based on their inspection and crash history across all employers (former and current). Given the often transient nature of driver employment, the DSMS will be a valuable tool for FMCSA to address driver-specific problems that cannot be easily handled at the motor carrier level. The DSMS may eventually be a valuable tool for motor carriers to monitor their own drivers and assess prospective hires. These efforts will encourage safe and compliant behavior among CMV drivers and will enable carriers to consider drivers' safety histories when making hiring decisions.

## 3.   CSMS Methodology

The following sections describe the CSMS methodology used to calculate the measurement and percentile of each BASIC and the Crash Indicator for individual motor carriers.

### 3.1    Unsafe Driving BASIC Assessment

This section describes the calculation of carrier measures and percentile ranks in the Unsafe Driving BASIC.  This BASIC is defined as:

> Operating CMVs in a dangerous or careless manner.  Example violations: speeding, reckless driving, improper lane change, and inattention.  See Appendix A for a complete list of roadside inspection violations used in the SMS.

The CSMS assesses the Unsafe Driving BASIC using relevant violations of FMCSRs recorded during roadside inspections and reported in MCMIS.  Individual carriers' BASIC measures also incorporate carrier size in terms of power units (PUs) and annual vehicle miles travelled (VMT).  These measures are used to generate percentile ranks that reflect each carrier's driver safety posture relative to carriers in the same segment with similar numbers of inspections with violations.

#### 3.1.1    Calculation of BASIC Measure

The BASIC measures for the Unsafe Driving BASIC are calculated as the sum of severity and time weighted applicable violations divided by carrier average PUs times a Utilization Factor, as follows:

$$BASIC\ Measure = \frac{Total\ of\ time\ and\ severity\ weighted\ applicable\ violations}{Average\ PUs * Utilization\ Factor}$$

**Equation 3-1**

In this equation, the terms are defined as follows:

> Applicable Violation is defined as any violation recorded in any level roadside inspection that matches the FMCSR and HMR cites listed for Unsafe Driving (Table 1, Appendix A) and during the past 24 months.  In cases of multiple counts of the same violation, the CSMS only uses each violation cite once per inspection.

> *Note:* Some roadside inspections are performed following a traffic enforcement stop for a moving violation.  Violations reported during such stops do not always result in the issuance of a citation to the driver, but are used in the SMS whether or not a citation is issued.

> A Severity Weight from 1 (less severe) to 10 (most severe) is assigned to each applicable violation.  See the Unsafe Driving Table (Table 1, Appendix A) for the severity weights corresponding to each violation.  The severity weighting of each

violation cite accounts for the level of crash risk relative to the other violation cites used in the BASIC measurement.  The sum of all severity weights yielded by any one inspection for violations in any one BASIC is capped at a maximum of 30.  This cap of 30 is applied before the severity weights are multiplied by the time weight.

A Time Weight of 1, 2 or 3 is assigned to each applicable violation based on how long ago it was recorded.  Violations recorded in the past 6 months receive a time weight of 3.  Violations recorded between 6 and 12 months ago receive a time weight of 2.  All violations recorded earlier (older than 12 months but within the past 24 months) receive a time weight of 1.  This time weighting places more emphasis on recent violations relative to older violations.

Time and Severity Weighted Violation is a violation's severity weight multiplied by its time weight.

Average Power Units (PUs) is used in part to account for each carrier's level of exposure when calculating the BASIC measure.  The BASIC violations are normalized by the number of owned, term-leased, and trip-leased PUs (trucks, tractors, hazardous-material tank trucks, motor coaches, and school buses) contained in the Census data.  The average PUs for each carrier is calculated using (i) the carrier's current number of PUs, (ii) the number of PUs the carrier had 6 months ago, and (iii) the number of PUs the carrier had 18 months ago.  The average PU calculation is shown below:

$$PU(average) = \frac{PU(current) + PU(6Months) + PU(18Months)}{3}$$

**Equation 3-2**

Utilization Factor is a multiplier that adjusts the Average PU values based on the utilization in terms of vehicle miles travelled (VMT) per Average PU where VMT data in the past 24 months are available.  The primary sources of VMT information in the Census are: (1) Form MCS-150, filled out by the carrier, and (2) Form MCS-151, filled out by law enforcement as part of an investigation.  Carriers are required to update their MCS-150 information biennially. In cases where the VMT data has been obtained multiple times over the past 24 months for the same carrier, the most current positive VMT figure is used.  The Utilization Factor is calculated by the following three steps:

(i)     Carrier Segment
There are two segments that each motor carrier falls into:
- "Combo" – combination trucks/motor coach buses constituting 70% or more of the total PU.
- "Straight" – straight trucks/other vehicles constituting more than 30% of the total PU.

(ii)    VMT per Average PU

The VMT per Average PU is derived by taking most recent positive VMT data and dividing it by the average PUs (defined above).

(iii)    Utilization Factor

Given the information in (i) and (ii) the Utilization Factor are determined from the following tables:

| Combo Segment | |
|---|---|
| **VMT per Average PU** | **Utilization Factor** |
| < 80,000 | 1 |
| 80,000 - 160,000 | 1+0.6[(VMT per PU-80,000) / 80,000] |
| 160,000 - 200,000 | 1.6 |
| > 200,000 | 1 |
| No Recent VMT Information | 1 |

**Table 3-1.  VMT per PU for Combo Segment**

| Straight Segment | |
|---|---|
| **VMT per Average PU** | **Utilization Factor** |
| < 20,000 | 1 |
| 20,000 - 60,000 | VMT per PU / 20,000 |
| 60,000 - 200,000 | 3 |
| > 200,000 | 1 |
| No Recent VMT Information | 1 |

**Table 3-2.  VMT per Average PU for Straight Segment**

### 3.1.2   Calculation of BASIC Percentile Rank

Based on the BASIC measures, the CSMS applies data sufficiency standards and safety event grouping to assign a percentile rank to carriers that can then potentially receive a CSA 2010 intervention or detrimental SFD.  The calculation is as follows:

A.  Determine the carrier's segment:
- "Combo" – combination trucks/motor coach buses constituting 70% or more of the total PU.
- "Straight" – straight trucks/other vehicles constituting more than 30% of the total PU.

B.  Determine the total number of inspections with at least one BASIC violation and remove carriers with less than three such inspections.  For the remaining carriers, place each carrier into one of five groups based on the carrier segment and the number of inspections with an Unsafe Driving violation:

| Safety Event Group Category | Combo Segment: Number of Inspections with Unsafe Driving Violations | Straight Segment: Number of Inspections with Unsafe Driving Violations |
|---|---|---|
| 1 | 3-8 | 3-4 |
| 2 | 9-21 | 5-8 |
| 3 | 22-57 | 9-18 |
| 4 | 58-149 | 19-49 |
| 5 | 150+ | 50+ |

**Table 3-3.  Safety Event Group Categories for Unsafe Driving BASIC**

C.  Within each group, rank all the carriers' BASIC measures in ascending order.  Transform the ranked values into percentiles from 0 (representing the lowest BASIC measure) to 100 (representing the highest BASIC measure).  Eliminate carriers whose violations in the BASIC are all older than twelve months.  Carriers that remain retain the previously calculated percentile.

## 3.2    Fatigued Driving (HOS) BASIC Assessment

This section describes the calculation of carrier measures and percentile ranks in the Fatigued Driving (HOS) BASIC.  This BASIC is defined as:

Operating CMVs by drivers ill, fatigued, or in non-compliance with the Hours-Of-Service (HOS) regulations.  This BASIC includes violations of regulations surrounding the complete and accurate recording of logbooks as they relate to HOS requirements and the management of CMV driver fatigue.  Instances related to the Fatigued Driving (HOS) BASIC are distinguished from incidents where unconsciousness or an inability to react is brought about by the use of alcohol, drugs, or other controlled substances.  Example violations include: HOS, logbook, and operating a CMV while ill or fatigued.  See Appendix A for a complete list of roadside inspection violations used in the SMS.

The CSMS assesses the Fatigued Driving (HOS) BASIC using relevant violations recorded during roadside inspections to calculate a measure for motor carriers.  These measures are used to generate percentile ranks that reflect each carrier's safety posture relative to carriers with similar numbers of relevant inspections.

### 3.2.1    Calculation of BASIC Measure

The equation used for calculating Fatigued Driving (HOS) BASIC measures is as follows:

$$BASIC\ Measure = \frac{Total\ of\ time\ and\ severity\ weighted\ applicable\ violations}{Total\ time\ weight\ of\ relevant\ inspections}$$

**Equation 3-3**

In this equation, the terms are defined as follows:

Applicable Violation is any violation recorded in any level roadside inspection that matches the FMCSRs and HMRs listed for Fatigued Driving (HOS) (Table 2, Appendix A) during the past 24 months.  The CSMS only uses each violation cite once per inspection in cases of multiple counts of the same violation.

A Relevant Inspection is any Driver Inspection (Level 1, 2, 3 or 6), including those that do **not** result in a violation in the BASIC, or any other inspection resulting in applicable BASIC violation.

A Severity Weight is assigned to each applicable violation, with a value dependent on two parts: (i) the level of crash risk relative to the other violations comprising the BASIC measurement, and (ii) whether or not the violation resulted in an OOS condition.

   (i)       The level of crash risk is assigned to each applicable violation ranging from 1 (less severe) to 10 (most severe); see the Fatigued Driving (HOS) table (Table 2, Appendix A) for the violations' corresponding severity weights.
   (ii)      An OOS weight of 2 is then added to the severity weight of OOS violations.  In cases of multiple counts of the same violation, the OOS weight of 2 applies if any of the counts of the violation are OOS.

The sum of all severity weights yielded by any one inspection for violations in any one BASIC is capped at a maximum of 30. This cap of 30 is applied before the severity weights are multiplied by the time weight.

A Time Weight of 1, 2 or 3 is assigned to each applicable violation and each relevant inspection based on its age.  Violations recorded in the past 6 months receive a time weight of 3.  Violations recorded between 6 and 12 months ago receive a time weight of 2.  All violations recorded earlier (older than 12 months but within the past 24 months) receive a time weight of 1.  Using the exact same time weight scheme, time weights are assigned to each relevant inspection, regardless of whether or not an inspection yielded an applicable violation.  This time weighting places more emphasis on results of recent inspections relative to older inspections.

Time and Severity Weighted Violation is a violation's severity weight multiplied by its time weight.

### 3.2.2 Calculation of BASIC Percentile Rank

Based on the BASIC measures, the CSMS applies data sufficiency standards and safety event grouping to assign a percentile rank to carriers that can then potentially receive a CSA 2010 intervention or detrimental SFD.  The calculation is as follows:

A.  Determine the total number of relevant inspections and number of inspections with at least one BASIC violation.  For the Fatigued Driving (HOS) BASIC, remove carriers with (1) less than three relevant driver inspections or (2) no inspections resulting in at least one BASIC violation.  For the remaining carriers, place each carrier into one of five groups based on the number of relevant inspections:

| Safety Event Group Category | Number of Relevant Inspections |
|:---:|:---:|
| 1 | 3-10 |
| 2 | 11-20 |
| 3 | 21-100 |
| 4 | 101-500 |
| 5 | 501+ |

**Table 3-4.  Safety Event Group Categories for the Fatigued Driving (HOS) BASIC**

B.  Within each group, rank all the carriers' BASIC measures in ascending order. Transform the ranked values into percentiles from 0 (representing the lowest BASIC measure) to 100 (representing the highest BASIC measure). Eliminate carriers that meet both of the following criteria: (1) no violation was recorded in the BASIC during the previous twelve months, and (2) no violation in the BASIC was recorded during the latest relevant inspection. For the remaining carriers with three or more relevant inspections resulting in a Fatigued Driving (HOS) BASIC violation, assign the percentile values to each carrier's BASIC.

## 3.3  Driver Fitness BASIC Assessment

This section describes the calculation of carrier measures and percentile ranks in the Driver Fitness BASIC.  This BASIC is defined as:

Operating CMVs by drivers who are unfit to operate a CMV due to lack of training, experience, or medical qualifications.  Example violations: failing to have a valid and appropriate commercial driver's license and being medically unqualified to operate a CMV.  See Appendix A for a complete list of roadside inspection violations used in the SMS.

The CSMS assesses the Driver Fitness BASIC using relevant violations recorded during roadside inspections to calculate a measure for individual motor carriers.  These measures are used to generate percentile ranks that reflect each carrier's driver safety posture relative to carriers with similar numbers of relevant inspections.

### 3.3.1   Calculation of BASIC Measure

The equation used for calculating the BASIC measure for Driver Fitness is as follows:

$$BASIC\ Measure = \frac{Total\ of\ time\ and\ severity\ weighted\ applicable\ violations}{Total\ time\ weight\ of\ relevant\ inspections}$$

**Equation 3-4**

In this equation, the terms are defined as follows:

Applicable Violation is any violation recorded in any level roadside inspection that matches the FMCSRs and HMRs listed for Driver Fitness (Table 3, Appendix A) during the past 24 months.  The CSMS only uses each violation cite once per inspection in cases of multiple counts of the same violation.

A Relevant Inspection is any Driver Inspection (Level 1, 2, 3 or 6), including those that do **not** result in a violation in the BASIC, or any other inspection resulting in applicable BASIC violation.

A Severity Weight is assigned to each applicable violation, with a value dependent on two parts: (i) the level of crash risk relative to the other violations comprising the BASIC measurement, and (ii) whether or not the violation resulted in an OOS condition.

(i)     The level of crash risk is assigned to each applicable violation ranging from 1 (less severe) to 10 (most severe); see the Driver Fitness table (Table 3, Appendix A) for the violations' corresponding severity weights.

(ii)    An OOS weight of 2 is then added to the severity weight of OOS violations.  In cases of multiple counts of the same violation, the OOS weight of 2 applies if any of the counts of the violation are OOS.

The sum of all severity weights yielded by any one inspection for violations in any one BASIC is capped at a maximum of 30.  This cap of 30 is applied before the severity weights are multiplied by the time weight.

A Time Weight of 1, 2 or 3 is assigned to each applicable violation and each relevant inspection based on its age.  Violations recorded in the past 6 months

receive a time weight of 3.  Violations recorded between 6 and 12 months ago
receive a time weight of 2.  All violations recorded earlier (older than 12 months
but within the past 24 months) receive a time weight of 1.  Using the exact same
time weight scheme, time weights are assigned to each relevant inspection,
regardless of whether or not an inspection yielded an applicable violation.  This
time weighting places more emphasis on results of recent inspections relative to
older inspections.

<u>Time and Severity Weighted Violation</u> is a violation's severity weight multiplied
by its time weight.

### 3.3.2    Calculation of BASIC Percentile Rank

Based on the BASIC measures, the CSMS applies data sufficiency standards and safety
event grouping to assign a percentile rank to carriers that can then potentially receive a
CSA 2010 intervention or detrimental SFD.  The calculation is as follows:

A.  Determine the total number of relevant inspections and number of
inspections with at least one BASIC violation.  For the Driver Fitness
BASIC, remove carriers with (1) less than five relevant driver inspections
or (2) no inspections resulting in at least one BASIC violation.  For the
remaining carriers, place each carrier into one of five groups based on the
number of relevant inspections:

| Safety Event Group Category | Number of Relevant Inspections |
|:---:|:---:|
| 1 | 5-10 |
| 2 | 11-20 |
| 3 | 21-100 |
| 4 | 101-500 |
| 5 | 501+ |

**Table 3-5.  Safety Event Group Categories for the Driver Fitness BASIC**

B.  Within each group, rank all the carriers' BASIC measures in ascending
order.  Transform the ranked values into percentiles from 0 (representing
the lowest BASIC measure) to 100 (representing the highest BASIC
measure).  Eliminate carriers that meet both of the following criteria: (1)
no violation was recorded in the BASIC during the previous twelve
months, and (2) no violation in the BASIC was recorded during the latest
relevant inspection.  For the remaining carriers with five or more relevant
inspections resulting in a Driver Fitness BASIC violation, assign the
percentile values to each carrier's BASIC.

### 3.4    Controlled Substances/Alcohol BASIC

This section describes the calculation of carrier measures and percentile ranks in the Controlled Substances/Alcohol BASIC.  The definition of this BASIC is as:

> Operating CMVs by drivers cited in roadside inspections for impairment due to alcohol, illegal drugs, and misuse of prescription or over-the-counter medications.  Example violations: use or possession of controlled substances or alcohol.  See Appendix A for a complete list of roadside inspection violations used in the SMS.

The CSMS assesses the Controlled Substances/Alcohol BASIC using relevant violations of FMCSRs recorded during roadside inspections and reported in MCMIS.  Individual carriers' BASIC measures also incorporate quantity of relevant roadside inspections.  These measures are used to generate percentile ranks that reflect each carrier's driver safety posture relative to carriers with similar numbers of inspections with violations.

### 3.4.1    Calculation of BASIC Measure

The BASIC measures for the Controlled Substances/Alcohol BASIC are calculated as the sum of severity and time weighted applicable violations divided by time weighted relevant inspections, as follows:

$$BASIC\ Measure = \frac{Total\ of\ time\ and\ severity\ weighted\ applicable\ violations}{Total\ time\ weight\ of\ relevant\ inspections}$$

**Equation 3-5**

In this equation, the terms are defined as follows:

> Applicable Violation is defined as any violation recorded in any level roadside inspection that matches the FMCSR and HMR cites listed for Controlled Substances/Alcohol (Table 4, Appendix A) and during the past 24 months.  In cases of multiple counts of the same violation, the CSMS only uses each violation cite once per inspection.

> *Note:* Some roadside inspections are performed following a traffic enforcement stop for a moving violation.  Violations reported during such stops do not always result in the issuance of a citation to the driver, but are used in the SMS whether or not a citation is issued.

> A Relevant Inspection is any Driver Inspection (Level 1, 2, 3 or 6), including those that do **not** result in a violation in the BASIC, or any other inspection resulting in applicable BASIC violation.

> A Severity Weight from 1 (less severe) to 10 (most severe) is assigned to each applicable violation.  See the Controlled Substances/Alcohol Table (Table 4, Appendix A) for the severity weights corresponding to each violation.  The

severity weighting of each violation cite accounts for the level of crash risk relative to the other violation cites used in the BASIC measurement. The sum of all severity weights yielded by any one inspection for violations in any one BASIC is capped at a maximum of 30. This cap of 30 is applied before the severity weights are multiplied by the time weight.

A Time Weight of 1, 2 or 3 is assigned to each applicable violation and each relevant inspection based on its age. Violations recorded in the past 6 months receive a time weight of 3. Violations recorded between 6 and 12 months ago receive a time weight of 2. All violations recorded earlier (older than 12 months but within the past 24 months) receive a time weight of 1. Using the exact same time weight scheme, time weights are assigned to each relevant inspection, regardless of whether or not an inspection yielded an applicable violation. This time weighting places more emphasis on results of recent inspections relative to older inspections.

Time and Severity Weighted Violation is a violation's severity weight multiplied by its time weight.

### 3.4.2   Calculation of BASIC Percentile Rank

Based on the BASIC measures, the CSMS applies data sufficiency standards and safety event grouping to assign a percentile rank to carriers that can then potentially receive a CSA 2010 intervention. The calculation is as follows:

A. Remove carriers with no violations in this BASIC. For the remaining carriers, place each carrier into one of four groups based on the number of carrier relevant inspections:

| Safety Event Group Category | Number of inspections with Controlled Substance/Alcohol Violations |
|:---:|:---:|
| **1** | 1 |
| **2** | 2 |
| **3** | 3 |
| **4** | 4+ |

**Table 3-6.  Safety Event Group Categories for Controlled Substances/Alcohol BASIC**

B. Within each group, rank all the carriers' BASIC measures in ascending order. Transform the ranked values into percentiles from 0 (representing the lowest BASIC measure) to 100 (representing the highest BASIC measure). Eliminate carriers whose violations in the BASIC are all older than twelve months. Carriers that remain retain the previously calculated percentile.

### 3.5    Vehicle Maintenance BASIC Assessment

This section describes the calculation of carrier measures and percentile ranks in the Vehicle Maintenance BASIC. This BASIC is defined as:

> Failure to properly maintain a CMV. Example violations: brakes, lights, and other mechanical defects, and failure to make required repairs. See Appendix A for a complete list of roadside inspection violations used in the SMS.

The CSMS assesses the Vehicle Maintenance BASIC using relevant violations recorded during roadside inspections to calculate a measure of each BASIC for individual motor carriers. These measures are used to generate percentile ranks that reflect each carrier's safety posture relative to carriers with similar numbers of relevant inspections.

### 3.5.1    Calculation of BASIC Measure

The equation used for calculating Vehicle Maintenance BASIC measures is as follows:

$$BASIC\ Measure = \frac{Total\ of\ time\ and\ severity\ weighted\ applicable\ violations}{Total\ time\ weight\ of\ relevant\ inspections}$$

**Equation 3-6**

In this equation, the terms are defined as follows:

> <u>Applicable Violation</u> is defined as any violation recorded in any level roadside inspection that matches the FMCSR and HMR cites listed for Vehicle Maintenance (Table 5, Appendix A) during the past 24 months. In cases of multiple counts of the same violation, the CSMS only uses each violation cite once per inspection.

> <u>A Relevant Inspection</u> is any Vehicle Inspection (Level 1, 2, 5 or 6), including those that do **not** result in a violation in the BASIC, or any other inspection resulting in applicable BASIC violation.

> <u>A Severity Weight</u> is assigned to each applicable violation with a value dependent on two parts: (i) the level of crash risk relative to the other violation cites used in the BASIC measurement, and (ii) whether or not the violation resulted in an OOS condition.
>
> <u>(i)</u>    The level of crash risk is assigned to each applicable violation ranging from 1 (less severe) to 10 (most severe); see the Vehicle Maintenance table (Table 5, Appendix A) for the corresponding severity weights of each violation cite.
>
> <u>(ii)</u>    An OOS weight of 2 is then added to the severity weight of OOS violations. In cases of multiple counts of the same violation, the OOS weight of 2 applies if any of the counts of the violation are OOS.

The sum of all severity weights yielded by any one inspection for violations in any one BASIC is capped at a maximum of 30. This cap of 30 is applied before the severity weights are multiplied by the time weight.

A Time Weight of 1, 2 or 3 is assigned to each applicable violation and each relevant inspection based on its age. Violations recorded in the past 6 months receive a time weight of 3. Violations recorded between 6 and 12 months ago receive a time weight of 2. All violations recorded earlier (older than 12 months but within the past 24 months) receive a time weight of 1. Using the exact same time weight scheme, time weights are assigned to each relevant inspection, regardless of whether or not an inspection yielded an applicable violation. This time weighting places more emphasis on results of recent inspections relative to older inspections.

Time and Severity Weighted Violation is a violation's severity weight multiplied by its time weight.

### 3.5.2   Calculation of BASIC Percentile Rank

Based on the BASIC measures, the CSMS applies data sufficiency standards and safety event grouping to assign a percentile rank to carriers that can then potentially receive a CSA 2010 intervention or detrimental SFD. The calculation is as follows:

A. Determine the total number of relevant vehicle inspections and the number of inspections with at least one BASIC violation. Remove carriers with (1) less than five relevant inspections or (2) no inspections resulting in at least one BASIC violation. For the remaining carriers, place each carrier into one of five groups based on the number of relevant inspections:

| Safety Event Group Category | Number of Relevant Inspections |
|:---:|:---:|
| 1 | 5-10 |
| 2 | 11-20 |
| 3 | 21-100 |
| 4 | 101-500 |
| 5 | 501+ |

**Table 3-7.  Safety Event Group Categories for the Vehicle Maintenance BASIC**

B. Within each group, rank all the carriers' BASIC measures in ascending order. Transform the ranked values into percentiles from 0 (representing the lowest BASIC measure) to 100 (representing the highest BASIC measure). Eliminate carriers that meet both of the following criteria: (1) no violation was

recorded in the BASIC during the previous twelve months, and (2) no violation in the BASIC was recorded during the latest relevant inspection. For the remaining carriers with five or more relevant inspections resulting in a Vehicle Maintenance BASIC violation, assign the percentile values to each carrier's BASIC.

## 3.6    Cargo-Related BASIC Assessment

This section describes the calculation of carrier measures and percentile ranks in the Cargo-Related BASIC. This BASIC is defined as:

> Failure to properly prevent shifting loads, spilled or dropped cargo, and unsafe handling of hazardous materials on a CMV. Example violations: improper load securement, cargo retention, and hazardous material handling. See Appendix A for a complete list of roadside inspection violations used in the SMS.

The CSMS assesses the Cargo-Related BASIC using relevant violations recorded during roadside inspections to calculate a measure of each BASIC for individual motor carriers. These measures are used to generate percentile ranks that reflect each carrier's safety posture relative to carriers with similar numbers of relevant inspections

### 3.6.1    Calculation of BASIC Measure

The equation used for calculating Cargo-Related BASIC measures is as follows:

$$BASIC\ Measure = \frac{Total\ of\ time\ and\ severity\ weighted\ applicable\ violations}{Total\ time\ weight\ of\ relevant\ inspections}$$

**Equation 3-7**

In this equation, the terms are defined as follows:

> Applicable Violation is defined as any violation recorded in any level roadside inspection that matches the FMCSR and HMR cites listed in the Cargo-Related BASIC (Table 6, Appendix A) during the past 24 months. In cases of multiple counts of the same violation, the CSMS only uses each violation cite once per inspection.

> A Relevant Inspection is any Vehicle Inspection (Level 1, 2, 5 or 6), including those that do **not** result in a violation in the BASIC, or any other inspection resulting in applicable BASIC violation.

> A Severity Weight is assigned to each applicable violation with a value dependent on two parts: (i) the level of crash risk relative to the other violation cites used in the BASIC measurement, and (ii) whether or not the violation resulted in an OOS condition.

(i)    The level of crash risk is assigned to each applicable violation ranging from 1 (less severe) to 10 (most severe); see the Cargo-Related table (Table 6, Appendix A) for the corresponding severity weights of each violation cite.

(ii)    An OOS weight of 2 is then added to the severity weight of OOS violations.  In cases of multiple counts of the same violation, the OOS weight of 2 applies if any of the counts of the violation are OOS.

The sum of all severity weights yielded by any one inspection for violations in any one BASIC is capped at a maximum of 30.  This cap of 30 is applied before the severity weights are multiplied by the time weight.

<u>A Time Weight</u> of 1, 2 or 3 is assigned to each applicable violation and each relevant inspection based on its age.  Violations recorded in the past 6 months receive a time weight of 3.  Violations recorded between 6 and 12 months ago receive a time weight of 2.  All violations recorded earlier (older than 12 months but within the past 24 months) receive a time weight of 1.  Using the exact same time weight scheme, time weights are assigned to each relevant inspection, regardless of whether or not an inspection yielded an applicable violation.  This time weighting places more emphasis on results of recent inspections relative to older inspections.

<u>Time and Severity Weighted Violation</u> is a violation's severity weight multiplied by its time weight.

### 3.6.2   Calculation of BASIC Percentile Rank

Based on the BASIC measures, the CSMS applies data sufficiency standards and safety event grouping to assign a percentile rank to carriers that can then potentially receive a CSA 2010 intervention or detrimental SFD.  The calculation is as follows:

A. Determine the total number of relevant vehicle inspections and the number of inspections with at least one BASIC violation.  Remove carriers with (1) less than five relevant inspections or (2) no inspections resulting in at least one BASIC violation.  For the remaining carriers, place each carrier into one of five groups based on the number of relevant inspections:

| Safety Event Group Category | Number of Relevant Inspections |
|:---:|:---:|
| 1 | 5-10 |
| 2 | 11-20 |
| 3 | 21-100 |
| 4 | 101-500 |
| 5 | 501+ |

**Table 3-8. Safety Event Group Categories for the Cargo-Related BASIC**

B. Within each group, rank all the carriers' BASIC measures in ascending order. Transform the ranked values into percentiles from 0 (representing the lowest BASIC measure) to 100 (representing the highest BASIC measure). Eliminate carriers that meet both of the following criteria: (1) no violation was recorded in the BASIC during the previous twelve months, and (2) no violation in the BASIC was recorded during the latest relevant inspection. For the remaining carriers with five or more relevant inspections resulting in a Cargo-Related BASIC violation, assign the percentile values to each carrier's BASIC.

## 3.7 Crash Indicator Assessment

This section describes the calculation of carrier measures and percentile ranks for the Crash Indicator. The Crash Indicator is defined as:

> Histories or patterns of high crash involvement, including frequency and severity, based on information from state-reported crash reports.

Although the BASICs are used to measure an entity's behaviors, the crash history utilized by the Crash Indicator is not specifically a behavior; instead, it is the consequence of behavior and may indicate a problem with the entity that warrants intervention.

The CSMS assesses the Crash Indicator using relevant state-reported crash data reported in MCMIS. Individual carriers' Crash Indicator measures also incorporate carrier size in terms of PUs and annual VMT. These measures are used to generate percentile ranks that reflect each carrier's safety posture relative to carriers in the same segment with similar numbers of crashes.

### 3.7.1 Calculation of Crash Indicator Measure

The equation used for calculating the Crash Indicator measure is as follows:

$$Crash\ Indicator\ Measure = \frac{Total\ of\ time\ and\ severity\ weighted\ applicable\ crashes}{Average\ PUs * Utilization\ Factor}$$

**Equation 3-8**

In this equation, the terms are defined as follows:

Applicable Crash is a state-reported crash that meets the reportable crash standard during the past 24 months. A reportable crash is one that results in at least one fatality; one injury where the injured person is taken to a medical facility for immediate medical attention; or, one vehicle having been towed from the scene as a result of disabling damage caused by the crash (i.e. tow-away).

Crash Severity Weight places more weight on crashes with more severe consequences. For example, a crash involving an injury or fatality is weighted more heavily than a crash where only a tow-away occurred. A hazmat release also increases the weighting of a crash, as shown in Table 3-9.

| Crash Type | Crash Severity Weight |
|---|---|
| Involves tow-away but no injury or fatality | 1 |
| Involves injury or fatality | 2 |
| Involves a hazmat release | Crash Severity Weight (from above) + 1 |

**Table 3-9. Crash Severity Weights for Crash Indicator**

A Time Weight of 1, 2 or 3 is assigned to each applicable crash based on the time elapsed since the crash occurred. Crashes that occurred within 6 months of the measurement date receive a time weight of 3. Crashes that occurred between 6 and 12 months prior to the measurement date receive a time weight of 2. All crashes that happened later (older than 12 months but within the past 24 months of the measurement date) receive a time weight of 1. This time weighting places more emphasis on recent crashes relative to older crashes.

Time and Severity Weighted Crash is a crash's severity weight multiplied by its time weight.

Average Power Units (PUs) is used in part to account for each carrier's level of exposure when calculating the BASIC measure. The BASIC violations are normalized by the number of owned, term-leased, and trip-leased PUs (trucks, tractors, hazardous-material tank trucks, motor coaches, and school buses) contained in the Census data. The average PUs for each carrier is calculated using (i) the carrier's current number of PUs, (ii) the number of PUs the carrier

had 6 months ago, and (iii) the number of PUs the carrier had 18 months ago. The average PU calculation is shown below:

$$PU(average) = \frac{PU(current) + PU(6Months) + PU(18Months)}{3}$$

<div align="right">**Equation 3-9**</div>

Utilization Factor is a multiplier that adjusts the Average PU values based on the utilization in terms of vehicle miles travelled (VMT) per Average PU where VMT data in the past 24 months are available.  The primary sources of VMT information in the Census are: (1) Form MCS-150, filled out by the carrier, and (2) Form MCS-151, filled out by law enforcement as part of an investigation. Carriers are required to update their MCS-150 information biennially. In cases where the VMT data has been obtained multiple times over the past 24 months for the same carrier, the most current positive VMT figure is used.  The Utilization Factor is calculated by the following three steps:

(i)     Carrier Segment
There are two segments that each motor carrier falls into:
- "Combo" – combination trucks/motor coach buses constituting 70% or more of the total PU.
- "Straight" – straight trucks/other vehicles constituting more than 30% of the total PU.

(ii)     VMT per Average PU
The VMT per Average PU is derived by taking most recent positive VMT data and dividing it by the average PUs (defined above).

(iii)     Utilization Factor
Given the information in (i) and (ii) the Utilization Factor are determined from the following tables:

| Combo Segment | |
|---|---|
| **VMT per Average PU** | **Utilization Factor** |
| < 80,000 | 1 |
| 80,000 - 160,000 | 1+0.6[(VMT per PU-80,000) / 80,000] |
| 160,000 - 200,000 | 1.6 |
| > 200,000 | 1 |
| No Recent VMT Information | 1 |

**Table 3-10.   VMT per PU for Combo Segment**

| Straight Segment | |
|---|---|
| **VMT per Average PU** | **Utilization Factor** |
| < 20,000 | 1 |
| 20,000 - 60,000 | VMT per PU / 20,000 |
| 60,000 - 200,000 | 3 |
| > 200,000 | 1 |
| No Recent VMT Information | 1 |

**Table 3-11.  VMT per Average PU for Straight Segment**

### 3.7.2  Calculation of Crash Indicator Percentile Rank

Based on the Crash Indicator measures, the CSMS applies data sufficiency standards and Safety Event Grouping to assign a percentile rank to carriers that can potentially receive a CSA 2010 intervention.  The calculation is as follows:

A.  Determine the carrier's segment:
- "Combo" – combination trucks/motor coach buses constituting 70% or more of the total PU.
- "Straight" – straight trucks/other vehicles constituting more than 30% of the total PU.

B.  For carriers with two or more applicable crashes, place each carrier into one of five groups based on the carrier segment and number of crashes:

| Safety Event Group Category | Combo Segment: Number of Crashes | Straight Segment: Number of Crashes |
|---|---|---|
| **1** | 2-3 | 2 |
| **2** | 4-6 | 3-4 |
| **3** | 7-16 | 5-8 |
| **4** | 17-45 | 9-26 |
| **5** | 46+ | 27+ |

**Table 3-12.  Safety Event Group Categories for Crash Indicator**

C.  Within each group, rank all the carriers' Crash Indicator measures in ascending order.  Transform the ranked values into percentiles from 0 (representing the lowest indicator measure) to 100 (representing the highest indicator measure).  Remove carriers that did not have a crash recorded in

the previous twelve months.  Carriers that remain retain the previously calculated percentile.

# 4.  DSMS Methodology

The DSMS is the second major component of the SMS, along with the CSMS.  Law enforcement officials use the DSMS results to examine the safety performance of individual CMV drivers when conducting CSA 2010 investigations.  Currently, the DSMS results are being used strictly as an investigative tool for law enforcement and **are not available to carriers, drivers, or the public**.  However, the raw safety information from roadside inspections and crashes that feeds the DSMS is compiled by the same system that will provide CMV driver-based data to FMCSA's Driver Pre-Employment Screening Program (PSP). This new program will allow motor carriers to access driver inspection and crash records electronically as a part of the hiring process.[4]

This section describes the algorithms used in the DSMS methodology and the computational logic used to calculate the driver measures and percentiles for each BASIC and the Crash Indicator for individual CMV drivers.  BASICs that are evaluated similarly are described together.

- Unsafe Driving BASIC and Controlled Substances/Alcohol BASIC
- Fatigued Driving (HOS) BASIC and Driver Fitness BASIC
- Vehicle Maintenance BASIC and Cargo-Related BASIC
- Crash Indicator

## 4.1  Unsafe Driving BASIC and Controlled Substances/Alcohol BASIC Assessment

This section describes the measurement of the Unsafe Driving BASIC and the Controlled Substances/Alcohol BASIC.  The definition of each BASIC is as follows:

- Unsafe Driving BASIC—Operation of CMVs in a dangerous or careless manner.  Example violations: speeding, reckless driving, improper lane change, and inattention.

- Controlled Substances/Alcohol BASIC—Operation of CMVs by drivers who are impaired due to alcohol, illegal drugs, and misuse of prescription or over-the-counter medications.  Example violations: use or possession of controlled substances or alcohol.

The DSMS assesses both the Unsafe Driving BASIC and Controlled Substances/Alcohol BASIC by using applicable violations recorded during roadside inspections to calculate a measure in each BASIC for individual drivers.  These measures are used to generate percentile ranks that reflect drivers' safety postures relative to drivers with applicable violations.

---

[4] More information about the PSP program can be found on FMCSA's PSP website at http://www.psp.fmcsa.dot.gov/.

### 4.1.1 Calculation of BASIC Measure

The BASIC measures for the Unsafe Driving and Controlled Substances/Alcohol BASICs are calculated as the sum of severity and time weighted applicable violations as follows:

$$BASIC Measure = Total\ of\ time\ and\ severity\ weighted\ applicable\ violations$$

**Equation 4-1**

In this equation, the terms are defined as follows:

Applicable Violation is defined as any violation recorded in any level roadside inspection that matches the FMCSR and HMR cites listed for Unsafe Driving (Table 1, Appendix A) and Controlled Substances/Alcohol (Table 4, Appendix A) during the past 36 months, and for which the CMV driver can be held responsible ('Driver Responsible' column, Table 1 and 2). In cases of multiple counts of the same violation, the DSMS only uses each violation cite once per inspection.

A Severity Weight from 1 (less severe) to 10 (most severe) is assigned to each applicable violation. See the Unsafe Driving Table (Table 1, Appendix A) and the Controlled Substance and Alcohol Table (Table 4, Appendix A) for the corresponding severity weights of each violation cite. The severity weighting of each violation cite accounts for the level of crash risk relative to the other violation cites used in the BASIC measurement. The sum of all severity weights yielded by any one inspection for violations in any one BASIC is capped at a maximum of 30.

A Time Weight of 1, 2 or 3 is assigned to each applicable violation based on how long ago a violation on the inspection was recorded. Violations recorded in the past 12 months receive a time weight of 3. Violations recorded between 12 and 24 months ago receive a time weight of 2. All violations recorded earlier (older than 24 months but within the past 36 months) receive a time weight of 1. This time weighting places more emphasis on recent violations relative to older violations.

Time and Severity Weighted Violation is a violation's severity weight multiplied by its time weight.

### 4.1.2 Calculation of BASIC Percentile Rank

Based on the BASIC measures, the DSMS applies data sufficiency standards to assign a percentile rank to drivers who can then potentially be subjected to a CSA 2010 intervention. The calculation is as follows:

A. Determine the total number of inspections with at least one BASIC violation. Remove drivers with no BASIC violations.

B. Rank all the drivers' BASIC measures in ascending order. Transform the ranked values into percentiles from 0 (representing the lowest BASIC measure) to 100 (representing the highest BASIC measure). Then, assign the percentile values for that BASIC to each driver.

## 4.2    Fatigued Driving (HOS) BASIC and Driver Fitness BASIC Assessment

This section describes the measurement of the Fatigued Driving (HOS) BASIC and the Driver Fitness BASIC. The definition of each BASIC is as follows:

- Fatigued Driving (HOS) BASIC—Operation of CMVs by drivers who are ill, fatigued, or in non-compliance with the Hours-Of-Service (HOS) regulations. This BASIC includes violations of regulations surrounding the complete and accurate recording of logbooks as they relate to HOS requirements and the management of CMV driver fatigue. Instances related to the Fatigued Driving (HOS) BASIC are distinguished from incidents where unconsciousness or an inability to react is brought about by the use of alcohol, drugs, or other controlled substances. Example violations include: HOS, logbook, and operating a CMV while ill or fatigued.

- Driver Fitness BASIC—Operation of CMVs by drivers who are unfit to operate a CMV due to lack of training, experience, or medical qualifications. Example violations: failure to have a valid and appropriate commercial driver's license and being medically unqualified to operate a CMV.

The DSMS assesses both the Fatigued Driving (HOS) BASIC and Driver Fitness BASIC using applicable violations recorded during roadside inspections to calculate a measure in each BASIC for individual drivers. These measures are used to generate percentile ranks that reflect drivers' relative safety posture.

### 4.2.1    Calculation of BASIC Measure

The equation used for calculating the BASIC measure for Fatigued Driving (HOS) and Driver Fitness is as follows:

$$BASIC\ Measure = \frac{Total\ of\ time\ and\ severity\ weighted\ applicable\ violations}{Total\ time\ weight\ of\ relevant\ inspections}$$

**Equation 4-2**

In this equation, the terms are defined as follows:

Applicable Violation is defined as any violation recorded in any level roadside inspection that matches the FMCSR and HMR cites listed for Fatigued Driving (HOS) (Table 2, Appendix A) and Driver Fitness (Table 3, Appendix A) during

the past 36 months, and for which the CMV driver can be held responsible
(‗Driver Responsible‗ column, Table 3 and 4).  In cases of multiple counts of the
same violation, the DSMS only uses each violation cite once per inspection.

A Relevant Inspection is any Driver Inspection (Level 1, 2, 3 or 6), including
those that do **not** result in a violation in the BASIC, or any other inspection
resulting in applicable BASIC violation.

A Severity Weight is assigned to each applicable violation, with a value
dependent on two parts: (i) the level of crash risk relative to the other violation
cites used in the BASIC measurement, and (ii) whether or not the violation
resulted in an OOS condition.

(i) The level of crash risk is assigned to each applicable violation ranging
from 1 (less severe) to 10 (most severe); see the Fatigued Driving (HOS)
Table (Table 2, Appendix A) and the Driver Fitness Table (Table 3,
Appendix A) for the corresponding severity weights of each violation cite.

(ii) An OOS weight of 2 is then added to the severity weight of OOS
violations.  In cases of multiple counts of the same violation, if any of the
counts of the violation are OOS the OOS weight of 2 applies.

The sum of all severity weights yielded by any one inspection for violations in
any one BASIC is capped at a maximum of 30.  This cap of 30 is applied before
the severity weights are multiplied by the time weight.

A Time Weight of 1, 2 or 3 is assigned to each applicable violation and each
relevant inspection based on its age.  Violations recorded in the past 12 months
receive a time weight of 3.  Violations recorded between 12 and 24 months ago
receive a time weight of 2.  All violations recorded earlier (older than 24 months
but within the past 36 months) receive a time weight of 1.  Using the exact same
time weight scheme, time weights are assigned to each relevant inspection,
regardless of whether or not an inspection yielded an applicable violation.  This
time weighting places more emphasis on results of recent inspections relative to
older inspections.

Time and Severity Weighted Violation is a violation‗s severity weight multiplied
by its time weight.

### 4.2.2   Calculation of BASIC Percentile Rank

Based on the BASIC measures, the DSMS applies data sufficiency standards to assign a
percentile rank to drivers that can then potentially be subjected to a CSA 2010
intervention.  The calculation is as follows:

A.  Determine the total number of relevant inspections and number of inspections
with at least one BASIC violation.  Remove drivers with (1) less than three
relevant inspections or (2) no inspections resulting in at least one BASIC

violation.  For the remaining drivers, place each driver into one of three groups based on the number of relevant inspections:

| Safety Event Group Category | Number of Relevant Inspections |
|:---:|:---:|
| **1** | 3 |
| **2** | 4-6 |
| **3** | 7+ |

**Table 4-1.  Safety Event Group Categories for Fatigued Driving (HOS) and Driver Fitness BASICs**

B.  Within each group, rank all the drivers' BASIC measures in ascending order.  Transform the ranked values into percentiles from 0 (representing the lowest BASIC measure) to 100 (representing the highest BASIC measure).

## 4.3    Vehicle Maintenance BASIC and Cargo-Related BASIC Assessment

This section describes the measurement of the Vehicle Maintenance BASIC and the Cargo-Related BASIC.  The definition of each BASIC is as follows:

- Vehicle Maintenance BASIC— Failure to properly maintain a CMV.  Example violations: brakes, lights, and other mechanical defects, and failure to make required repairs that would be found in a pre-trip inspection.

- Cargo-Related BASIC— Failure to properly prevent shifting loads, spilled or dropped cargo, and unsafe handling of hazardous materials on a CMV.  Example violations: improper load securement, cargo retention, and hazardous material handling.

The DSMS assesses both the Vehicle Maintenance BASIC and the Cargo-Related BASIC using relevant violations recorded during roadside inspections to calculate a measure in each BASIC for individual drivers.  These measures are used to generate percentile ranks that reflect drivers' relative safety posture.

### 4.3.1    Calculation of BASIC Measure

The equation used for calculating the Vehicle Maintenance and Cargo-Related BASIC measures is as follows:

$$BASIC\ Measure = \frac{Total\ of\ time\ and\ severity\ weighted\ applicable\ violations}{Total\ time\ weight\ of\ relevant\ inspections}$$

**Equation 4-3**

In this equation, the terms are defined as follows:

Applicable Violation is as any violation recorded in any level roadside inspection that matches the FMCSR and HMR cites listed for Vehicle Maintenance (Table 5, Appendix A) and Cargo-Related (Table 6, Appendix A) BASICS during the past 36 months, and for which the CMV driver can be held responsible (_Driver Responsible‘ column, Table 5 and 6).  In cases of multiple counts of the same violation, the DSMS only uses each violation cite once per inspection.

A Relevant Inspection is any Vehicle Inspection (Level 1, 2, 5 or 6), including those that do **not** result in a violation in the BASIC, or any other inspection resulting in applicable BASIC violation.

A Severity Weight is assigned to each applicable violation with a value dependent on two parts: (i) the level of crash risk relative to the other violation cites used in the BASIC measurement, and (ii) whether or not the violation resulted in an OOS condition.

(i)     The level of crash risk is assigned to each applicable violation ranging from 1 (less severe) to 10 (most severe); see the Vehicle Maintenance Table (Table 5, Appendix A) and the Cargo-Related (Table 6, Appendix A) BASICS for the corresponding severity weights of each violation cite.

(ii)    An OOS weight of 2 is then added to the severity weight of OOS violations.  In cases of multiple counts of the same violation, if any of the counts of the violation are OOS the OOS weight of 2 applies.

The sum of all severity weights yielded by any one inspection for violations in any one BASIC is capped at a maximum of 30.  This cap of 30 is applied before the severity weights are multiplied by the time weight.

A Time Weight of 1, 2 or 3 is assigned to each applicable violation and each relevant inspection based on its age.  Violations recorded in the past 12 months receive a time weight of 3.  Violations recorded between 12 and 24 months ago receive a time weight of 2.  All violations recorded earlier (older than 24 months but within the past 36 months) receive a time weight of 1.  Using the exact same time weight scheme, time weights are assigned to each relevant inspection, regardless of whether or not an inspection yielded an applicable violation.  This time weighting places more emphasis on results of recent inspections relative to older inspections.

Time and Severity Weighted Violation is a violation‘s severity weight multiplied by its time weight.

### 4.3.2    Calculation of BASIC Percentile Rank

Based on the BASIC measures, the DSMS applies data sufficiency standards to assign a percentile rank to drivers that can then potentially be subjected to a CSA 2010 intervention.  The calculation is as follows:

A. Determine the total number of relevant vehicle inspections and the number of inspections with at least one BASIC violation.  Remove drivers with (1) less than three relevant inspections or (2) no inspections resulting in at least one BASIC violation.  For the remaining drivers, place each driver into one of three groups based on the number of relevant inspections:

| Safety Event Group Category | Number of Relevant Inspections |
|---|---|
| 1 | 3 |
| 2 | 4-6 |
| 3 | 7+ |

**Table 4-2.  Safety Event Group Categories for Vehicle Maintenance and Cargo-Related BASICs**

B. Within each group, rank all the drivers' BASIC measures in ascending order.  Transform the ranked values into percentiles from 0 (representing the lowest BASIC measure) to 100 (representing the highest BASIC measure).

## 4.4    Crash Indicator Assessment

This section describes the measurement of the Crash Indicator.  The definition of the Crash Indicator is as follows:

- Crash Indicator—Histories or patterns of high crash involvement, including frequency and severity, based on information from state-reported crash reports.

Although the BASICs are used to measure an entity's behaviors, the crash history utilized by the Crash Indicator is not specifically a behavior; rather, it is the consequence of behavior and may indicate a problem with the entity that warrants intervention.

The DSMS assesses the Crash Indicator using relevant state-reported crash data to calculate a measure of the indicator for individual drivers.  This measure is used to generate percentile ranks that reflect drivers' relative crash posture.

### 4.4.1    Calculation of Crash Indicator Measure

The equation used for calculating the Crash Indicator measure is as follows:

$$Crash\ Indicator\ Measure = Total\ of\ time\ and\ severity\ weighted\ applicable\ crashes$$

**Equation 4-4**

In this equation, the terms are defined as follows:

Applicable Crash is based on crash reports provided by the states for each crash that meets the reportable crash standard during the past 36 months. A reportable crash is one that results in at least one fatality; one injury where the person injured is taken to a medical facility for immediate medical attention; or one vehicle having been towed from the scene (i.e. tow-away) as a result of disabling damage caused by the crash.

Crash Severity Weight places more weight on crashes with more severe consequences. For example, a crash involving an injury or fatality is weighted more heavily than a crash where only a tow-away occurred. A hazmat release also increases the weighting of a crash, as shown in Table 4-3.

| Crash Type | Crash Severity Weight |
|---|---|
| Involves tow-away but no injury or fatality | 1 |
| Involves injury or fatality | 2 |
| Involves a hazmat release | Crash Severity Weight (from above) + 1 |

**Table 4-3. Crash Severity Weights for Crash Indicator**

A Time Weight of 1, 2 or 3 is assigned to each applicable crash based on the time elapsed since it occurred. Crashes that occurred in the past 12 months receive a time weight of 3. Crashes that occurred between 12 and 24 months ago receive a time weight of 2. All crashes that happened later (older than 24 months but within the past 36 months) receive a time weight of 1. This time weighting places more emphasis on recent crashes relative to older crashes.

Time and Severity Weighted Crash is a crash's severity weight multiplied by its time weight.

### 4.4.2    Calculation of Crash Indicator Percentile Rank

Based on the Crash Indicator measures, the DSMS applies data sufficiency standards and assigns a percentile rank to drivers who then can potentially receive a CSA 2010 intervention. The calculation is as follows:

A. Identify drivers with at least one applicable crash.

B. Rank all the drivers' Crash Indicator measures in ascending order. Transform the ranked values into percentiles from 0 (representing the lowest indicator measure) to 100 (representing the highest indicator measure). Then, assign the percentile values to each driver.

## 5.  Sample SMS Output

As part of the SMS development process, a web-based interface was developed to display preliminary/prototype results.  The website provides a query capability allowing a user to search an entity of interest or identify the worst performing entities in each BASIC and Crash Indicator.  Also available is a drill-down capability, which displays all the BASIC and Crash Indicator results of an individual entity and the safety events used in determining the BASIC percentile.

Figure 5-1 is a screenshot of the CSMS carrier measurement summary page for an actual carrier with the identifying fields obscured.  This summary page provides carrier identification information (e.g., name, USDOT number), current safety information (e.g., safety rating, SafeStat results, inspection, and crash activity), and SMS BASIC and Crash Indicator information (e.g., measure, rank, and percentile).  The BASIC percentiles above the CSA 2010 intervention thresholds are highlighted in yellow to indicate potential problem areas.  Percentiles of 97 and higher in the Unsafe Driving, Fatigued Driving (HOS), Driver Fitness, Vehicle Maintenance and Cargo-Related BASICs are highlighted in red.

Note that the carrier in Figure 5-1 is at 99.9% in both the Unsafe Driving BASIC and at 98.6% in the Driver Fitness BASIC.  These BASIC percentiles mean that this carrier has demonstrated worse safety performance than 99.9% and 98.6%, respectively, of the other carriers evaluated in these BASICs.  Under the current SafeStat/CR process, this carrier, as a Category E carrier, is not a high priority to receive a CR and has not yet received a CR or safety rating.  Under the CSA 2010 OM, this carrier will be slated for CSA 2010 interventions.



**Figure 5-1. CSMS Screenshot**

## 6.  SMS Report – Summary/Next Steps

The SMS methodology is part of a continuous improvement process in support of CSA 2010 and the implementation of the new FMCSA OM. Several major enhancements (see Appendix B) were made to the SMS as part of lessons learned from the CSA 2010 OM test and public lessoning session feedback.   Future improvements to the SMS will be also based on feedback from stakeholders such as enforcement personnel, industry and the public, as well as on additional findings as FMCSA implements the CSA OM nationally.  In addition, as new data sources become available, these may be incorporated into the SMS methodology.  Finally, the SMS will be enhanced periodically as future research reveals new and useful knowledge about crash causation and about the relationship between crash risk and regulatory compliance.

# Appendix A

**Violation Severity by BASIC**

*Overview*

The tables in this Appendix contain a breakdown of all FMCSRs and HMRs that can lead to roadside violations, with each table representing a unique BASIC. A severity weight is assigned to each regulation and reflects its relevance to crash risk. Within each BASIC, the regulations are grouped based on their attributes so that similar violations can be assigned the same severity weights. Severity weights, discussed in more detail below, are <u>not</u> comparable across the BASICs.

*Interpretation of the Severity Weights*

The violation severity weights in the tables that follow have been converted into a scale from 1 to 10, where 1 represents the lowest crash risk and 10 represents the highest crash risk relative to the other violations in the BASIC. Because the weights reflect the relative importance of each violation only within each particular BASIC, they cannot be compared meaningfully across the various BASICs. Therefore, a ‗5' in one BASIC is not equivalent to a ‗5' in another BASIC, but the ‗5' does represent the midpoint between a crash risk of 1 and 10 within the same BASIC. The ―Violation Group" column in each table identifies the group to which each violation has been assigned. Each violation within a violation group is assigned the same severity weight.

*Derivation of the Severity Weights*

The severity weights for each violation were derived through the following six-step process:

1. **BASIC Mapping**—All roadside safety-related violations were mapped to an appropriate BASIC so the severity weight analysis could be conducted on each individual BASIC.
2. **Violation Grouping**—All violations in each BASIC were placed into groups of similar violations based on the judgment of enforcement subject matter experts. These groups, listed in the ―Violation Group" column in each table, make it possible to incorporate otherwise rarely cited violations into the robust statistical analysis used to derive the severity weights. The violation grouping also ensured that similar types of violations received the same severity weight.
3. **Crash Occurrence Analysis**—Statistical analysis was performed to quantify the extent of the relationship between crash involvement on the one hand, and violation rates in each violation group, within each BASIC, on the other hand. A driver approach was used in this analysis. This approach was followed due to

strong demonstrable relationships between driver crashes and violations documented in prior research at the Volpe Center.  The earlier research was conducted in support of FMCSA's CRWG, the CSA 2010 Initiative's predecessor.  Based on the conclusions from this past research, the Volpe Center developed a Driver Information Resource (DIR) for FMCSA.  The DIR uses individual crash and inspection reports from all states to construct multi-year driver safety histories on individual drivers.  Multivariate negative binomial regression models were used to quantify the strength of relationships between driver violations rates in individual violation groups and crash involvement.

4. **Crash Consequences Analysis**—This analysis incorporates crash consequences attributable to the violation groups based on findings from the Violation Severity Assessment Study (VSAS).[5]  The VSAS quantifies the crash risk associated with individual FMCSR and HMR violations in terms of comparable dollar values.  These comparable dollar values represent the increased social cost attributable to the presence of a violation.  Together, the regression analysis (Step 3) and VSAS findings make it possible to address total crash risk in terms of both crash occurrence and crash consequence.

5. **Subject Matter Expert Review**—Enforcement subject matter experts reviewed the results derived purely from the statistical approaches described in Steps 3 and 4.  Modifications were made to the severity weights based on input from the subject matter experts. This approach helps to compensate for the limitations of the statistical analysis, such as lack of statistical significance of rarely cited violations.

6. **CSMS Effectiveness Test**—Various severity weighting schemes developed in Steps 1 through 5 were applied to the CSMS to provide an empirical evaluation of the weighting schemes.  The empirical evaluation, or "CSMS Effectiveness Test," was modeled after the SafeStat Effectiveness Test.[6]  The CSMS Effectiveness Test was accomplished through the following actions:  (1) performing a simulated CSMS run that calculates carrier percentile ranks for each BASIC using historical data; (2) examining each carrier's crash involvement over the immediate 18 months after the simulated CSMS timeframe, and (3) observing the relationship between the percentile ranks in each BASIC and the subsequent post-CSMS carrier crash rates.  The CSMS Effectiveness Test provides an environment to evaluate various severity weight schemes in terms of their impact in identifying high-risk carriers.  It also provides a means of testing other weight schemes, such as the OOS weight, to help optimize CSMS's effectiveness.

This six-step process made it possible to develop a conceptual framework for the CSMS in the form of violation groupings and associated severity weights.  The associated

---

[5] *Violations Severity Assessment Study Final Report* (October 2007).  Prepared for FMCSA by John A. Volpe National Transportation Systems Center.

[6] SafeStat Motor Carrier Safety Status Measurement System Methodology: Version 8.6 (January 2004). Prepared for FMCSA by John A. Volpe National Transportation Systems Center.  Chapter 7: SafeStat Evaluation.

severity weights were based on both empirical analysis and valuable accumulated knowledge from field experts.  The data-driven component of the process, in particular, differentiates the CSMS from SafeStat and addresses some of the criticisms of the SafeStat algorithm.

Tables 1 through 6 list all of the violations in the CSMS, with the first two columns of each table identifying each violation by regulatory part and its associated definition.  The third column in each table identifies the violation group to which each violation is assigned, followed by the violation groups' severity weights in the fourth column.  The final column in these tables specifies whether or not each violation is also included in the DSMS; violations included in the DSMS are the subset of CSMS BASIC violations of which the CMV driver could also be a responsible party.

| | Table 1. CSMS Unsafe Driving BASIC Violations[7] | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight | Violation in the DSMS (Y/N) |
| 177.800(d) | Unnecessary delay in HM transportation to destination | HM Related | 1 | Y |
| 390.17DT | Operating a CMV while texting | Texting | 10 | Y |
| 390.20 | Failing to properly secure parked vehicle | Other Driver Violations | 1 | Y |
| 392.2C | Failure to obey traffic control device | Dangerous Driving | 5 | Y |
| 392.2DH | Headlamps - Failing to dim when required | Misc Violations | 3 | Y |
| 392.2FC | Following too close | Dangerous Driving | 5 | Y |
| 392.2LC | Improper lane change | Dangerous Driving | 5 | Y |
| 392.2LV | Lane Restriction violation | Misc Violations | 3 | Y |
| 392.2P | Improper passing | Dangerous Driving | 5 | Y |
| 392.2PK | Unlawfully parking and/or leaving vehicle in the roadway | Other Driver Violations | 1 | Y |
| 392.2R | Reckless driving | Reckless Driving | 10 | Y |
| 392.2RR | Railroad Grade Crossing violation | Dangerous Driving | 5 | Y |
| 392.2S | Speeding | Speeding Related | 5 | Y |
| 392.2-SLLS1 | State/Local Laws - Speeding 1-5 miles per hour over the speed limit | Speeding 1 | 1 | Y |
| 392.2-SLLS2 | State/Local Laws - Speeding 6-10 miles per hour over the speed limit | Speeding 2 | 4 | Y |
| 392.2-SLLS3 | State/Local Laws - Speeding 11-14 miles per hour over the speed limit | Speeding 3 | 7 | Y |
| 392.2-SLLS4 | State/Local Laws - Speeding 15 or more miles per hour over the speed limit | Speeding 4 | 10 | Y |

---

[7] Violation severity weights reflect the relative importance of each violation within each BASIC. These weights *cannot* be compared or added meaningfully across the BASICs.

| Table 1. CSMS Unsafe Driving BASIC Violations[7] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight | Violation in the DSMS (Y/N) |
| 392.2-SLLSWZ | State/Local Laws - Speeding work/construction zone | Speeding 4 | 10 | Y |
| 392.2-SLLT | State/Local Laws - Operating a CMV while texting | Texting | 10 | Y |
| 392.2T | Improper turns | Dangerous Driving | 5 | Y |
| 392.2Y | Failure to yield right of way | Dangerous Driving | 5 | Y |
| 392.6 | Scheduling run to necessitate speeding | Speeding Related | 5 | N |
| 392.10(a)(1) | Failing to stop at railroad crossing—bus | Dangerous Driving | 5 | Y |
| 392.10(a)(2) | Failing to stop at railroad crossing—chlorine | Dangerous Driving | 5 | Y |
| 392.10(a)(3) | Failing to stop at railroad crossing—placard | Dangerous Driving | 5 | Y |
| 392.10(a)(4) | Failing to stop at railroad crossing—HM cargo | Dangerous Driving | 5 | Y |
| 392.14 | Failed to use caution for hazardous condition | Dangerous Driving | 5 | Y |
| 392.16 | Failing to use seat belt while operating CMV | Seat Belt | 7 | Y |
| 392.22(a) | Failing to use hazard warning flashers | Other Driver Violations | 1 | Y |
| 392.60(a) | Unauthorized passenger on board CMV | Other Driver Violations | 1 | Y |
| 392.62 | Unsafe bus operations | Other Driver Violations | 1 | Y |
| 392.62(a) | Bus—Standees forward of the standee line | Other Driver Violations | 1 | Y |
| 392.71(a) | Using or equipping a CMV with radar detector | Speeding Related | 5 | Y |
| 397.3 | State/local laws ordinances regulations | HM Related | 1 | Y |
| 397.13 | Smoking within 25 feet of HM vehicle | HM Related | 1 | Y |
| 398.4 | Driving of vehicle—migrant workers | Other Driver Violations | 1 | Y |

| Table 2. CSMS Fatigued Driving (HOS) BASIC Violations[8] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[9] | Violation in the DSMS (Y/N) |
| 392.2H | State/Local Hours of Service (HOS) | Hours | 7 | Y |
| 392.3 | Operating a CMV while ill/fatigued | Jumping OOS/Driving Fatigued | 10 | Y |
| 395.1(h)(1) | 15, 20, 70/80 HOS violations (Alaska-Property) | Hours | 7 | Y |
| 395.1(h)(2) | 15, 20, 70/80 HOS violations (Alaska-Passenger) | Hours | 7 | Y |
| 395.1(h)(3) | Adverse driving conditions violations (Alaska) | Hours | 7 | Y |
| 395.1(o) | 16 hour rule violation (Property) | Hours | 7 | Y |
| 395.3(a)(1) | Requiring or permitting driver to drive more than 11 hours | Hours | 7 | Y |
| 395.3A1R | 11 hour rule violation (Property) | Hours | 7 | Y |
| 395.3(a)(2) | Requiring or permitting driver to drive after 14 hours on duty | Hours | 7 | Y |
| 395.3A2R | 14 hour rule violation (Property) | Hours | 7 | Y |
| 395.3(b) | 60/70- hour rule violation | Hours | 7 | Y |
| 395.3BR | 60/70 hour rule violation (Property) | Hours | 7 | Y |
| 395.3(c) | 34- hour restart violation (Property) | Hours | 7 | Y |
| 395.5(a)(1) | 10- hour rule violation (Passenger) | Hours | 7 | Y |
| 395.5(a)(2) | 15- hour rule violation (Passenger) | Hours | 7 | Y |
| 395.5(b) | 60/70- hour rule violation (Passenger) | Hours | 7 | Y |
| 395.8 | Log violation (general/form and manner) | Other Log/Form & Manner | 2 | Y |

[8] Violation severity weights reflect the relative importance of each violation within each BASIC. These weights *cannot* be compared or added meaningfully across the BASICs.

[9] In cases where a violation results in an out-of-service order as defined in 49 CFR 390.5, an additional weight of 2 is added to arrive at a total severity weight for the violation.

| Table 2. CSMS Fatigued Driving (HOS) BASIC Violations[8] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[9] | Violation in the DSMS (Y/N) |
| 395.8(a) | No drivers record of duty status | Incomplete/ Wrong Log | 5 | Y |
| 395.8(e) | False report of drivers record of duty status | False Log | 7 | Y |
| 395.8(f)(1) | Drivers record of duty status not current | Incomplete/ Wrong Log | 5 | Y |
| 395.8(k)(2) | Driver failing to retain previous 7 days' logs | Incomplete/ Wrong Log | 5 | Y |
| 395.13(d) | Driving after being declared out-of-service | Jumping OOS/Driving Fatigued | 10 | Y |
| 395.15(b) | Onboard recording device information requirements not met | EOBR Related | 1 | Y |
| 395.15(c) | Onboard recording device improper form and manner | EOBR Related | 1 | Y |
| 395.15(f) | Onboard recording device failure and driver failure to reconstruct duty status | EOBR Related | 1 | Y |
| 395.15(g) | On-board recording device information not available | EOBR Related | 1 | Y |
| 395.15(i)(5) | Onboard recording device does not display required information. | EOBR Related | 1 | N |
| 398.6 | Violation of hours of service regulations—migrant workers | Hours | 7 | Y |

| Table 3. CSMS Driver Fitness BASIC Violations [10] | | | | |
|---|---|---|---|---|
| **Section** | **Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection** | **Violation Group Description** | **Violation Severity Weight[11]** | **Violation in the DSMS (Y/N)** |
| 177.816 | Driver training requirements | General Driver Qualification | 4 | N |
| 383.21 | Operating a CMV with more than one driver's license | License-related | 8 | Y |
| 383.21(a) | Operating a CMV with more than one driver's license† | License-related | 8 | Y |
| 383.23(a)(2) | Operating a CMV without a CDL | License-related | 8 | Y |
| 383.23(c) | Operating on learner's permit without CDL holder | License-related | 8 | Y |
| 383.23(c)(1) | Operating on learner's permit without CDL holder | License-related | 8 | Y |
| 383.23(c)(2) | Operating on learner's permit without valid driver's license | License-related | 8 | Y |
| 383.51(a) | Driving a CMV (CDL) while disqualified | License-related | 8 | Y |
| 383.91(a) | Operating a CMV with improper CDL group | License-related | 8 | Y |
| 383.93(b)(1) | No double/triple trailer endorsement on CDL | License-related | 8 | Y |
| 383.93(b)(2) | No passenger vehicle endorsement on CDL | License-related | 8 | Y |
| 383.93(b)(3) | No tank vehicle endorsement on CDL | License-related | 8 | Y |
| 383.93(b)(4) | No hazardous materials endorsement on CDL | License-related | 8 | Y |

---

[10] Violation severity weights reflect the relative importance of each violation within each BASIC. These weights *cannot* be compared or added meaningfully across the BASICs.

[11] In cases where a violation results in an out-of-service order as defined in 49 CFR 390.5, an additional weight of 2 is added to arrive at a total severity weight for the violation.

† Citations marked with † are being phased out based on regulatory changes, and are intended for removal from the SMS at a later time.

| Table 3. CSMS Driver Fitness BASIC Violations [10] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[11] | Violation in the DSMS (Y/N) |
| 383.93(b)(5) | No school bus endorsement on CDL | License-related | 8 | Y |
| 383.93B5LCDL | License (CDL) - Operating a school bus without a school bus endorsement as described in 383.93(b)(5) | License-related | 8 | Y |
| 383.95(a) | Violating airbrake restriction | License-related | 8 | Y |
| 386.72(b) | Failing to comply with Imminent Hazard OOS Order | Fitness/Jumping OOS | 10 | Y |
| 391.11 | Unqualified driver | License-related | 8 | Y |
| 391.11(b)(1) | Interstate driver under 21 years of age | General Driver Qualification | 4 | Y |
| 391.11(b)(2) | Non-English speaking driver | General Driver Qualification | 4 | Y |
| 391.11B2S | Driver must be able to understand highway traffic signs and signals in the English language | General Driver Qualification | 4 | Y |
| 391.11(b)(4) | Driver lacking physical qualification(s) | Physical | 2 | Y |
| 391.11(b)(5) | Driver lacking valid license for type vehicle being operated | License-related | 8 | Y |
| 391.11(b)(7) | Driver disqualified from operating CMV | License-related | 8 | Y |
| 391.15(a) | Driving a CMV while disqualified | License-related | 8 | Y |
| 391.41(a) | Driver not in possession of medical certificate | Medical Certificate | 1 | Y |
| 391.43(h) | Improper medical examiners certificate form | Medical Certificate | 1 | Y |
| 391.45(b) | Expired medical examiner's certificate | Medical Certificate | 1 | Y |
| 391.49(j) | No valid medical waiver in driver's possession | Medical Certificate | 1 | Y |

| Table 3. CSMS Driver Fitness BASIC Violations [10] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[11] | Violation in the DSMS (Y/N) |
| 398.3(b) | Driver not physically qualified | Physical | 2 | Y |
| 398.3(b)(8) | No doctor's certificate in possession | Medical Certificate | 1 | Y |

| | Table 4. CSMS Controlled Substances/Alcohol BASIC Violations[12] | | | |
|---|---|---|---|---|
| Section | Violation Description | Violation Group Description | Violation Severity Weight | Violation in the DSMS (Y/N) |
| 392.5(c)(2) | Violating OOS order pursuant to 392.5(a)/(b) | Alcohol Jumping OOS | 10 | Y |
| 392.4(a) | Driver uses or is in possession of drugs | Drugs | 10 | Y |
| 392.5(a) | Possession/use/under influence alcohol-4hrs prior to duty | Alcohol | 5 | Y |

---

[12] Violation severity weights reflect the relative importance of each violation within each BASIC. These weights *cannot* be compared or added meaningfully across the BASICs.

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 365.511 | Fail to display current CVSA Decal: Permanent Authority | Inspection Reports | 4 | N |
| 374.313(a) | Failure to maintain a reasonable temperature | Cab, Body, Frame | 2 | Y |
| 374.313(b) | Bus — Failure to maintain restroom | Cab, Body, Frame | 2 | Y |
| 374.313(c) | Bus — Not maintained in clean working order | Cab, Body, Frame | 2 | Y |
| 385.103(c) | Fail to display current CVSA decal— Provisional Authority | Inspection Reports | 4 | N |
| 392.2WC | Wheel (Mud) Flaps missing or defective | Windshield /Glass /Markings | 1 | Y |
| 392.7 | No pre-trip inspection | Inspection Reports | 4 | Y |
| 392.7(a) | Driver failing to conduct pre-trip inspection | Inspection Reports | 4 | Y |
| 392.7(b) | Driver failing to conduct a pre-trip inspection of Intermodal Equipment | Inspection Reports | 4 | Y |
| 392.8 | Failing to inspect/use emergency equipment | Emergency Equipment | 2 | Y |
| 392.22(b) | Failing/improper placement of warning devices | Cab, Body, Frame | 2 | Y |
| 392.33 | Operating CMV with lamps/reflectors obscured | Lighting | 6 | Y |
| 393.9(a) | Inoperative required lamps | Clearance Identification Lamps/Other | 2 | Y |

[13] Violation severity weights reflect the relative importance of each violation within each BASIC. These weights *cannot* be compared or added meaningfully across the BASICs.

[14] In cases where a violation results in an out-of-service order as defined in 49 CFR 390.5, an additional weight of 2 is added to arrive at a total severity weight for the violation.

† Citations marked with † are being phased out based on regulatory changes, and are intended for removal from the SMS at a later time.

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 393.9H | Inoperative head lamps | Lighting | 6 | Y |
| 393.9T | Inoperative tail lamp | Lighting | 6 | Y |
| 393.9TS | Inoperative turn signal | Lighting | 6 | Y |
| 393.11 | No/defective lighting devices/reflective devices/projected | Reflective Sheeting | 3 | Y |
| 393.11LR | Lower retroreflective sheeting/reflex reflectors manufactured on or after 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.11N | No retroreflective sheeting/reflex reflectors manufactured on or after 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.11RT | Retroreflective not affixed as required Trailer manufactured on or after 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.11S | Side retroreflective sheeting/reflex reflectors manufactured on or after 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.11TL | Truck Tractor manufactured on or after 7/1/1997 with no retro reflective sheeting or reflex reflectors on mud flaps | Reflective Sheeting | 3 | Y |
| 393.11TT | Truck Tractor no retroreflective sheeting/reflex reflectors manufactured on or after 7/1/1997 | Reflective Sheeting | 3 | Y |
| 393.11TU | Truck Tractor upper body corners retroreflective sheeting/reflex manufactured on or after 7/1/1997 | Reflective Sheeting | 3 | Y |
| 393.11UR | Upper reflex reflectors retroreflective sheeting/reflex reflectors manufactured on or after 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.13(a) | Retroreflective tape not affixed; Trailer manufactured before 12//1/1993 | Reflective Sheeting | 3 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 393.13(b) | No retroreflective sheeting/reflex reflectors manufactured on or after 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.13(c)(1) | Side retroreflective sheeting/reflex reflectors manufactured on or before 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.13(c)(2) | Lower retroreflective sheeting/reflex reflectors manufactured on or before 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.13(c)(3) | Upper retroreflective sheeting/reflex reflectors manufactured on or before 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.13(d)(1) | Side retroreflective sheeting/reflex reflectors manufactured on or after 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.13(d)(2) | Lower rear retroreflective sheeting/reflex reflectors manufactured on or after 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.13(d)(3) | Upper rear retroreflective sheeting/reflex reflectors manufactured on or after 12/1/1993 | Reflective Sheeting | 3 | Y |
| 393.17 | No/defective lamp/reflector-tow-away operation | Lighting | 6 | Y |
| 393.17(a) | No/defective lamps-towing unit-tow-away operation | Lighting | 6 | Y |
| 393.17(b) | No/defective tow-away lamps on rear unit | Lighting | 6 | Y |
| 393.19 | Inoperative/defective hazard warning lamp | Lighting | 6 | Y |
| 393.23 | Required lamp not powered by vehicle electricity | Clearance Identification Lamps/Other | 2 | Y |
| 393.24(a) | Non-compliance with headlamp requirements | Lighting | 6 | Y |
| 393.24(b) | Non-compliant fog/driving lamps | Lighting | 6 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 393.24 | Non-compliant fog or driving lamps | Lighting | 6 | Y |
| 393.24(c) | Improper headlamp mounting | Lighting | 6 | N |
| 393.24(d) | Improper head / auxiliary / fog lamp aiming | Lighting | 6 | N |
| 393.25(a) | Improper lamp mounting | Lighting | 6 | N |
| 393.25(b) | Lamps are not visible as required | Lighting | 6 | Y |
| 393.25(e) | Lamp not steady burning | Lighting | 6 | Y |
| 393.25(f) | Stop lamp violations | Lighting | 6 | Y |
| 393.26 | Requirements for reflectors | Reflective Sheeting | 3 | Y |
| 393.28 | Improper or no wiring protection as required | Other Vehicle Defect | 3 | Y |
| 393.30 | Improper battery installation | Other Vehicle Defect | 3 | Y |
| 393.40 | Inadequate brake system on a CMV | Brakes, All Others | 4 | Y |
| 393.41 | No or defective parking brake system on CMV | Brakes, All Others | 4 | Y |
| 393.42 | No brakes as required | Brakes, All Others | 4 | Y |
| 393.43 | No/improper breakaway or emergency braking | Brakes, All Others | 4 | Y |
| 393.43(a) | No/improper tractor protection valve | Brakes, All Others | 4 | Y |
| 393.43(d) | No or defective automatic trailer brake | Brakes, All Others | 4 | Y |
| 393.44 | No/defective bus front brake line protection | Brakes, All Others | 4 | Y |
| 393.45 | Brake tubing and hose adequacy | Brakes, All Others | 4 | N |
| 393.45(a)(4) | Failing to secure brake hose/tubing against mechanical damage | Brakes, All Others | 4 | N |
| 393.45(b)(2) | Failing to secure brake hose/tubing against mechanical damage | Brakes, All Others | 4 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 393.45(b)(3) | Failing to secure brake hose/tubing against high temperatures | Brakes, All Others | 4 | N |
| 393.45(d) | Brake connections with leaks/constrictions | Brakes, All Others | 4 | N |
| 393.47 | Inadequate/contaminated brake linings | Brakes, All Others | 4 | Y |
| 393.47(a) | Inadequate brakes for safe stopping | Brakes, All Others | 4 | Y |
| 393.47(b) | Mismatched brake chambers on same axle | Brakes, All Others | 4 | Y |
| 393.47(c) | Mismatched slack adjuster effective length | Brakes, All Others | 4 | Y |
| 393.47(d) | Insufficient brake linings | Brakes, All Others | 4 | Y |
| 393.47(e) | Clamp/Roto-Chamber type brake(s) out of adjustment | Brakes Out of Adjustment | 4 | Y |
| 393.47(f) | Wedge type brake(s) out of adjustment | Brakes Out of Adjustment | 4 | Y |
| 393.47(g) | Insufficient drum/rotor thickness | Brakes, All Others | 4 | Y |
| 393.48(a) | Inoperative/defective brakes | Brakes, All Others | 4 | Y |
| 393.48(b)(1) | Defective brake limiting device | Brakes, All Others | 4 | Y |
| 393.50 | Inadequate reservoir for air/vacuum brakes | Brakes, All Others | 4 | N |
| 393.50(a) | Failing to have sufficient air/vacuum reserve | Brakes, All Others | 4 | N |
| 393.50(b) | Failing to equip vehicle—prevent reservoir air/vacuum leak | Brakes, All Others | 4 | N |
| 393.50(c) | No means to ensure operable check valve | Brakes, All Others | 4 | N |
| 393.50(d) | No or defective air reservoir drain valve | Brakes, All Others | 4 | Y |
| 393.51 | No or defective brake warning device | Brakes, All Others | 4 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 393.52(a)(1) | Insufficient braking force as percent of GVW or GCW | Brakes, All Others | 4 | Y |
| 393.53(a) | Automatic brake adjuster CMV manufactured on or after 10/20/1993— hydraulic brake | Brakes, All Others | 4 | Y |
| 393.53(b) | Automatic brake adjuster CMV manufactured on or after 10/20/1994— air brake | Brakes, All Others | 4 | Y |
| 393.53(c) | Brake adjustment indicator CMV manufactured on or after 10/20/1994— external automatic adjustment | Brakes, All Others | 4 | Y |
| 393.55(a) | ABS— all CMVs manufactured on or after 3/1/1999 with hydraulic brakes | Brakes, All Others | 4 | N |
| 393.55(b) | ABS— malfunction indicators for hydraulic brake system | Brakes, All Others | 4 | N |
| 393.55(c)(1) | ABS— all tractors manufactured on or after 3/1/1997 air brake system | Brakes, All Others | 4 | N |
| 393.55(c)(2) | ABS— all other CMVs manufactured on or after 3/1/1998 air brake system | Brakes, All Others | 4 | N |
| 393.55(d)(1) | ABS— malfunctioning circuit/signal manufactured on or after 3/1/1997, single-unit CMV manufactured on or after 3/1/1998 | Brakes, All Others | 4 | N |
| 393.55(d)(2) | ABS— malfunctioning indicator to cab of towing CMV manufactured on or after 3/1/2001 | Brakes, All Others | 4 | N |
| 393.55(d)(3) | ABS— malfunctioning indicator connection from towed CMV manufactured on or after 3/1/2001 | Brakes, All Others | 4 | N |
| 393.55(e) | ABS— malfunctioning lamps towed CMV manufactured on or after 3/1/1998, manufactured before 3/1/2009 | Brakes, All Others | 4 | Y |
| 393.60(b) | Windshields required | Windshield/ Glass/ Makings | 1 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 393.60(c) | Damaged or discolored windshield | Windshield/ Glass/ Makings | 1 | Y |
| 393.60(d) | Glazing permits less than 70 percent of light | Windshield/ Glass/ Makings | 1 | Y |
| 396.60EWS | Windshield - Obstructed | Windshield/ Glass/ Makings | 1 | Y |
| 393.61 | Inadequate or missing truck side windows | Windshield/ Glass/ Makings | 1 | Y |
| 393.61(a) | Inadequate or missing truck side windows | Windshield/ Glass/ Makings | 1 | Y |
| 393.61(b)(2) | Emergency exit window handle broken † | Windshield/ Glass/ Makings | 1 | Y |
| 393.62(a) | No or defective bus emergency exits, manufactured on or after 9/1/1994 | Windshield/ Glass/ Makings | 1 | Y |
| 393.62(b) | No or defective bus emergency exits, manufactured on or after 9/1/1973 but before 9/1/1994 | Windshield/ Glass/ Makings | 1 | Y |
| 393.62(c) | No or defective bus emergency exit windows, manufactured before 9/1/1973 | Windshield/ Glass/ Makings | 1 | Y |
| 393.62(d) | No / defective Safety glass/push-out window | Windshield/ Glass/ Makings | 1 | Y |
| 393.62(e) | No or inadequate bus emergency exit marking | Windshield/ Glass/ Makings | 1 | Y |
| 393.65(b) | Improper location of fuel system | Fuel Systems | 1 | Y |
| 393.65(c) | Improper securement of fuel tank | Fuel Systems | 1 | Y |
| 393.65(f) | Improper fuel line protection | Fuel Systems | 1 | Y |
| 393.67 | Fuel tank requirement violations | Fuel Systems | 1 | N |
| 393.67(c)(7) | Fuel tank fill pipe cap missing | Fuel Systems | 1 | Y |
| 393.67(c)(8) | Improper fuel tank safety vent | Fuel Systems | 1 | N |
| 393.68 | Compressed Natural Gas (CNG) Fuel Container does not conform to regulations | Other Vehicle Defect | 3 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 393.70 | Fifth wheel | Coupling Devices | 3 | N |
| 393.70(a) | Defective coupling device—improper tracking | Coupling Devices | 3 | N |
| 393.70(b) | Defective/improper fifth wheel assemblies | Coupling Devices | 3 | Y |
| 393.70(b)(2) | Defective fifth wheel locking mechanism | Coupling Devices | 3 | Y |
| 393.70(c) | Defective coupling devices for full trailer | Coupling Devices | 3 | Y |
| 393.70(d) | No/improper safety chains/cables for full trailer | Coupling Devices | 3 | Y |
| 393.70(d)(8) | Improper safety chain attachment | Coupling Devices | 3 | Y |
| 393.71 | Improper coupling driveaway/tow-away operation | Coupling Devices | 3 | Y |
| 393.71(g) | Prohibited towing connection / device | Coupling Devices | 3 | Y |
| 393.71(h) | Towbar requirement violations | Coupling Devices | 3 | Y |
| 393.71(h)(10) | No/improper safety chains/cables for towbar | Coupling Devices | 3 | Y |
| 393.75 | Tires/tubes (general) | Tires | 8 | Y |
| 393.75(a) | Flat tire or fabric exposed | Tires | 8 | Y |
| 393.75(a)(1) | Tire—ply or belt material exposed | Tires | 8 | Y |
| 393.75(a)(2) | Tire—tread and/or sidewall separation | Tires | 8 | Y |
| 393.75(a)(3) | Tire—flat and/or audible air leak | Tires | 8 | Y |
| 393.75(a)(4) | Tire—cut exposing ply and/or belt material | Tires | 8 | Y |
| 393.75(b) | Tire—front tread depth less than 4/32 of inch | Tires | 8 | Y |
| 393.75(c) | Tire—other tread depth less than 2/32 of inch | Tires | 8 | Y |
| 393.75(d) | Tire-bus regrooved/recap on front wheel | Tires | 8 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight [14] | Violation in the DSMS (Y/N) |
| 393.75(e) | Tire—regrooved on front of truck/truck-tractor | Tire vs. Load | 3 | Y |
| 393.75(f) | Tire—load weight rating/under inflated | Tire vs. Load | 3 | Y |
| 393.75(f)(1) | Weight carried exceeds tire load limit † | Tire vs. Load | 3 | Y |
| 393.75(f)(2) | Tire under-inflated † | Tire vs. Load | 3 | Y |
| 393.75(h) | Tire under-inflated | Tire vs. Load | 3 | Y |
| 393.76 | Sleeper berth requirement violations | Other Vehicle Defect | 3 | Y |
| 393.77 | Defective and/or prohibited heaters | Other Vehicle Defect | 3 | Y |
| 393.77(b)(5) | Protection of operating controls from tampering | Other Vehicle Defect | 3 | Y |
| 393.77(b)(11) | Bus heater fuel tank location | Other Vehicle Defect | 3 | Y |
| 393.78 | Windshield wipers inoperative/defective | Windshield/ Glass/ Makings | 1 | Y |
| 393.79(a) | Defroster / Defogger inoperative | Windshield/ Glass/ Makings | 1 | Y |
| 393.80 | Failing to equip vehicle with two rear vision mirrors | Other Vehicle Defect | 3 | Y |
| 393.81 | Horn inoperative | Other Vehicle Defect | 3 | Y |
| 393.82 | Speedometer inoperative / inadequate | Other Vehicle Defect | 3 | Y |
| 393.83(a) | Exhaust system location | Exhaust Discharge | 1 | Y |
| 393.83(b) | Exhaust discharge fuel tank/filler tube | Exhaust Discharge | 1 | Y |
| 393.83(c) | Improper exhaust—bus (gasoline) | Exhaust Discharge | 1 | Y |
| 393.83(d) | Improper exhaust—bus (diesel) | Exhaust Discharge | 1 | Y |
| 393.83(e) | Improper exhaust discharge (not rear of cab) | Exhaust Discharge | 1 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 393.83(f) | Improper exhaust system repair (patch/wrap) | Exhaust Discharge | 1 | Y |
| 393.83(g) | Exhaust leak under truck cab and/or sleeper | Exhaust Discharge | 1 | Y |
| 393.83(h) | Exhaust system not securely fastened | Exhaust Discharge | 1 | Y |
| 393.84 | Inadequate floor condition | Cab, Body, Frame | 2 | Y |
| 393.86 | No or improper rearend protection | Cab, Body, Frame | 2 | Y |
| 393.86(a)(1) | Rear impact guards—all trailers/semitrailers manufactured on or after 1/26/98 | Cab, Body, Frame | 2 | N |
| 393.86(a)(2) | Impact guard width— all trailers/semitrailers manufactured on or after 1/26/98 | Cab, Body, Frame | 2 | N |
| 393.86(a)(3) | Impact guard height— all trailers/semitrailers manufactured on or after 1/26/98 | Cab, Body, Frame | 2 | N |
| 393.86(a)(4) | Impact guard rear— all trailers/semitrailers manufactured on or after 1/26/98 | Cab, Body, Frame | 2 | N |
| 393.86(a)(5) | Cross-sectional vertical height— all trailers/semitrailers manufactured on or after 1/26/98 | Cab, Body, Frame | 2 | N |
| 393.86(b)(1) | Rear Impact Guards— motor vehicle manufactured on or after 12/31/52, see exceptions | Cab, Body, Frame | 2 | Y |
| 393.88 | Improperly located television receiver | Cab, Body, Frame | 2 | Y |
| 393.89 | Bus driveshaft not properly protected | Cab, Body, Frame | 2 | Y |
| 393.90 | Bus—no or obscure standee line | Cab, Body, Frame | 2 | Y |
| 393.91 | Bus—improper aisle seats | Cab, Body, Frame | 2 | Y |
| 393.93(a) | Bus—not equipped with seat belt | Cab, Bdy, Frame | 2 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 393.93(a)(3) | Seats not secured in conformance with FMVSS | Cab, Body, Frame | 2 | N |
| 393.93(b) | Truck not equipped with seat belt | Cab, Body, Frame | 2 | Y |
| 393.95(a) | No/discharged/unsecured fire extinguisher | Emergency Equipment | 2 | Y |
| 393.95(a)(1)(i) | No/discharged/unsecured fire extinguisher | Emergency Equipment | 2 | Y |
| 393.95(b) | No spare fuses as required | Emergency Equipment | 2 | Y |
| 393.95(c) | No spare fuses as required | Emergency Equipment | 2 | Y |
| 393.95(f) | No / insufficient warning devices | Emergency Equipment | 2 | Y |
| 393.95(g) | HM—restricted emergency warning device | Emergency Equipment | 2 | Y |
| 393.201(a) | Frame cracked / loose / sagging / broken | Cab, Body, Frame | 2 | Y |
| 393.201(b) | Bolts securing cab broken/loose/missing | Cab, Body, Frame | 2 | N |
| 393.201(c) | Frame rail flange improperly bent/cut/notched | Cab, Body, Frame | 2 | N |
| 393.201(d) | Frame accessories improperly attached | Cab, Body, Frame | 2 | N |
| 393.201(e) | Prohibited holes drilled in frame rail flange | Cab, Body, Frame | 2 | N |
| 393.203 | Cab/body parts requirements violations | Cab, Body, Frame | 2 | Y |
| 393.203(a) | Cab door missing/broken | Cab, Body, Frame | 2 | Y |
| 393.203(b) | Cab/body improperly secured to frame | Cab, Body, Frame | 2 | Y |
| 393.203(c) | Hood not securely fastened | Cab, Body, Frame | 2 | Y |
| 393.203(d) | Cab seats not securely mounted | Cab, Body, Frame | 2 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 393.203(e) | Cab front bumper missing/ unsecured/ protrude | Cab, Body, Frame | 2 | Y |
| 393.205(a) | Wheel/rim cracked or broken | Wheels, Studs, Clamps, Etc. | 2 | Y |
| 393.205(b) | Stud/bolt holes elongated on wheels | Wheels, Studs, Clamps, Etc. | 2 | Y |
| 393.205(c) | Wheel fasteners loose and/or missing | Wheels, Studs, Clamps, Etc. | 2 | Y |
| 393.207(a) | Axle positioning parts defective/missing | Suspension | 7 | Y |
| 393.207(b) | Adjustable axle locking pin missing/disengaged | Suspension | 7 | Y |
| 393.207(c) | Leaf spring assembly defective/missing | Suspension | 7 | Y |
| 393.207(d) | Coil spring cracked and/or broken | Suspension | 7 | Y |
| 393.207(e) | Torsion bar cracked and/or broken | Suspension | 7 | Y |
| 393.207(f) | Air suspension pressure loss | Suspension | 7 | Y |
| 393.207(g) | No/defective air suspension exhaust control | Suspension | 7 | N |
| 393.209(a) | Steering wheel not secured/broken | Steering Mechanism | 6 | Y |
| 393.209(b) | Excessive steering wheel lash | Steering Mechanism | 6 | Y |
| 393.209(c) | Loose steering column | Steering Mechanism | 6 | Y |
| 393.209(d) | Steering system components worn/welded/missing | Steering Mechanism | 6 | Y |
| 393.209(e) | Power steering violations | Steering Mechanism | 6 | Y |
| 396.1 | Must have knowledge of and comply with regulations | Inspection Reports | 4 | Y |
| 396.3(a)(1) | Inspection/repair and maintenance parts and accessories | Wheels, Studs, Clamps, Etc. | 2 | Y |
| 396.3A1B | Brakes (general) | Brakes, All Others | 4 | Y |

| Table 5. CSMS Vehicle Maintenance BASIC Violations [13] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[14] | Violation in the DSMS (Y/N) |
| 396.3A1BA | Brake out of adjustment | Brakes Out of Adjustment | 4 | N |
| 396.3A1BC | Brake-air compressor violation | Brakes, All Others | 4 | N |
| 396.3A1BD | Brake-defective brake drum | Brakes, All Others | 4 | N |
| 396.3A1BL | Brake-reserve system pressure loss | Brakes, All Others | 4 | N |
| 396.3A1T | Tires (general) | Tires | 8 | Y |
| 396.5 | Excessive oil leaks† | Other Vehicle Defect | 3 | N |
| 396.5(a) | Failing to ensure that vehicle is properly lubricated | Other Vehicle Defect | 3 | N |
| 396.5(b) | Oil and/or grease leak | Other Vehicle Defect | 3 | N |
| 396.7 | Unsafe operations forbidden | Other Vehicle Defect | 3 | Y |
| 396.9(c)(2) | Operating an OOS vehicle | Vehicle Jumping OOS | 10 | Y |
| 396.9(d)(2) | Failure to correct defects noted on inspection report | Inspection Reports | 4 | N |
| 396.11 | No or inadequate driver vehicle inspection report | Inspection Reports | 4 | Y |
| 396.13(c) | No reviewing driver's signature on Driver Vehicle Inspection Report (DVIR) | Inspection Reports | 4 | Y |
| 396.17(c) | Operating a CMV without periodic inspection | Inspection Reports | 4 | N |
| 398.5 | Parts/access—migrant workers | Other Vehicle Defect | 3 | Y |
| 398.7 | Inspect/maintain motor vehicle—migrant workers | Inspection Reports | 4 | N |
| 399.207 | Vehicle access requirements violations | Cab, Body, Frame | 2 | N |
| 399.211 | Inadequate maintenance of driver access | Cab, Body, Frame | 2 | N |

| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
|---|---|---|---|---|
| 171.2(a) | Failure to comply with HM regulations | HM Other | 2 | Y |
| 171.2(b) | Failure to comply with the requirements for HM transportation (including labeling and handling) | HM Other | 2 | Y |
| 171.2(c) | Representing a package./container for HM not meeting specs | Markings - HM | 5 | N |
| 171.2(d) | Accepting HM without registering with PHMSA | Documentation - HM | 3 | Y |
| 171.2(f) | Transporting HM not in accordance with this part | Fraudulent Behavior | 5 | Y |
| 171.2(g) | Cargo tank does not comply with HM Regulations | Fraudulent Behavior | 5 | N |
| 171.2(k) | Representing vehicle with HM, none present | Fraudulent Behavior | 5 | Y |
| 172.301(a)(1) | No proper shipping name and/or ID# marking on non-bulk | Markings - HM | 5 | N |
| 172.301(a)(3) | No ID number on side/ends of non-bulk package — large quantity of single HM | Markings - HM | 5 | N |
| 172.301(b) | No technical name on non-bulk | Documentation - HM | 3 | N |
| 172.301(c) | No special permit number on non-bulk package | Documentation - HM | 3 | N |
| 172.301(d) | No consignee/consignor on non-bulk | Documentation - HM | 3 | N |
| 172.302(a) | No ID number (portable and cargo tank) | Markings - HM | 5 | Y |
| 172.302(b) | Bulk package marking incorrect size | Markings - HM | 5 | N |
| 172.302(c) | No special permit number on bulk package | Documentation - HM | 3 | N |
| 172.303(a) | Prohibited HM marking on package | Markings - HM | 5 | N |

Table 6. CSMS Cargo-Related BASIC Violations [15]

---

[15] Violation severity weights reflect the relative importance of each violation within each BASIC. These weights *cannot* be compared or added meaningfully across the BASICs.

[16] In cases where a violation results in an out-of-service order as defined in 49 CFR 390.5, an additional weight of 2 is added to arrive at a total severity weight for the violation.

† Citations marked with † are being phased out based on regulatory changes, and are intended for removal from the SMS at a later time

| | Table 6. CSMS Cargo-Related BASIC Violations [15] | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 172.304(a)(1) | Package marking not durable, English, or print | Markings - HM | 5 | N |
| 172.304(a)(2) | Marking not on sharply contrasting color | Markings - HM | 5 | N |
| 172.304(a)(3) | Marking obscured by label or attachments | Markings - HM | 5 | N |
| 172.304(a)(4) | Marking not away from other marking | Markings - HM | 5 | N |
| 172.310(a) | No gross weight on radioactive materials package greater than 50 KG | Markings - HM | 5 | N |
| 172.310(b) | Radioactive materials package not marked "Type A or B" | Markings - HM | 5 | N |
| 172.312(a) | No package orientation arrows | Cargo Protection - HM | 4 | N |
| 172.312(a)(2) | No package orientation arrows | Cargo Protection - HM | 4 | N |
| 172.312(b) | Prohibited use of orientation arrows | Cargo Protection - HM | 4 | N |
| 172.313(a) | No "inhalation hazard" on package | Markings - HM | 5 | N |
| 172.313(b) | No "poison" on non-bulk plastic package | Markings - HM | 5 | N |
| 172.316(a) | "Other regulated material" non-bulk package not marked | Markings - HM | 5 | N |
| 172.320(a) | Class 1 package not marked with ex-number | Markings - HM | 5 | N |
| 172.322(b) | No marine pollutant marking on bulk packaging | Markings - HM | 5 | N |
| 172.324 | Non-bulk hazardous substance not marked | Markings - HM | 5 | N |
| 172.325(a) | Elevated temperature not marked "Hot" | Markings - HM | 5 | N |
| 172.325(b) | Improperly marked molten aluminum/sulphur | Markings - HM | 5 | N |
| 172.326(b) | No portable tank owner or lessee marking | Markings - HM | 5 | N |
| 172.326(c)(1) | No ID number marking on vehicle carrying portable tank | Markings - HM | 5 | N |
| 172.326(c)(2) | Shipper failed to provide ID number to carrier | Markings - HM | 5 | N |
| 172.328(a) | Shipper failed to provide or affix ID number for cargo tank | Markings - HM | 5 | N |

| | Table 6. CSMS Cargo-Related BASIC Violations [15] | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 172.328(b) | Cargo tank not marked for class 2 | Markings - HM | 5 | N |
| 172.328(c) | No quenched and tempered steel (QT)/other than quenched and tempered steel (NQT) marked on cargo tank (MC 330/331) | Markings - HM | 5 | N |
| 172.328(d) | Fail to mark manual remote shutoff device | Markings - HM | 5 | N |
| 172.330(a)(2) | Tank car tank (non cylinder) not marked as required | Markings - HM | 5 | N |
| 172.330(b) | Motor vehicle with tank not marked | Markings - HM | 5 | N |
| 172.332 | Required ID markings displayed | Markings - HM | 5 | N |
| 172.334 | Prohibited ID number marking | Markings - HM | 5 | N |
| 172.334(a) | ID # displayed on Class 7/Class 1/Dangerous or Subsidiary placard | Markings - HM | 5 | N |
| 172.336(b) | ID numbers not properly displayed | Markings - HM | 5 | N |
| 172.336(c)(1) | Failing to display ID numbers on compartment cargo tank in sequence | Markings - HM | 5 | N |
| 172.338 | Carrier failed to replace missing ID number | Markings - HM | 5 | N |
| 172.400(a) | Package/containment not labeled as required | Markings - HM | 5 | Y |
| 172.401 | Prohibited labeling | Markings - HM | 5 | N |
| 172.402(a) | No label for subsidiary hazard | Markings - HM | 5 | N |
| 172.402(b) | Display of class number on label | Markings - HM | 5 | N |
| 172.402(d) | Subsidiary labeling for radioactive materials | Markings - HM | 5 | N |
| 172.402(e) | Subsidiary labeling for class 1(explosive) materials | Markings - HM | 5 | N |
| 172.403(a) | Radioactive material label requirement | Markings - HM | 5 | N |
| 172.403(f) | Radioactive material package—2 labels on opposite sides | Markings - HM | 5 | N |
| 172.403(g) | Failed to label radioactive material properly | Markings - HM | 5 | N |

| | Table 6. CSMS Cargo-Related BASIC Violations [15] | | | |
|---|---|---|---|---|
| **Section** | **Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection** | **Violation Group Description** | **Violation Severity Weight[16]** | **Violation in the DSMS (Y/N)** |
| 172.403(g)(2) | Class 7 label – no activity/activity not in SI units | Markings - HM | 5 | N |
| 172.404(a) | Mixed package not properly labeled | Markings - HM | 5 | N |
| 172.404(b) | Failed to properly label consolidated package | Markings - HM | 5 | N |
| 172.406(a)(1) | Label placement not as required | Markings - HM | 5 | N |
| 172.406(c) | Multiple label placement not as required | Markings - HM | 5 | N |
| 172.406(d) | Label not on contrasting background or no border | Markings - HM | 5 | N |
| 172.406(e) | Failed to display duplicate label as required | Markings - HM | 5 | N |
| 172.406(f) | Label obscured by marking or attachment | Markings - HM | 5 | N |
| 172.504(a) | Vehicle not placarded as required | Markings - HM | 5 | Y |
| 172.506(a)(1) | Placards not affixed to vehicle | Markings - HM | 5 | Y |
| 172.516(a) | Placard not visible from direction it faces | Markings - HM | 5 | Y |
| 172.516(c)(1) | Placard not securely affixed or attached | Markings - HM | 5 | Y |
| 172.516(c)(2) | Placard not clear of appurtenance | Markings - HM | 5 | Y |
| 172.516(c)(4) | Placard improper location | Markings - HM | 5 | Y |
| 172.516(c)(5) | Placard not reading horizontally | Markings - HM | 5 | Y |
| 172.516(c)(6) | Placard damaged, deteriorated, or obscured | Markings - HM | 5 | Y |
| 172.516(c)(7) | Placard not on contrasting background or border | Markings - HM | 5 | Y |
| 172.600(c) | Emergency Response (ER) information not available | Documentation - HM | 3 | Y |
| 172.602(a) | Emergency response information missing | Documentation - HM | 3 | Y |
| 172.602(b) | Form and manner of emergency response information | Documentation - HM | 3 | Y |
| 172.602(c)(1) | Maintenance/accessibility of emergency response information | Documentation - HM | 3 | Y |
| 173.24(b)(1) | Release of HM from package | Load Securement | 10 | Y |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 173.25(c) | Failure to label and package poison properly, when transported with edible material | Markings - HM | 5 | Y |
| 173.29(a) | Empty package improper transportation | Cargo Protection - HM | 4 | N |
| 173.30 | Loading/ unloading transport vehicles | Cargo Protection - HM | 4 | Y |
| 173.33(a) | Cargo tank general requirements | Cargo Protection - HM | 4 | Y |
| 173.33(b) | HM in cargo tank which had dangerous reaction with cargo tank | Cargo Protection - HM | 4 | Y |
| 173.33(c)(2) | Cargo tank not marked with design or maximum allowable working pressure (MAWP) | Cargo Protection - HM | 1 | N |
| 173.35(a) | Intermediate bulk container requirements | Package Integrity - HM | 8 | Y |
| 173.35(f)(2) | Intermediate bulk container (IBC) not secured to or within vehicle | Load Securement | 10 | Y |
| 173.54 | Forbidden explosives, offering or transporting | Fire Hazard - HM | 6 | N |
| 173.315(j)(3) | Residential gas tank not secure in transport | Fire Hazard - HM | 6 | Y |
| 173.315(j)(4) | Liquefied Petroleum Gas (LPG) storage tank overfilled for transport | Fire Hazard - HM | 6 | N |
| 173.421(a) | Transporting limited quantity—radioactive material exceeds 0.5 millirem/hour | Cargo Protection - HM | 4 | N |
| 173.427(a)(iv) | No instructions for exclusive use packaging—low specific activity | Cargo Protection - HM | 4 | Y |
| 173.427(a)(vi) | Exclusive use low specific activity (LSA) radioactive material not marked "Radioactive-LSA" | Markings - HM | 5 | Y |
| 173.427(a)(6)(iv) | No instructions for exclusive use packaging—low specific activity | Cargo Protection - HM | 4 | Y |
| 173.427(a)(6)(vi) | Exclusive use low specific activity (LSA) radioactive material not marked "Radioactive-LSA" | Markings - HM | 5 | Y |
| 173.427(d) | Not packaged in accordance with 10 CFR, part 71 | Cargo Protection - HM | 4 | Y |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 173.441(a) | Exceeding radiation level limitations allowed for transport | Cargo Protection - HM | 4 | N |
| 177.801 | Accepting/transporting HM not prepared properly | HM Other | 2 | Y |
| 177.817(a) | No shipping papers (carrier) | Documentation - HM | 3 | Y |
| 177.817(b) | Shipper certification missing (when required) | Documentation - HM | 3 | N |
| 177.817(e) | Shipping paper accessibility | Documentation - HM | 3 | Y |
| 177.823(a) | No placards/markings when required | Markings - HM | 5 | N |
| 177.834(a) | Package not secure in vehicle | Load Securement | 10 | Y |
| 177.834(c) | Smoking while loading or unloading | Fire Hazard - HM | 6 | Y |
| 177.834(f) | Using a tool likely to cause damage to the closure of any package or container | Load Securement | 10 | Y |
| 177.834(i) | Attendance of cargo tank— (load or unload) | Cargo Protection - HM | 4 | Y |
| 177.834(j) | Manholes and valves not closed or leak free | Cargo Protection - HM | 4 | Y |
| 177.834(m)(1) | Securing specification 106a or 110a tanks | Cargo Protection - HM | 4 | N |
| 177.834(n) | Improper loading—specification 56, 57, IM101 and IM102 | Fire Hazard - HM | 6 | N |
| 177.835(a) | Loading/Unloading Class 1 with engine running | Fire Hazard - HM | 6 | Y |
| 177.835(c) | Transporting Class 1 in combination vehicles | Fire Hazard - HM | 6 | N |
| 177.835(j) | Transfer of Class 1 materials en route | Fire Hazard - HM | 6 | Y |
| 177.837(c) | Cargo tanks not properly bonded/grounded | Cargo Protection - HM | 4 | N |
| 177.837(d) | Improper unloading of combustible liquids | Cargo Protection - HM | 4 | N |
| 177.838 | Improper transport of class 4, 5 or division 4.2 | Fire Hazard - HM | 6 | Y |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 177.840 | Improper transport of class 2 | Fire Hazard - HM | 6 | Y |
| 177.840(g) | Discharge valve not closed in transit class 2 | Cargo Protection - HM | 4 | Y |
| 177.840(o) | Fail to test off-truck remote shutoff device | Cargo Protection - HM | 4 | Y |
| 177.840(s) | Fail to possess remote shutoff when unloading | Cargo Protection - HM | 4 | Y |
| 177.841(e) | Poison label loaded with foodstuffs | HM Other | 2 | Y |
| 177.842(a) | Total transport index exceeds 50— non-exclusive use | HM Other | 2 | N |
| 177.842(b) | Distance from package to person—radioactive material | HM Other | 2 | N |
| 177.842(d) | Blocking and bracing of radioactive material packages | HM Other | 2 | Y |
| 177.848(d) | Prohibited load/transport/storage combination | Fire Hazard - HM | 6 | N |
| 177.848(f) | Class 1 load separation or segregation | HM Other | 2 | N |
| 178.245-4 | DOT51 integrity and securement | Package Integrity - HM | 8 | N |
| 178.245-5 | DOT51 valve protection | Package Integrity - HM | 8 | N |
| 178.245-6(a) | DOT51 name plate Markings - HM | Package Integrity - HM | 8 | N |
| 178.245-6(b) | Tank outlets not marked | Package Integrity - HM | 8 | N |
| 178.251-4 | DOT 56/57 integrity and securement | Package Integrity - HM | 8 | N |
| 178.251-7(b) | DOT 56/57 spec Markings - HM | Package Integrity - HM | 8 | N |
| 178.255-4 | DOT 60 manhole | Package Integrity - HM | 8 | N |
| 178.255-7 | DOT 60 valve protection | Package Integrity - HM | 8 | N |
| 178.255-14 | DOT 60 ID plate | Package Integrity - HM | 8 | N |
| 178.270-1 | IM101/102 general design | Package Integrity - HM | 8 | N |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 178.270-11(d)(1) | IM101/102 pressure relief | Package Integrity - HM | 8 | N |
| 178.270-4 | Structural integrity | Package Integrity - HM | 8 | N |
| 178.270-6 | IM 101/102 frames | Package Integrity - HM | 8 | N |
| 178.270-8 | IM101/102 valve protection | Package Integrity - HM | 8 | N |
| 178.270-9 | IM101/102 manholes | Package Integrity - HM | 8 | N |
| 178.270-14 | IM101/102 spec plate | Package Integrity - HM | 8 | N |
| 178.336-9(a) | Safety relief devices MC330 | Package Integrity - HM | 8 | N |
| 178.336-9(c) | Marking of inlets/outlets MC330 | Package Integrity - HM | 8 | N |
| 178.336-10 | Protecting of fittings MC330 | Package Integrity - HM | 8 | N |
| 178.336-13 | Anchoring of tank MC330 | Package Integrity - HM | 8 | N |
| 178.336-17 | Metal ID plate marking MC330 | Package Integrity - HM | 8 | N |
| 178.336-17(a) | Certification plate MC330 | Package Integrity - HM | 8 | N |
| 178.337-8(a) | Outlets general requirements MC331 | Package Integrity - HM | 8 | N |
| 178.337-8(a)(2) | Outlets MC331 | Package Integrity - HM | 8 | N |
| 178.337-8(a)(3) | Internal or back flow valve MC331 | Package Integrity - HM | 8 | N |
| 178.337-8(a)(4)(i) | Remote closure device greater than 3500 gallons MC331 | Package Integrity - HM | 8 | Y |
| 178.337-8(a)(4)(ii) | Remote closure device less than 3500 gallons MC331 | Package Integrity - HM | 8 | Y |
| 178.337-9(c) | Marking inlets/outlets MC331 | Package Integrity - HM | 8 | N |
| 178.337-10(a) | Protection of fittings MC331 | Package Integrity - HM | 8 | N |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 178.337-10(d) | Rear end protection MC331 | Package Integrity - HM | 8 | N |
| 178.337-11(b) | Shut off valves MC331 | Package Integrity - HM | 8 | Y |
| 178.337-13 | MC331 supports and anchoring | Package Integrity - HM | 8 | N |
| 178.337-17(a) | Metal ID plate missing MC331 | Package Integrity - HM | 8 | N |
| 178.338-6 | Manhole MC338 | Package Integrity - HM | 8 | N |
| 178.338-8 | Pressure relief devices MC338 | Package Integrity - HM | 8 | N |
| 178.338-10(a) | Protection of fittings MC338 | Package Integrity - HM | 8 | N |
| 178.338-10(c) | Rear end protection MC338 | Package Integrity - HM | 8 | N |
| 178.338-11(b) | Manual shutoff valve MC338 | Package Integrity - HM | 8 | Y |
| 178.338-12 | Shear section MC338 | Package Integrity - HM | 8 | N |
| 178.338-13 | Supports and anchoring MC338 | Package Integrity - HM | 8 | N |
| 178.338-18(a) | Name plate/Specification plate missing MC338 | Package Integrity - HM | 8 | N |
| 178.338-18(b) | Specification plate missing MC338 | Package Integrity - HM | 8 | N |
| 178.340-6 | MC306/307/312 supports and anchoring | Package Integrity - HM | 8 | N |
| 178.340-7(a) | MC306/307/312 ring stiffeners | Package Integrity - HM | 8 | N |
| 178.340-7(c) | MC306/307/312 double bulkhead drain | Package Integrity - HM | 8 | N |
| 178.340-7(d)(2) | MC306/307/312 ring stiffener drain hole | Package Integrity - HM | 8 | N |
| 178.340-8(a) | MC306/307/312 appurtenances attachment | Package Integrity - HM | 8 | N |
| 178.340-8(b) | MC306/307/312 rearend protection | Package Integrity - HM | 8 | N |

| | Table 6. CSMS Cargo-Related BASIC Violations [15] | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 178.340-8(c) | MC306/307/312 overturn protection | Package Integrity - HM | 8 | N |
| 178.340-8(d) | MC306/307/312 piping protection | Package Integrity - HM | 8 | N |
| 178.340-8(d)(1) | MC306/307/312 piping protection | Package Integrity - HM | 8 | N |
| 178.340-8(d)(2) | MC306/307/312 minimum road clearance | Package Integrity - HM | 8 | N |
| 178.340-10(b) | MC306/307/312 metal certification plate missing | Package Integrity - HM | 8 | N |
| 178.341-3(a) | MC306 no manhole closure | Package Integrity - HM | 8 | N |
| 178.341-4 | MC306 venting | Package Integrity - HM | 8 | N |
| 178.341-4(d)(1) | MC306 inadequate emergency venting | Package Integrity - HM | 8 | N |
| 178.341-4(d)(2) | MC306 pressure activated vents | Package Integrity - HM | 8 | N |
| 178.341-4(d)(3) | MC306 no fusible venting | Package Integrity - HM | 8 | N |
| 178.341-5(a) | MC306 internal valves | Package Integrity - HM | 8 | N |
| 178.341-5(a)(1) | MC306 heat actuated safety | Package Integrity - HM | 8 | N |
| 178.341-5(a)(2) | MC306 remote control shutoff | Package Integrity - HM | 8 | Y |
| 178.342-3 | MC307 manhole closure | Package Integrity - HM | 8 | Y |
| 178.342-4 | MC307 venting | Package Integrity - HM | 8 | N |
| 178.342-4(b) | Inadequate venting capacity | Package Integrity - HM | 8 | N |
| 178.342-5(a) | MC307 internal valve | Package Integrity - HM | 8 | N |
| 178.342-5(a)(1) | MC307 heat actuated safety | Package Integrity - HM | 8 | N |
| 178.342-5(a)(2) | MC307 remote control shutoff | Package Integrity - HM | 8 | Y |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 178.343-3 | Manhole closure MC312 | Package Integrity - HM | 8 | N |
| 178.343-4 | Venting MC312 (show calculations) | Package Integrity - HM | 8 | N |
| 178.343-5(a) | MC312 top outlet and valve | Package Integrity - HM | 8 | N |
| 178.343-5(b)(1) | MC312 bottom valve/piping protection | Package Integrity - HM | 8 | N |
| 178.345-1(i)(2) | DOT 406, 407, 412 Obstructed double bulkhead drain/vent | Package Integrity - HM | 8 | N |
| 178.345-5(d) | DOT406/407/412 manhole securement | Package Integrity - HM | 8 | N |
| 178.345-6 | DOT406/407/412 supports and anchoring | Package Integrity - HM | 8 | N |
| 178.345-7(d)(4) | DOT406/407/412 ring stiffener drain | Package Integrity - HM | 8 | N |
| 178.345-8(a) | DOT406/407/412 accident protection | Package Integrity - HM | 8 | N |
| 178.345-8(a)(5) | DOT406/407/412 minimum road clearance | Package Integrity - HM | 8 | N |
| 178.345-8(b) | DOT406/407/412 bottom damage protection | Package Integrity - HM | 8 | N |
| 178.345-8(c) | DOT406/407/412 rollover damage protection | Package Integrity - HM | 8 | N |
| 178.345-8(d) | DOT406/407/412 rear end protection | Package Integrity - HM | 8 | N |
| 178.345-10 | DOT406/407/412 pressure relief | Package Integrity - HM | 8 | N |
| 178.345-11(b) | DOT406/407/412 tank valves | Package Integrity - HM | 8 | N |
| 178.345-11(b)(1) | DOT406/407/412 remote control | Package Integrity - HM | 8 | Y |
| 178.345-11(b)(1)(i) | DOT406/407/412 remote control | Package Integrity - HM | 8 | Y |
| 178.345-14(b) | DOT406/407/412 name plate | Package Integrity - HM | 8 | N |
| 178.345-14(c) | DOT406/407/412 specification plate | Package Integrity - HM | 8 | N |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 178.703(a) | Intermediate bulk container (IBC) manufacturer Markings - HM | Package Integrity - HM | 8 | N |
| 178.703(b) | Intermediate bulk container additional Markings - HM | Package Integrity - HM | 8 | N |
| 178.704(e) | Intermediate bulk container bottom discharge valve protection | Package Integrity - HM | 8 | N |
| 180.205(c) | Periodic re-qualification of cylinders | Package Testing - HM | 7 | N |
| 180.213(d) | Re-qualification Markings - HM | Package Testing - HM | 7 | N |
| 180.352(b) | Intermediate bulk container retest or inspection | Package Testing - HM | 7 | N |
| 180.405(b) | Cargo tank specifications | Package Testing - HM | 7 | N |
| 180.405(j) | Certification withdrawal (failed to remove/cover/obliterate spec plate) | Package Testing - HM | 7 | N |
| 180.407(a)(1) | Cargo tank periodic test and inspection | Package Testing - HM | 7 | N |
| 180.407(c) | Failing to periodically test and inspect cargo tank | Package Testing - HM | 7 | N |
| 180.415(b) | Cargo tank test or inspection Markings - HM | Package Testing - HM | 7 | N |
| 180.605(k) | Test date marking | Package Testing - HM | 7 | N |
| 385.403 | No HM Safety Permit | Documentation - HM | 3 | Y |
| 392.9 | Failing to secure load | Load Securement | 10 | Y |
| 392.9(a) | Failing to secure load | Load Securement | 10 | Y |
| 392.9(a)(1) | Failing to secure cargo/§§ 393.100-393.136 | Load Securement | 10 | Y |
| 392.9(a)(2) | Failing to secure vehicle equipment | Load Securement | 10 | Y |
| 392.9(a)(3) | Driver's view/movement is obstructed | Load Securement | 10 | Y |

| | Table 6. CSMS Cargo-Related BASIC Violations [15] | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 392.62(c)(1) | Bus — baggage/freight restricts driver operation | Load Securement | 10 | Y |
| 392.62(c)(2) | Bus — Exit(s) obstructed by baggage/freight | Load Securement | 10 | Y |
| 392.62(c)(3) | Passengers not protected from falling baggage | Load Securement | 10 | Y |
| 392.63 | Pushing/towing a loaded bus | Load Securement | 10 | Y |
| 393.87 | Warning flag required on projecting load | Warning Flags | 4 | Y |
| 393.87(a) | Warning flag required on projecting load | Warning Flags | 4 | Y |
| 393.87(b) | Improper warning flag placement | Warning Flags | 4 | Y |
| 393.100 | Failure to prevent cargo shifting | Load Securement | 10 | Y |
| 393.100(a) | Failure to prevent cargo shifting | Load Securement | 10 | Y |
| 393.100(b) | Leaking/spilling/blowing/falling cargo | Load Securement | 10 | Y |
| 393.100(c) | Failure to prevent cargo shifting | Load Securement | 10 | Y |
| 393.102(a) | Improper securement system (tiedown assemblies) | Load Securement | 10 | Y |
| 393.102(a)(1) | Insufficient means to prevent forward movement | Load Securement | 10 | Y |
| 393.102(a)(3) | Insufficient means to prevent lateral movement | Load Securement | 10 | Y |
| 393.102(a)(2) | Tiedown assembly with inadequate working load limit | Load Securement | 10 | Y |
| 393.102(b) | Insufficient means to prevent vertical movement | Load Securement | 10 | Y |
| 393.102(c) | No equivalent means of securement | Load Securement | 10 | Y |
| 393.104(a) | Inadequate/damaged securement device/system | Load Securement | 10 | Y |
| 393.104(b) | Damaged securement system/tiedowns | Load Securement | 10 | Y |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 393.104(c) | Damaged vehicle structures/anchor points | Load Securement | 10 | Y |
| 393.104(d) | Damaged Dunnage/bars/blocking-bracing | Load Securement | 10 | Y |
| 393.104(f)(1) | Knotted tiedown | Load Securement | 10 | Y |
| 393.104(f)(2) | Use of tiedown with improper repair. | Load Securement | 10 | Y |
| 393.104(f)(3) | Loose/unfastened tiedown. | Load Securement | 10 | Y |
| 393.104(f)(4) | No edge protection for tiedowns | Load Securement | 10 | Y |
| 393.104F4R | No edge protection for tiedowns | Load Securement | 10 | Y |
| 393.105(f)(5) | No edge protection for tiedowns | Load Securement | 10 | Y |
| 393.106(a) | No/improper front end structure/headerboard | Load Securement | 10 | Y |
| 393.106(b) | Cargo not immobilized or secured | Load Securement | 10 | Y |
| 393.106(c)(1) | No means to prevent cargo from rolling | Load Securement | 10 | Y |
| 393.106(c)(2) | Cargo without direct contact/prevention from shifting | Load Securement | 10 | Y |
| 393.106(d) | Insufficient aggregate working load limit | Load Securement | 10 | Y |
| 393.110 | Failing to meet minimum tiedown requirements ( | Load Securement | 10 | Y |
| 393.110(b) | Insufficient tiedowns; without headerboard/blocking | Load Securement | 10 | Y |
| 393.110(c) | Insufficient tiedowns; with headerboard/blocking | Load Securement | 10 | Y |
| 393.110(d) | Large/odd-shaped cargo not adequately secured | Load Securement | 10 | Y |
| 393.112 | Tiedown not adjustable by driver | Load Securement | 10 | Y |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 393.114 | No/improper front end structure | Load Securement | 10 | Y |
| 393.114(b)(1) | Insufficient height for front-end structure | Load Securement | 10 | Y |
| 393.114(b)(2) | Insufficient width for front-end structure | Load Securement | 10 | Y |
| 393.114(d) | Front-end structure with large opening(s) | Load Securement | 10 | Y |
| 393.116 | No/improper securement of logs | Load Securement | 10 | Y |
| 393.116(d)(1) | Short; over 1/3 length past structure | Load Securement | 10 | Y |
| 393.116(d)(2) | Short, insufficient/no tiedowns | Load Securement | 10 | Y |
| 393.116(d)(3) | Short, tiedowns improperly positioned | Load Securement | 10 | Y |
| 393.116(d)(4) | Short, no center stakes/high log not secured | Load Securement | 10 | Y |
| 393.116(e) | Short, length; improper securement | Load Securement | 10 | Y |
| 393.118 | No/improper lumber/building materials. securement | Load Securement | 10 | Y |
| 393.118(b) | Improper placement of bundles | Load Securement | 10 | Y |
| 393.118(d) | Insufficient protection against lateral movement | Load Securement | 10 | Y |
| 393.118(d)(3) | Insufficient/improper arrangement of tiedowns | Load Securement | 10 | Y |
| 393.120 | No/improper securement of metal coils | Load Securement | 10 | Y |
| 393.120(b)(1) | Coil/vertical improper securement | Load Securement | 10 | Y |
| 393.120(b)(2) | Coils, rows, eyes vertical; improper secure. | Load Securement | 10 | Y |
| 393.120(c)(1) | Coil/eye crosswise improper securement | Load Securement | 10 | Y |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 393.120(c)(2) | X-pattern on coil(s) with eyes crosswise | Load Securement | 10 | Y |
| 393.120(d)(1) | Coil with eye lengthwise—improper securement | Load Securement | 10 | Y |
| 393.120(d)(4) | Coils, rows, eyes length—improper securement. | Load Securement | 10 | Y |
| 393.120(e) | No protection against shifting/tipping | Load Securement | 10 | Y |
| 393.122 | No/improper securement of paper rolls | Load Securement | 10 | Y |
| 393.122(b) | Rolls vertical—improper securement | Load Securement | 10 | Y |
| 393.122(c) | Rolls vertical /split—improper securement | Load Securement | 10 | Y |
| 393.122(d) | Rolls vertical /stacked—improper securement | Load Securement | 10 | Y |
| 393.122(e) | Rolls crosswise—improper securement | Load Securement | 10 | Y |
| 393.122(f) | Rolls crosswise/stacked load—improperly secured | Load Securement | 10 | Y |
| 393.122(g) | Rolls length—improper securement | Load Securement | 10 | Y |
| 393.122(h) | Rolls lengthwise/stacked—improper securement | Load Securement | 10 | Y |
| 393.122(i) | Improper securement—rolls on flatbed/curb-side | Load Securement | 10 | Y |
| 393.124 | No/improper securement of concrete pipe | Load Securement | 10 | Y |
| 393.124(b) | Insufficient working load limit—concrete pipes | Load Securement | 10 | Y |
| 393.124(c) | Improper blocking of concrete pipe | Load Securement | 10 | Y |
| 393.124(d) | Improper arrangement of concrete pipe | Load Securement | 10 | Y |
| 393.124(e) | Improper securement, up to 45 in. diameter | Load Securement | 10 | Y |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 393.124(f) | Improper securement, greater than 45 inch diameter | Load Securement | 10 | Y |
| 393.126 | Fail to ensure intermodal container secured | Load Securement | 10 | Y |
| 393.126(b) | Damaged/missing tiedown/securement device | Load Securement | 10 | Y |
| 393.126(c)(1) | Lower corners not on vehicle/structure | Load Securement | 10 | Y |
| 393.126(c)(2) | All corners of chassis not secured | Load Securement | 10 | Y |
| 393.126(c)(3) | Front and rear not secured independently | Load Securement | 10 | Y |
| 393.126(d)(1) | Empty container not properly positioned | Load Securement | 10 | Y |
| 393.126(d)(2) | Empty container, more than 5 foot overhang | Load Securement | 10 | Y |
| 393.126(d)(4) | Empty container—not properly secured | Load Securement | 10 | Y |
| 393.128 | No/improper securement of vehicles | Load Securement | 10 | Y |
| 393.128(b)(1) | Vehicle not secured—front and rear | Load Securement | 10 | Y |
| 393.128(b)(2) | Tiedown(s) not affixed to mounting points. | Load Securement | 10 | Y |
| 393.128(b)(3) | Tiedown(s) not over/around wheels. | Load Securement | 10 | Y |
| 393.130 | No/improper heavy vehicle/machine securement | Load Securement | 10 | Y |
| 393.130(b) | Item not properly prepared for transport | Load Securement | 10 | Y |
| 393.130(c) | Improper restraint/securement of item | Load Securement | 10 | Y |
| 393.132 | No/improper securement of crushed vehicles | Load Securement | 10 | Y |
| 393.132(b) | Prohibited use of synthetic webbing. | Load Securement | 10 | Y |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 393.132(c) | Insufficient tiedowns per stack cars | Load Securement | 10 | Y |
| 393.132(c)(5) | Insufficient means to retain loose parts | Load Securement | 10 | Y |
| 393.134 | No/improper securement of roll/hook container | Load Securement | 10 | Y |
| 393.134(b)(1) | No blocking against forward movement | Load Securement | 10 | Y |
| 393.134(b)(2) | Container not secured to front of vehicle | Load Securement | 10 | Y |
| 393.134(b)(3) | Rear of container not properly secured | Load Securement | 10 | Y |
| 393.136 | No/improper securement of large boulders | Load Securement | 10 | Y |
| 393.136(b) | Improper placement/positioning for boulder | Load Securement | 10 | Y |
| 393.136(c)(1) | Boulder not secured with chain | Load Securement | 10 | Y |
| 393.136(d) | Improper securement—cubic boulder | Load Securement | 10 | Y |
| 393.136(e) | Improper securement—non-cubic boulder with base | Load Securement | 10 | Y |
| 393.136(f) | Improper securement—non-cubic boulder without base | Load Securement | 10 | Y |
| 397.1(a) | Driver/carrier must obey part 397 | HM Other | 2 | Y |
| 397.1(b) | Failing to require employees to know/obey part 397 | HM Other | 2 | Y |
| 397.2 | Must comply with rules in parts 390-397—transporting HM | HM Other | 2 | Y |
| 397.7(a) | Improperly parked explosives vehicle | Fire Hazard - HM | 6 | Y |
| 397.7(b) | Improperly parked HM vehicle | Fire Hazard - HM | 6 | Y |
| 397.11(a) | HM vehicle operated near open fire | Fire Hazard - HM | 6 | Y |
| 397.11(b) | HM vehicle parked within 300 feet of fire | Fire Hazard - HM | 6 | Y |
| 397.15 | HM vehicle fueling violation | Fire Hazard - HM | 6 | Y |
| 397.17 | No tire examination on HM vehicle | HM Other | 2 | Y |

| Table 6. CSMS Cargo-Related BASIC Violations [15] | | | | |
|---|---|---|---|---|
| Section | Violation Description Shown on Driver/Vehicle Examination Report Given to CMV Driver after Roadside Inspection | Violation Group Description | Violation Severity Weight[16] | Violation in the DSMS (Y/N) |
| 397.19 | No instructions/documents when transporting Division 1.1/1.2/1.3 (explosive) materials | Documentation - HM | 3 | Y |
| 397.19(c) | Required documents not in possession—explosive materials | Documentation - HM | 3 | Y |
| 397.67 | HM vehicle routing violation (non-radioactive materials) | HM Route | 1 | Y |
| 397.101(b) | Radioactive materials vehicle not on preferred route | HM Route | 1 | Y |
| 397.101(d) | No or incomplete route plan—radioactive materials | HM Route | 1 | Y |
| 397.101(e)(2) | Driver not in possession of training certificate | HM Route | 1 | Y |
| 397.101(e)(3) | Driver not in possession of written route plan | HM Route | 1 | Y |

**Appendix B**

**SMS Methodology Changes from Version 1.2 to 2.0**

FMCSA and its stakeholders share a commitment to safety, which has been underscored by strong participation in FMCSA's listening sessions on CSA 2010 resulting in constructive input from organizations, enforcement personnel, industry, and motor carrier safety experts. During the Operational Model test period, FMCSA solicited feedback and suggestions from stakeholders including FMCSA staff, state partners, industry and safety advocates and, as a result, the Agency has identified four opportunities to enhance the new program. The enhancements include:

1. Modifications to the measure of exposure for the Unsafe Driving BASIC and Crash Indicator
2. Refinements to the measurement approach for the Controlled Substances/Alcohol BASIC
3. Updates to the severity weights of roadside violations based on subject matter expert review
4. A more strategic approach to addressing motor carriers with a history of vehicle size and weight violations

Below is detailed information regarding the feedback, analysis and implementation approach for each of these four enhancements.

**1. Modifications to the measure of exposure for the Unsafe Driving BASIC and Crash Indicator**

   a. *Feedback*: The sole use of number of Power Units (PUs) owned by a motor carrier underestimates the on-road exposure for carriers that more extensively utilize their PUs. The use of Vehicle Miles Travelled (VMT) should be considered as a means of assessing the Unsafe Driving BASIC and Crash Indicator that currently rely on PUs.

   b. *Analysis Conducted*: Analysis conducted by FMCSA shows that, while measuring exposure solely by PUs may overly identify high-utilization carriers (i.e., carriers with above average VMT per PU) as deficient, the sole use of VMT overly identifies low-utilization carriers as deficient. In addition, complete and accurate data on all carriers' VMT is not currently available.

   c. *Solution*: FMCSA has revised its approach to measure carriers' exposure on the road within the Unsafe Driving BASIC and the Crash Indicator. This new approach uses a combination of PUs and, when available and reliable, VMT data from FMCSA's Motor Carrier Census. Further, the

Agency is currently exploring options to enhance the completeness and accuracy of VMT data including confirming the validity of the VMT information from other sources.

    d.  *Implementation Approach:*

        i. <u>Segmentation</u> –The carrier population is segmented into two groups for the Unsafe Driving BASIC and Crash Indicator based on the types of vehicles operated so that companies operating fundamentally different types of vehicles are no longer compared to each other:

            1. Segment 1 –"Combo": Combination trucks/motor coach buses constituting 70% or more of the total PUs in a carrier's fleet.

            2. Segment 2 –"Straight": Straight trucks/other vehicles constituting more than 30% of the total PUs in a carrier's fleet.

        ii. <u>Utilization Factor</u> –Carriers with above average truck utilization will receive an adjustment to their PUs called the Utilization Factor (UF), which will provide a safety-based adjustment to the Unsafe Driving BASIC and Crash Indicator percentiles.  Only carriers with annualized VMT data reported in the past 24 months on the Motor Carrier Census (obtained via the VMT field on the MCS-150 Form or from a FMCSA investigation) will be eligible to receive an adjustment.  Carriers without current VMT will not benefit from the utilization factor in their safety assessment calculations.

       iii. <u>Safety Event Grouping</u> – The Unsafe Driving BASIC and Crash Indicator will change from using PUs as the basis for safety event grouping (formerly referred to as peer grouping) to using the number of inspections with an Unsafe Driving-related violation for the Unsafe Driving BASIC and the number of crashes for the Crash Indicator.  The safety event grouping allows the SMS to handle the diverse motor carrier population while ensuring similarly situated carriers are treated with the same standard.

**2. Refinements to the measurement approach for the Controlled Substances/Alcohol BASIC**

    a.  *Feedback Received*:  Operational Model test results and law enforcement experts indicated that violations within this BASIC are more likely to be found <u>during</u> an inspection rather than <u>cause</u> an inspection and therefore,

measuring exposure in this BASIC by number of PUs does not accurately reflect carrier exposure.

b. *Analysis Conducted*:  Analysis confirmed that these types of violations are more likely to result from an inspection than to be the cause of the inspection.

c. *Solution:*  The Controlled Substance/Alcohol BASIC measure of exposure will now be based on number of relevant inspections instead of number of PUs as in the prior version of the SMS. This BASIC will change from using PUs as the basis for safety event grouping to using number of inspections with a Controlled Substance/Alcohol-related violation.

d. *Implementation Approach*:  This measure is now calculated by the following formula:

$$BASIC\ Measure = \frac{number\ of\ time\ and\ severity\ weighted\ applicable\ violations}{total\ time\ weight\ of\ relevant\ inspections}$$

Note: Further information on time and severity weights is available in this SMS Methodology document.

**3. Updates to the severity weights of roadside violations based on subject matter expert review**

a. *Feedback Received*: Law enforcement personnel recommended that the violation used in the measurement system should be updated to reflect the current set of roadside inspection safety violations.  Enforcement personnel, along with the motor carrier industry, also suggested that the severity weights assigned to some violations be reassessed.

b. *Analysis Conducted*:  Subject Matter Experts (SMEs) from FMCSA's field staff, including enforcement personnel and CSA 2010 development team members, examined severity weighting and submitted recommendations for changes to the Agency.

c. *Solution*:  This version of SMS includes updated violations and severity weightings.

d. *Implementation Approach*:  Appendix A in the SMS Methodology contains a complete listing of violations and severity weights.

**4. A more strategic approach to addressing motor carriers with a history of size and weight violations**

a. *Feedback Received*: Results from the Operational Model test have demonstrated the difficulties of enforcing vehicle size and weight violations through CSA 2010 interventions conducted by FMCSA and State  Safety Investigators

b.  *Analysis Conducted*:  Alternative methods to address this safety issue are currently under development. These methods include more refined collection of detailed size and weight violation data and alerts in systems used by roadside inspectors to identify carriers with patterns of prior size and weight violations.

c.  *Solution:*  Size and weight violations have been removed from the Cargo-Related BASIC. However, it is important to note that roadside inspectors will continue to cite these violations at the roadside and Safety Investigators will continue to address these violations, including potential enforcement actions if appropriate, through investigations.

# EXHIBIT C

via a pre-established format through an .xml interface.

Public agencies may enter PFC remittance information into the database by either manual data entry or upload via a pre-established format through an .xml interface. The public agency data entry for projects is limited to manual entry wherein the public agency selects each appropriate project and inputs the data for that project.

The FAA notes that approximately 93 percent of the public agencies approved to collect PFC participate in the PFC database system. Those public agencies and air carriers choosing to use the database will no longer be required to distribute their quarterly reports to any interested party in any other way beginning June 21, 2010.

Issued in Washington, DC, on March 25, 2010.

**Frank San Martin,**
*Manager, Airports Financial Assistance Division.*

[FR Doc. 2010–8124 Filed 4–8–10; 8:45 am]

**BILLING CODE 4910–13–M**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

**[Summary Notice No. PE–2010–16]**

### Petition for Exemption; Summary of Petition Received

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notice of petition for exemption received.

**SUMMARY:** This notice contains a summary of a petition seeking relief from specified requirements of 14 CFR. The purpose of this notice is to improve the public's awareness of, and participation in, this aspect of FAA's regulatory activities. Neither publication of this notice nor the inclusion or omission of information in the summary is intended to affect the legal status of the petition or its final disposition.

**DATES:** Comments on this petition must identify the petition docket number involved and must be received on or before April 29, 2010.

**ADDRESSES:** You may send comments identified by Docket Number FAA–2010–0216 using any of the following methods:

• *Government-wide rulemaking Web site:* Go to *http://www.regulations.gov* and follow the instructions for sending your comments electronically.

• *Mail:* Send comments to the Docket Management Facility; U.S. Department of Transportation, 1200 New Jersey

Avenue, SE., West Building Ground Floor, Room W12–140, Washington, DC 20590.

• *Fax:* Fax comments to the Docket Management Facility at 202–493–2251.

• *Hand Delivery:* Bring comments to the Docket Management Facility in Room W12–140 of the West Building Ground Floor at 1200 New Jersey Avenue, SE., Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

*Privacy:* We will post all comments we receive, without change, to *http://www.regulations.gov*, including any personal information you provide. Using the search function of our docket web site, anyone can find and read the comments received into any of our dockets, including the name of the individual sending the comment (or signing the comment for an association, business, labor union, etc.). You may review DOT's complete Privacy Act Statement in the **Federal Register** published on April 11, 2000 (65 FR 19477–78).

*Docket:* To read background documents or comments received, go to *http://www.regulations.gov* at any time or to the Docket Management Facility in Room W12–140 of the West Building Ground Floor at 1200 New Jersey Avenue, SE., Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Mr. Leslie B. Taylor, phone (816) 329–4134, fax (816) 320–4090, e-mail *leslie.b.taylor@faa.gov.*

This notice is published pursuant to 14 CFR 11.85.

Issued in Washington, DC, on April 2, 2010.

**Pamela Hamilton-Powell,**
*Director, Office of Rulemaking.*

### Petition for Exemption

*Docket No.:* FAA–2010–0216.

*Petitioner:* Hawker Beechcraft Corporation.

*Section of 14 CFR Affected:* 14 CFR 23.783(f)(1).

*Description of Relief Sought:* Hawker Beechcraft Corporation (HBC) requests an exemption from the specific dimensions of the passenger entry door of the Hawker Beechcraft Model 390–2. The door has basic dimensions greater than the minimum required by § 23.783(f)(1). The total area of the model 390–2 cabin door opening minus the area occupied by localized projections is greater than the minimum area required by § 23.783(f)(1); however, the minimum width dimension cannot

be met at discrete points due to the protrusions.

[FR Doc. 2010–8128 Filed 4–8–10; 8:45 am]

**BILLING CODE 4910–13–P**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Motor Carrier Safety Administration

**[Docket No. FMCSA–2004–18898]**

### Withdrawal of Proposed Improvements to the Motor Carrier Safety Status Measurement System (SafeStat) and Implementation of a New Carrier Safety Measurement System (CSMS)

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), DOT.

**ACTION:** Notice; request for comments.

**SUMMARY:** The FMCSA announces that it will replace its Motor Carrier Safety Status Measurement System (SafeStat) with an improved Carrier Safety Measurement System (CSMS) on November 30, 2010. The CSMS has been developed and tested as part of the Agency's Comprehensive Safety Analysis 2010 (CSA 2010) initiative. Therefore, FMCSA is withdrawing the notice of proposed improvements to SafeStat that was published for public comment on May 3, 2006. SafeStat is an automated algorithm currently used by FMCSA to identify high-risk and other motor carriers for on-site compliance reviews. By implementing the new CSMS algorithm, FMCSA will be able to better identify high-risk motor carriers, make more efficient and effective the Agency's and its State partners' allocation of compliance and enforcement resources and provide the motor carrier industry and other safety stakeholders with more comprehensive, informative, and regularly updated safety performance data.

From April 12, 2010 to November 30, 2010, FMCSA will provide individual motor carriers with a preview of their performance data at *http://csa2010.fmcsa.dot.gov.* This preview in advance of full implementation on November 30, 2010, will improve safety by effecting early compliance and providing opportunities for motor carriers to become better educated on the new CSMS.

**DATES:** Submit comments before September 30, 2010.

**ADDRESSES:** You may submit comments identified by the Docket Number in the heading of this notice by any of the following methods:

• *Web site: http://www.regulations.gov.* Follow the

instructions for submitting comments on the Federal electronic docket site.
- *Fax:* 1–202–493–2251.
- *Mail:* Docket Management Facility, U.S. Department of Transportation, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590–0001.
- *Hand Delivery:* Ground Floor, Room W12–140, DOT Building, 1200 New Jersey Avenue, SE., Washington, DC, between 9 a.m. and 5 p.m. E.S.T., Monday through Friday, except Federal holidays.

*Instructions:* For detailed instructions on submitting comments and for additional information, see the Public Participation heading below. Note that all comments received, including any personal information, will be posted without change to *http://www.regulations.gov.* Please see the Privacy Act heading below.

*Docket:* For access to the docket to read background documents or comments received, go to *http://www.regulations.gov* at any time or to the ground floor, room W12–140, DOT Building, New Jersey Avenue, SE., Washington, DC, between 9 a.m. and 5 p.m., E.S.T., Monday through Friday, except Federal holidays.

*Privacy Act:* Anyone is able to search the electronic form of all comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). You may review DOT's complete Privacy Act Statement in the **Federal Register** published on April 11, 2000 (65 FR 19476) or you may visit *http://docketsinfo.dot.gov.*

*Public participation:* The *www.regulations.gov* Web site is generally available 24 hours each day, 365 days each year. You can get electronic submission and retrieval help and guidelines under the "help" section of the *http://www.regulations.gov* Web site and also at the DOT's *http://docketsinfo.dot.gov* Web site. If you want FMSCA to notify you that we received your comments, please include a self-addressed, stamped envelope or postcard or print the acknowledgement page that appears after submitting comments online.

Comments received after the comment closing date will be included in the docket, and we will consider late comments to the extent practicable.

**FOR FURTHER INFORMATION CONTACT:** Mr. Bryan Price, Federal Motor Carrier Safety Administration, 1000 Liberty Avenue, Suite 1300, Pittsburgh, PA 15222, Telephone 412–395–4816 E-Mail: *bryan.price@dot.gov.*

**SUPPLEMENTARY INFORMATION:**

## Comprehensive Safety Analysis 2010 (CSA 2010)

CSA 2010 is a major FMCSA safety initiative that will improve the effectiveness of the Agency's compliance and enforcement programs. CSA 2010 will help the Agency assess the safety performance of a greater segment of the motor carrier industry and allow it to intervene earlier with more carriers to change unsafe behavior and practices. The ultimate goal is to achieve a greater reduction in large truck and bus crashes, injuries, and fatalities, while making efficient use of the resources of FMCSA and its State partners.

In contrast to the Agency's current operational model, CSA 2010 is characterized by three principal components:

(1) A more comprehensive carrier safety measurement system;

(2) A broader array of progressive interventions to augment comprehensive on-site investigations (compliance reviews), including warning letters, off-site investigations, and on-site focused investigations; and

(3) A new safety fitness determination (SFD) methodology based more on performance data and not necessarily tied to an on-site investigation. The third component, a new process pursuant to which FMCSA will formally propose and assign adverse SFDs—for example, unfit determinations and resulting prohibitions on operations—is the subject of a Notice of Proposed Rulemaking (NPRM) that will be published for comment at a later date during 2010.

This **Federal Register** notice addresses implementation of only the first component, a more comprehensive safety measurement system to identify and prioritize motor carriers for investigation. The new measurement system would be used to identify high-risk motor carriers for on-site investigations consistent with section 4138 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA–LU), [Sec. 4138, Pub. L. 109–59, 119 Stat. 1745 (49 U.S.C. 31144 note), August 10, 2005]. Furthermore, the new CSMS also would provide motor carriers and other safety stakeholders such as shippers with regularly updated safety performance assessments through a public Web site (*http://ai.fmcsa.dot.gov*).

FMCSA had originally planned to roll out CSA 2010 beginning in the summer of 2010. However, the Agency has received valuable feedback from its partners and stakeholders through CSA

2010 listening sessions and written comments to the CSA 2010 public docket referenced above. FMCSA has also gained valuable knowledge from its operational model test, involving nine States, which began in early 2008 and concludes in June 2010. Therefore, FMCSA has decided to move the beginning of CSA 2010 rollout from the summer to the fall of 2010. This will enable the Agency to incorporate comments and lessons learned into the CSA 2010 model prior to national rollout. Therefore, on November 30, 2010, FMCSA is planning on: (1) Replacing its current measurement system, SafeStat, with CSMS, (2) sending warning letters nationwide, and (3) implementing a revised nationwide Inspection Selection System for roadside inspectors that will be based on CSMS rather than SafeStat. The nine states currently operating in the operational model test will carry out the full array of CSA 2010 interventions after the test concludes in June 2010. These States are Colorado, Delaware, Georgia, Kansas, Maryland, Minnesota, Missouri, Montana, and New Jersey. For the remaining 41 States the new CSA 2010 interventions will be phased in during 2011. While the SFD rulemaking is in process, the Agency will continue to issue safety ratings in accordance with 49 CFR part 385—Safety Fitness Procedures.

## Implementation of New Carrier Safety Measurement System (CSMS) To Replace SAFESTAT

### SafeStat

The FMCSA's current operational model employs SafeStat to analyze the safety status of individual motor carriers in four analytic Safety Evaluation Areas (SEAs): (1) Accident, (2) Driver, (3) Vehicle and (4) Safety Management. The four SEA values are then combined into an overall safety status assessment, known as a SafeStat score. For a full description of the SafeStat methodology, visit the FMCSA Web site at: *http://ai.fmcsa.dot.gov.*

In 1997, FMSCA's predecessor Agency implemented SafeStat nationally as its primary tool for identifying high-risk and other motor carriers for compliance reviews. SafeStat results have also served as a prominent factor in roadside screening systems used by FMCSA and its State partners to identify motor carriers for increased inspection activity at the roadside.

In 1999, SafeStat data became available to the public on the FMCSA's Analysis and Information (A & I) online Web site *http://ai.fmcsa.dot.gov.* Motor

carriers, the insurance industry, shippers, safety advocates, and other interested parties began routinely accessing SafeStat data online for use in their own safety analysis and business decisions. In 2004, FMCSA removed public access to the Accident SEA due to problems with the completeness of crash data reported by the States at that time and because the raw crash data reported by the States generally do not include an indication of preventability or accountability. The remaining SafeStat data displayed at *http://ai.fmcsa.dot.gov* (Driver, Vehicle and Safety Management SEAs) continued to serve as a valuable source of information to motor carriers and other stakeholders. In fact, during calendar year 2009, the SafeStat online web site recorded nearly 4 million user sessions.

*New CSMS*

On November 30, 2010, FMCSA plans to replace SafeStat with the new CSMS. The new CSMS will work within the CSA 2010 operational model to monitor and quantify the safety performance of commercial motor carriers using data available in FMCSA's motor carrier database, the Motor Carrier Management Information System (MCMIS). Under CSA 2010, these data would include violations found during roadside inspections, traffic enforcement, and other types of interventions. The new CSMS groups these data into seven Behavioral Analysis Safety Improvement Categories (BASICs): Unsafe Driving, Fatigued Driving (Hours-of-Service), Driver Fitness, Controlled Substances and Alcohol, Vehicle Maintenance, Cargo Related, and Crash History. FMCSA developed the BASICs under the premise that commercial motor vehicle (CMV) crashes can ultimately be traced to the behavior of motor carriers and drivers.

There are three important ways that the new CSMS is different from the Agency's current measurement system, SafeStat. The new CSMS:

1. Is organized by seven specific behavioral areas (BASICs), while SafeStat is organized into four broad SEAs;

2. Uses all safety-based inspection violations, while SafeStat uses only out-of-service violations and selected moving violations;

3. Uses risk-based violation weightings while SafeStat does not.

For further information on the new CSMS see the Safety Measurement System Methodology at *http://csa2010.fmcsa.dot.gov*.

When the new CSMS is implemented on November 30, 2010, motor carrier BASICs will be publicly displayed at *http://ai.fmcsa.dot.gov* in the same manner that the SEAs are displayed today under SafeStat. As discussed above, FMCSA removed public access to the Accident SEA on SafeStat because of problems with the completeness of State crash data at that time and because the data do not include information on preventability or accountability. FMCSA is currently conducting a feasibility study on using police accident reports to determine motor carrier crash accountability before the crash data are entered into CSMS. Until this analysis is completed, the Agency will continue to follow its current policy under SafeStat: the crash data will be displayed publicly, but the CSMS assessment of a motor carrier's crash history will not be publicly displayed.

**Industry Preview**

Since 2004, FMSCA has been actively consulting with, and preparing, the motor carrier industry and other safety stakeholders for implementation of CSA 2010 and the new CSMS to replace SafeStat. The Agency first held a series of public listening sessions on the broader overall CSA 2010 initiative and the new CSMS in September and October of 2004. These six sessions were designed to collect public input on ways that FMCSA could improve its process of monitoring and assessing the safety performance of the commercial motor carrier industry. A broad cross section of stakeholders, including industry executives, truck and bus drivers, insurance and safety advocacy groups, State and local government officials, and enforcement professionals participated in the sessions (Docket Number FMCSA–2004–18898). Following these initial public listening sessions, FMCSA held annual formal public listening sessions across the country between 2006 and 2008 to prepare the motor carrier industry and other stakeholders for CSA 2010 deployment and the new CSMS. Most recently, in December 2009, FMCSA held two webcasts that included over 3,000 participants. These can be viewed on the CSA 2010 Web site at *http://csa2010.fmcsa.dot.gov*. In all of these formal sessions, in addition to FMCSA's other proactive outreach activities, differences between SafeStat and the new CSMS were emphasized to prepare the motor carrier industry and other stakeholders for implementation of CSA 2010 and the new CSMS.

On April 12, 2010, FMCSA will undertake an additional step to prepare the motor carrier industry and other stakeholders for replacement of SafeStat with the new CSMS. FMCSA will provide individual motor carriers with a preview of their performance data at *http://csa2010.fmcsa.dot.gov*, sorted into the BASICs as it will be in the new CSMS. To view their data, motor carriers will have to enter their Personal Identification Number (PIN). Motor carriers that do not have a PIN, or those that have forgotten their PIN, can go to the following Web address for assistance: *https://li-public.fmcsa.dot.gov/LIVIEW/PKG_PIN_START.PRC_INTRO*. This preview in advance of CSMS implementation on November 30, 2010 will improve motor carrier safety by encouraging early action by carriers to correct and prevent violations, especially in areas that are not currently measured by SafeStat.

The FMCSA is currently considering refinements to the CSMS with regard to issues such as methods of measuring exposure, peer grouping, and violation severity weighting, based upon public comments received thus far and observations resulting from the CSA 2010 Operational Model Test. As a result, initially this preview will not provide motor carriers with an assessment of whether their performance in the BASICs is above FMCSA thresholds that warrant an intervention in the broader CSA 2010 Operational Model Test. Assessments will be added to the preview Web site after completion of the CSA 2010 Operational Model Test, and after any refinements are made to the CSMS during the summer of 2010 but before implementation on November 30, 2010. Thus, motor carriers will have approximately 7½ months to view their roadside violations data from the CSA 2010 perspective—mid-April through November 2010. For the first 3½ months—mid-April through July 2010—carriers will see their violations categorized by BASIC. Beginning in August, after the refinements to CSMS are complete, motor carriers will be able to see an assessment of their violations through CSA 2010. The purpose of this data preview period is to provide individual motor carriers with the opportunity to view their data from the CSA 2010 perspective, and to use the time to identify and take actions to correct deficiencies in their operations which are leading to unsafe behavior.

**New CSMS for Identification of High-Risk Motor Carriers**

In section 4138 of SAFETEA–LU Congress emphasized the importance of directing compliance review resources toward high-risk motor carriers as follows:

The [FMCSA] shall ensure that compliance reviews are completed on motor carriers that have demonstrated through performance data that they pose the highest safety risk. At a minimum, a compliance review shall be conducted whenever a motor carrier is rated as category A or B for 2 consecutive months.

The Conference Report for SAFETEA–LU further clarified Section 4138 as follows:

Senate Bill:

The Senate bill requires the Secretary to ensure that safety compliance reviews of motor carriers are completed for carriers that have demonstrated that they pose the highest safety risk. A single compliance review is required for any motor carrier that is rated as category A or B for two consecutive months.

Conference Substitute: The Conference adopts the Senate provision with a modification to clarify that multiple compliance reviews are not required for carriers that are rated as category A or B for more than two consecutive months.

H. Conf. Rpt. No. 109–203, at p. 1003 (2005).

The term "SafeStat" is not specifically mentioned in the statute or conference report. However, the SafeStat-related terminology, "*rated Category A or B*" is used. Although it does identify those motor carriers that "pose the highest safety risk" consistent with section 4138, the new CSMS is not designed to generate alphabetized lists of motor carrier safety performance categories. In FY 2009, the Committee on Appropriations, U.S. Senate, recognized in its report accompanying the Transportation, Housing and Urban Development, and Related Agencies Appropriations bill, 2009, that FMCSA is developing a new means to identify high-risk motor carriers and expressed support that the initiative will improve the Agency's performance:

As the Committee noted last year, the agency is undertaking a comprehensive overhaul of all of its systems in order to better target its resources on the riskiest carriers. The agency is also seeking ways to reach more carriers through its inspection efforts by employing interventions that are less resource intensive than a full-scale compliance review. The Committee agrees that the agency's systems and procedures for conducting oversight need to be dramatically improved, and hopes that this initiative will improve the agency's performance.

The Committee notes that the agency has already completed several tasks including the development of the Behavioral Analysis and Safety Improvement Categories [BASICs] for carriers and drivers. These will be important in identifying and targeting risky carriers for intervention.

S. Rep. No. 110–418, at p.88 (2008).

Beginning on November 30, 2010, FMCSA plans to implement the new CSMS to identify high-risk motor carriers and to meet the intent of SAFETEA–LU section 4138. The new CSMS effectively identifies as many high-risk motor carriers and more precisely identifies their specific performance problems than the current method. Furthermore, FMCSA operational policies will continue to require onsite investigations (i.e., compliance reviews) of these high-risk motor carriers. The FMCSA therefore believes that its planned action of implementing a more effective method of identifying high-risk motor carriers, and continuing to require on-site investigations of these motor carriers is fully consistent with section 4138 of SAFTEA–LU.

## Comments

FMCSA requests comments on the above initiatives and the CSMS methodology, *http://csa2010.fmcsa.dot.gov*. Commenters are requested to provide supporting data wherever appropriate.

Issued on: April 6, 2010.

**Anne S. Ferro,**
*Administrator.*
[FR Doc. 2010–8183 Filed 4–8–10; 8:45 am]
**BILLING CODE P**

---

# DEPARTMENT OF THE TREASURY

## Departmental Offices; Debt Management Advisory Committee Meeting

Notice is hereby given, pursuant to 5 U.S.C. App. 2, § 10(a)(2), that a meeting will be held at the Hay-Adams Hotel, 16th Street and Pennsylvania Avenue, NW., Washington, DC, on May 4, 2010 at 11:30 a.m. of the following debt management advisory committee: Treasury Borrowing Advisory Committee of the Securities Industry and Financial Markets Association.

The agenda for the meeting provides for a charge by the Secretary of the Treasury or his designate that the Committee discuss particular issues and conduct a working session. Following the working session, the Committee will present a written report of its recommendations. The meeting will be closed to the public, pursuant to 5 U.S.C. App. 2, § 10(d) and Public Law 103–202, § 202(c)(1)(B) (31 U.S.C. 121 note).

This notice shall constitute my determination, pursuant to the authority placed in heads of agencies by 5 U.S.C. App. 2, § 10(d) and vested in me by Treasury Department Order No. 10 1–05, that the meeting will consist of discussions and debates of the issues presented to the Committee by the Secretary of the Treasury and the making of recommendations of the Committee to the Secretary, pursuant to Public Law 103–202, § 202(c)(1)(B). Thus, this information is exempt from disclosure under that provision and 5 U.S.C. 552b(c)(3)(B). In addition, the meeting is concerned with information that is exempt from disclosure under 5 U.S.C. 552b(c)(9)(A). The public interest requires that such meetings be closed to the public because the Treasury Department requires frank and full advice from representatives of the financial community prior to making its final decisions on major financing operations. Historically, this advice has been offered by debt management advisory committees established by the several major segments of the financial community. When so utilized, such a committee is recognized to be an advisory committee under 5 U.S.C. App. 2, § 3.

Although the Treasury's final announcement of financing plans may not reflect the recommendations provided in reports of the Committee, premature disclosure of the Committee's deliberations and reports would be likely to lead to significant financial speculation in the securities market. Thus, this meeting falls within the exemption covered by 5 U.S.C. 552b(c)(9)(A).

Treasury staff will provide a technical briefing to the press on the day before the Committee meeting, following the release of a statement of economic conditions and financing estimates. This briefing will give the press an opportunity to ask questions about financing projections. The day after the Committee meeting, Treasury will release the minutes of the meeting, any charts that were discussed at the meeting, and the Committee's report to the Secretary.

The Office of Debt Management is responsible for maintaining records of debt management advisory committee meetings and for providing annual reports setting forth a summary of Committee activities and such other matters as may be informative to the public consistent with the policy of 5 U.S.C. 552(b). The Designated Federal Officer or other responsible agency official who may be contacted for additional information is Fred Pietrangeli, Deputy Director for Office of Debt Management (202) 622–1876.

Dated: April 2, 2010.

**Mary Miller,**
*Assistant Secretary (Financial Markets).*
[FR Doc. 2010–8125 Filed 4–8–10; 8:45 am]
**BILLING CODE 4810–25–M**

# EXHIBIT D

November 18, 2010

. Highlights

FMCSA Announces CSA Safety Measurement System (SMS) Improvements

On August 16, 2010, FMCSA began providing carriers with information about where they stand in each of the new CSA SMS's Behavior Analysis and Safety Improvement Categories (BASICs) based on roadside inspection data and investigation findings. Based on feedback and analysis from the Data Preview period, the U.S. Department of Transportation's Federal Motor Carrier Safety Administration (FMCSA) will roll out the new SMS to the nation in December with the following revisions:

> . **Modify the presentation of SMS BASIC results**

>> Change the term "Deficient" to "Alert" when a motor carrier's score in one or more BASICs is above the FMCSA threshold for intervention.

>> Change the highlight color from red to orange.

>> Improve the language to clarify that BASIC results signify the carrier is prioritized for an FMCSA intervention.

*Explanation:* Feedback during the Data Preview indicate that the display of SMS results needs to clarify that BASIC percentiles above the FMCSA threshold signify the carrier is prioritized for an FMCSA intervention and do not signify or otherwise imply a "safety rating" or safety fitness determination.

> **Modify Cargo-Related BASIC**

>> Recalibrate the Cargo-Related BASIC by adjusting the cargo securement violation severity weightings based on input from subject matter experts (SMEs).

>> Modify the public display to show the SMS Cargo-Related BASIC violations only. The percentiles and intervention status will not be on public display.

*Explanation:* Feedback during the Data Preview period identified a concern that the BASIC was over-representing certain industry segments and potentially creating a misleading safety alert warning. The Agency conducted additional analysis and concluded that the Cargo-Related BASIC be recalibrated with SMEs providing input on the cargo securement severity weights. The agency received SME input and will now adjust the severity weights and run the algorithm accordingly.

Also, the agency is conducting additional analysis to further understand the impact on the different industry segments of a carrier's exposure in this BASIC. During this analysis period, the BASIC results will continue to be an effective intervention prioritization tool for enforcement personnel based on sound safety principles. Accordingly, the percentiles and intervention status will be accessible to the FMCSA enforcement community and motor carriers only.

To learn more about CSA and to stay updated during the coming months, subscribe to the CSA RSS feed or email list at **http://csa2010.fmcsa.dot.gov/stay_connected.aspx**.

# EXHIBIT E



U.S. Department
of Transportation

**Federal Motor Carrier
Safety Administration**

Administrator

June 8, 2010

1200 New Jersey Avenue, SE
Washington, DC  20590

Refer to:  MC-AA

Mr. John Hausladen
President
Minnesota Trucking Association
2277 Highway 36 West, #302
Roseville, MN  55113

Dear Mr. Hausladen:

Thank you for your letter of May 10 requesting that the Federal Motor Carrier Safety
Administration (FMCSA) review previously submitted recommendations made by the Minnesota
Trucking Association (MTA) with respect to the Comprehensive Safety Analysis (CSA) 2010
Program.  You asked for an update on FMCSA's position on issues you have raised and any
changes FMCSA may have made or anticipates making during National implementation.
The FMCSA agrees that open dialogue throughout, and after, CSA 2010 development is critical
to the implementation, maintenance, and continued improvement of an effective enforcement
model.

Your CSA 2010 Task Force submitted several key issues and recommendations to the FMCSA's
CSA 2010 Docket (Docket # FMCSA-2004-18898).  For clarity, FMCSA will paraphrase in the
enclosure each of the key issues and/or recommendations presented by the MTA's CSA 2010
Task Force and will be followed by an FMCSA response.

Thank you again for bringing these concerns to our attention.  Should you need additional
information or assistance, please contact Gary Woodford, CSA 2010 Program Manager, at
(202) 366-2978 or by e-mail at gary.woodford@dot.gov.

Sincerely,

Anne S. Ferro

Enclosure

**FMCSA Response:  Minnesota Trucking Association Letter, May 10, 2010**

### *Inconsistency in State Enforcement*

The MTA's CSA 2010 Task Force pointed out that some States have more aggressive motor carrier enforcement programs and suggested that motor carriers that travel in those States are at a disadvantage when being evaluated by the CSA 2010 Carrier Safety Measurement System (CSMS) methodology because they are subject to more scrutiny.  To support MTA's opinion, you provided an anecdotal example of a motor carrier that discovered 47% of its violations were accounted for in two States through which it travelled, but travel in those States accounted for only 19% of its annual fleet miles.

**FMCSA Response:**

FMCSA fully understands the importance of promoting a uniform and consistent roadside inspection program.  Working collaboratively with the Commercial Vehicle Safety Alliance (CVSA) and our State partners, FMCSA established a Data Uniformity Ad-hoc committee at the fall 2008 CVSA annual meeting.  A principal goal of this committee is consistent documentation of roadside inspection and violation data.  Through an FMCSA-funded high-priority grant, in the spring of 2009, CVSA staff and our State partners began work to prepare guidance that promotes more consistent documentation of roadside inspection and violation data.  As an initial step in this effort, FMCSA is in the process of updating the roadside inspection software violation tables used throughout the country to eliminate obsolete or inappropriate roadside violations and to provide more clarity on how certain violations should be recorded.

Furthermore, CVSA recently changed its operational policy to encourage member jurisdictions to review their current policies that govern when and how vehicles should be selected for an inspection. The goal of this operational policy is to raise awareness that a valid and consistent vehicle and driver inspection selection process is critical to the integrity of the jurisdiction's program and also the national inspection program.

However, clearly some states have more robust commercial motor vehicle enforcement programs than others.  Despite these apparent variances, FMCSA believes the key to improved motor carrier evaluations in the CSA 2010 CSMS is for the motor carrier to ensure it has taken all steps necessary to ensure compliance with the Federal Motor Carrier Safety Regulations when inspected.

### *Use of All Recorded Moving Violations from Roadside Inspections*

The MTA's CSA 2010 Task Force expressed serious concern with the fact that the CSA 2010 CSMS uses all recorded moving violations from roadside inspections whether or not a citation (i.e., traffic ticket) has been issued to the driver.  Your letter characterizes these recorded moving violations from roadside inspections as "warnings."  In general, MTA's concerns centered on three issues:

- Whether there is a link between the recorded moving violations and crashes when a citation has not been issued;
- Whether due process is accorded drivers receiving recorded violations; and

- All speeding violations recorded against a motor carrier count the same without regard to severity or whether a citation has been issued.

**FMCSA Response:**

The FMCSA has conducted effectiveness testing on the Unsafe Driving Behavior Analysis Safety Improvement Category (BASIC) for the CSA 2010 CSMS, as it is currently calculated, using all recorded moving violations without regard to whether a citation was issued. Put in simple terms, the analysis demonstrates there is a strong relationship between high scores in the Unsafe Driving BASIC and future crashes. Furthermore, FMCSA is aware of an additional study by the American Transportation Research Institute (ATRI) titled *"Predicting Truck Crash Involvement: Developing a Commercial Driver Behavior-Based Model and Recommended Countermeasures."* That study also established a relationship between moving violations recorded on roadside inspections (including speeding violations) and future crash involvement without regard to whether a citation was issued.

With respect to the MTA's due process concern, motor carriers or drivers may request a review of a moving violation with the appropriate State agency through the FMCSA's established DataQs system, just as they can with any other regulatory violation that does not have an associated citation issued with it. In addition, from a legal standpoint, FMCSA does not believe that using recorded moving violations for safety assessment and enforcement workload prioritization purposes, absent changes to a motor carrier's formal safety fitness rating or assessment of a penalty, constitutes deprivation of a property interest for which due process is required.

The FMCSA fully understands your concern with the fact that all speeding violations are weighted the same. Based upon concerns expressed by MTA, other stakeholders, and motor carriers participating in our CSA 2010 Operational Model Test, FMCSA is implementing modifications to the roadside inspection software used by its field staff and our State partners across the country. This modification will require roadside officers to designate the severity of speeding offenses recorded on roadside inspections. For example, the enforcement officer will have to designate whether the recorded speeding violation was 1-5 MPH over the speed limit, 6-10 MPH over, or 11-14 MPH over, etc. This modification will allow FMCSA to assign lesser severity weights to the less severe speeding violations in the CSA 2010 CSMS.

### *Concern with State Responses to DataQs Requests*

The MTA's CSA 2010 Task Force expressed concern with inconsistent responses by the States to requests for review of a violation through DataQs. In particular, your letter referenced the fact that a State may refuse to remove a violation from a motor carrier's record based upon a request submitted through DataQs, even if the violation has been dismissed in court. Furthermore, your letter suggested that recorded violations that do not have an associated citation issued (e.g. "warnings" for minor speeding infractions) cannot be heard in court because there is no penalty and therefore the violation itself becomes proof of guilt.

**FMCSA Response:**

The FMCSA is aware of stakeholder concerns regarding DataQs responses, and as a result, is actively promoting the standardization of the process for responding to requests for data review by motor carriers. Specifically, FMCSA and its State partners will provide procedural guidance to States on the management of the roadside request for data review process through our DataQ's management system. Over a year ago, FMCSA and several State partner subject matter experts formed a group to develop standardized procedures for the request for data review process. A sub-committee of this group is also reviewing motor carriers' due process rights during various stages of the appeals process. The goal of this initiative is to enhance the data review process by providing consistency and transparency for our stakeholders. A draft version of this guidance is currently under review and is set for release in the fall of 2010. It is longstanding FMSCA policy to continue using regulatory violations for assessment and workload prioritization purposes even if the violation has been dismissed or reduced to a lesser offense in court.

### *Peer Groups*

The MTA's CSA 2010 Task Force suggested that FMCSA revisit the approaches used to group motor carriers for comparative purposes in the CSA 2010 CSMS. One of the Task Forces' concerns is that motor carriers are compared against each other without regard to their type of operation (e.g., truckload or less-than-truckload, flat-bed), or the commodities they transport. You also questioned peer grouping by a carrier's number of power units. You articulated support for adding additional peer groups as suggested by the American Trucking Association to better compare motor carriers of similar size, and you also suggested that FMSCA consider peer grouping in a manner similar to how the peer groups are constructed in the current Safety Status (SafeStat) System. Finally, your letter expressed concern with what you characterized as a "bell curve" result of percentile ranking that will always find some motor carrier's deficient no matter how safe the industry becomes overall.

**FMCSA Response:**

The FMCSA does not plan to develop peer groups based on commodities transported (e.g. Hazmat (HM)) or industry segment (i.e., truckload vs. less-than-truckload) at this time. The FMCSA's foremost concern is safety and the likelihood of future crash occurrence, without regard to industry segment.

The peer grouping approach attempts to account for the inherent greater variability in rates based on small samples or limited levels of exposure and the stronger level of confidence in measures based on larger levels of exposure. The peer grouping also allows the CSMS to handle the widely diverse motor carrier population, while ensuring that similarly situated carriers are treated with the same standards.

For most BASICs, peer groups are defined based upon the number of relevant inspections that a motor carrier has received. For the Unsafe Driving and Crash BASICs, however, peer groups are currently defined based on a motor carrier's number of power units. Based upon observations from our operational model test and feedback from MTA and other stakeholders, FMCSA is

currently testing and evaluating approaches to peer grouping that will result in more effective and equitable comparison of motor carriers with similar exposure in the Crash and Unsafe Driving BASICs. One approach that is being considered for National implementation later this year is to employ peer grouping in these BASICs using the number of crashes or violations similar to the approach used in the current SafeStat system as suggested by the MTA's CSA 2010 Task Force.

The FMCSA understands the broader issue you characterized as the "bell curve" effect of percentile ranking but does not view it as problematic given that the primary use of the percentile rankings is to identify motor carriers for workload prioritization purposes. A broad and overriding FMSCA objective is to raise the bar in safety. If, for example, the performance of motor carriers falling in the worst 20th percentile continues to result in better performing motor carriers over time, then the safety bar will have been raised. It is also worthwhile to note that formal safety fitness determinations under the Safety Fitness Determination (SFD), Notice of Proposed Rulemaking (NPRM) would, as discussed at our public listening sessions, be based upon an absolute value, a "line in the sand," based solely on a motor carrier's own performance measure rather than a motor carrier's percentile ranking which is influenced by other carrier measures in its peer group.

### *Public Access to Carrier Safety Measurement System Results*

The MTA's CSA 2010 Task Force suggested that access to motor carrier results from the new CSMS be restricted to motor carriers and Federal and State enforcement officials only. To support your recommendation, the letter asserts that public access to the CSMS results "only causes confusion and poor policy decisions by shippers." Additionally, your letter suggests that the courts and plaintiffs' attorneys will draw their own conclusions on the CSMS results, resulting in undue liability for motor carriers. Finally, the MTA's CSA 2010 Task Force recommends that, if CSMS results are made public, the data be presented in a manner that is easy to understand and interpret.

**FMCSA Response:**

The FMCSA believes that making the CSMS results available to the public increases awareness and accountability, improves safety overall consistent with our overriding goal of reducing commercial motor vehicle crashes and is fully consistent with the Administration's Open Government Initiative. As indicated in our April 9, 2010, Federal Register Notice, public display of CSMS results is scheduled to begin in late 2010. The results of the predecessor system to the new CSMS, SafeStat, have been available to the public for nearly a decade. In 2009, the Analysis and Information Online website, which provides access to SafeStat results, recorded nearly 4 million user sessions, the vast majority of which were carriers, shippers, insurers and others reviewing SafeStat information. The FMCSA, therefore, believes there is clearly public demand for current and regularly updated assessments of motor carrier performance. This public demand allows FMCSA to leverage the support of shippers, insurers, and other interested stakeholders to ensure that motor carriers remain accountable for sustaining safe operations over time. It also raises awareness of the importance of roadside performance data generated by FMCSA and our State partners, thereby further accelerating the shared goal of improvements in data quality.

The FMCSA agrees, however, that the public display of the CSMS performance data should be presented in a manner that makes it clear to users what they mean and do not mean, and their limitations. During the latter part of the data preview period that began in April, the motor carrier industry will have access to their CSMS results in advance of the public. This period is scheduled to begin in August 2010. At that time, the format and content of the website will be similar to the format and content that will be used for public display at rollout later this year. The FMCSA welcomes suggestions to improve the presentation of the website before or after public rollout.

### *Carrier Access to Driver Data*

The MTA's Task Force recommended that motor carriers have access to a driver's "motor vehicle record, drug and alcohol testing history, all of the enforcement actions or warnings issued to a driver during roadside inspections, and a driver's accident history to strengthen the driver qualification process." Additionally, your letter recommended that this information be available to motor carriers prior to National deployment of CSA 2010. Finally, your letter suggested that a study should be initiated to assess the economic impact to motor carriers of the $10 per record fee charged by the contractor that is supporting FMCSA's Pre-Employment Screening Program (PSP).

**FMCSA Response:**

As you know, the PSP is a new pre-employment screening tool that recently became available. Developing a system to make this safety performance information electronically available for pre-employment screening purposes was mandated by Congress in section 4117 of the Safe, Accountable, Flexible, Efficient, Transportation Equity Act: A Legacy for Users. The PSP allows motor carriers to request and purchase motor vehicle inspection and crash records maintained by the FMCSA for the purpose of conducting pre-employment screening and with the operator-applicant's written consent. Individual drivers or operator-applicants may purchase their own Driver Information Resource record at any time The records purchased through the PSP contain the most recent five years of crash data and three years of roadside inspection data for individual drivers from the FMCSA Motor Carrier Management Information System (MCMIS). Thus, the PSP provides the vast majority of the performance data you deemed necessary to strengthen the driver qualification process.

The FMCSA does not plan to conduct a study on the economic impacts to the motor carrier industry of paying a $10 per record fee to receive driver records through the PSP program. While FMCSA believes that making this driver data available to potential employers will help them make more informed decisions when hiring commercial drivers, the program is voluntary. In addition, it warrants mentioning that the fees associated with the PSP Program cannot exceed the cost that would be charged to access the same information directly from FMCSA through a formal Freedom of Information Act request.

The FMCSA would also like to clarify a common misconception regarding driver qualification and CSA 2010. While not specifically mentioned in your letter, FMCSA is aware that many within the motor carrier industry believe that violations generated by a driver at his or her prior employer negatively impact a motor carrier's evaluation in the CSMS after that driver is hired. That is not the case. A motor carrier evaluation in the CSMS is based solely on inspection and crash data generated by drivers operating under that motor carrier's authority. Following the driver pre-employment qualification process, once hired, a driver's performance while operating

under a motor carrier's own authority is available to that carrier through their inspection and crash records. This allows a motor carrier to further monitor their drivers' on road safety performance while under their employment.

### *Safety Fitness Determination*

The MTA's Task Force recommended that FMCSA maintain its current safety fitness rating methodology, which is tied to the full on-site compliance review, rather than proceeding with SFD concepts that have been discussed in public listening sessions and other presentation forums throughout the country. Moreover, your letter suggested that a Satisfactory safety rating under the current rating system is the "Gold Standard" and indicates that the "public is protected." Your letter further recommended that if changes to the safety rating process are ultimately made through rulemaking, FMCSA should adopt a two-tiered approach whereby motor carriers would be deemed either "Continue to Operate" or "Unfit." As a basis for this recommendation, you expressed concern that the term "Marginal," which has been discussed as a potential SFD label, has a negative connotation and motor carriers that received this SFD may lose business or incur increased costs.

**FMCSA Response:**

The FMCSA believes that, while effective, there are longstanding limitations with our current safety rating process that can be improved to benefit highway safety. One such limitation is the fact that a motor carrier's safety rating generally cannot be proposed for a downgrade without completion of an additional full compliance review at a motor carrier's place of business. As a result, the meaning of a motor carrier's safety rating as a current assessment of its safety performance diminishes over time and may be misleading. Put simply, a Satisfactory safety rating does not mean a motor carrier is currently in compliance, and, is not an assurance that the "public is protected" as suggested in your letter. It simply means the motor carrier met the FMCSA's safety fitness standard on the day the most recent compliance review was completed. The FMCSA plans to publish a comprehensive NPRM to address the above limitation and to propose other improvements to the SFD process in early 2011. We will consider MTA's comments on this issue as we continue development of the NPRM and look forward to considering further comments once the details of the NPRM have been finalized and published.

### *Use of All Recordable Crashes in the Carrier Safety Measurement System*

The MTA's Task Force expressed serious concern with the fact that the CSMS uses all recordable crashes without considering preventability or accountability to assess motor carriers in the Crash BASIC. Specifically, your letter pointed out many consistent and understood themes on this issue, such as a motor carrier that operates 10 trucks and has three preventable or accountable crashes will be assessed the same as another motor carrier that operates 10 trucks and that has three non-preventable crashes.

**FMCSA Response:**

The FMCSA recognizes this concern and is considering several short-term and longer term approaches to address it. Initially, because FMCSA understands that many crashes cannot be attributed to the motor carrier, it will exclude the CSMS assessment of the Crash BASIC from any public websites that may be viewed by shippers or insurers. Furthermore, accountability of crashes will continue to be considered by FMCSA before issuance of any formal and final

adverse safety fitness ratings that follow compliance reviews. Longer term, FMCSA is evaluating the feasibility of an approach similar to a suggestion made by the American Trucking Associations, whereby staff would assess state reported crashes for accountability before the crashes are considered by the CSA 2010 CSMS methodology. In fact, FMCSA has already begun some preliminary analysis of this approach. The initial results of our feasibility test are promising, and indicate that the use of police accident reports (PARs) is a viable option for determining large truck and bus accountability. Work to date has been done in conjunction with the National Highway Traffic Safety Administration and the Volpe National Transportation Systems Center. We are now gathering information on various options for implementing such an approach, including the costs and challenges.

The FMCSA welcomes any additional information MTA may wish to offer on this subject. An alternative approach, for example, could be to require motor carriers to submit PARs to FMCSA for those accidents in which the carriers wish accountability to be determined. Other accidents, for which a motor carrier did not contest accountability by submitting a PAR, would be deemed accountable to the carrier.

The FMCSA data analysis has historically shown that motor carriers involved in a disproportionately high number of crashes are more likely than other motor carriers to be involved in future crashes. Simply put, FMCSA analysis indicates that past crashes are a good predictor of future crashes irrespective of accountability. Therefore, until a viable long-term solution can be instituted to determine accountability of State reported crashes, FMCSA will continue to use all recordable crashes in the CSA 2010 CSMS to identify motor carriers for workload prioritization purposes. The FMCSA believes this approach, coupled with not displaying CSMS crash assessments on public websites, and considering crash accountability before issuing adverse safety fitness ratings, is the most prudent position at this time. It balances the valid concerns of the MTA's CSA 2010 Task Force with FMCSA's mission to protect the motoring public using the best performance data currently available

### *Use of Power Units to Normalize the Crash and Unsafe Driving Behavioral Areas*

The MTA's CSA 2010 Task Force expressed concerns with the fact that the Crash and Unsafe Driving BASIC currently use a motor carrier's number of power units to measure exposure rather than vehicle miles travelled (VMT).

**FMCSA Response:**

FMCSA acknowledges that the use of power units as the sole measure of exposure can potentially create a disadvantage for segments of the motor carrier industry that utilize their power units more intensively through cross country team operations, for example. The FMCSA also believes that the use of VMT as the sole measure of exposure can create a similar disadvantage for segments of the motor carrier industry that operate limited mileage due to the nature of their operations. The FMCSA agrees, however, that VMT is another valuable and widely recognized measure of exposure that could potentially improve the effectiveness of the CSMS. Currently, VMT data are missing or obsolete for many carriers. As suggested by other stakeholders, FMCSA will make the vehicle mileage field of the MCS-150 a mandatory field for biennial updates. And, as part of the recently released CSA 2010 Data Review website, FMCSA is encouraging motor carriers to provide their annualized VMT data. The FMCSA is optimistic that MTA will support these efforts by strongly encouraging its members and others to regularly update their VMT data and by partnering on other collaborative ideas to best ensure that VMT is

regularly and accurately reported by the motor carrier industry. These efforts will support ongoing FMCSA analysis aimed at implementing the most effective and equitable measure of exposure possible prior to National deployment of the CSMS later in 2010.

### *Clean Inspections*

The MTA's CSA 2010 Task Force expressed a perception that "clean" inspections do not positively impact a motor carrier's assessments in the CSMS BASICs.

**FMCSA Response:**

A "clean inspection" reflects a relevant roadside inspection that does not result in any violations for a particular BASIC. A relevant inspection is one where the roadside inspector reviewed a particular area for evidence of violations (not all inspection types/levels look at all areas). For example, when a carrier has no BASIC violations related to the Fatigued Driving (Hours-of-Service) BASIC and/or Driver Fitness BASIC from a Driver Inspection (CVSA Level 1, 2, 3 or 6), this "clean inspection" will lower the associated BASIC measure. Similarly, when a carrier has no BASIC violations related to the Vehicle Maintenance BASIC and/or Cargo-Related BASIC from a Vehicle Inspection (CVSA Level 1, 2, 5 or 6), this "clean inspection" will lower the associated BASIC measure.

Additionally, it is entirely possible and common for an inspection that actually has out-of-service violations noted in one area to have a positive impact on a carrier's assessment in another area of the CSMS. For example, if a full driver and vehicle inspection is conducted (Level 1) and the driver is placed out-of-service for driving over allowable hours, the inspection will obviously have an adverse impact on the motor carrier's Fatigued Driving (Hours of Service) BASIC. However, if that same inspection report does not note vehicle violations, it is considered a relevant inspection that positively impacts the motor carriers' Vehicle Maintenance BASIC.

The FMCSA is aware of assertions within the motor carrier industry that carriers rarely receive inspections that do not result in one or more violations, and therefore, once a motor carrier is deemed deficient in a BASIC it is almost impossible to demonstrate improvement through additional inspections. This assertion is not supported by roadside inspection data. In fiscal year 2009, 33 percent of the approximately 3.5 million roadside inspections reported no violations.

### *Violation Severity Weights*

The MTA's CSA 2010 Task Force expressed concern with the severity weights that have been assigned to the various roadside inspection violations and suggested that many are not consistent with the severity of the violation or their relevance to crash risk. To support this position, your letter provided anecdotal examples of roadside violations within a BASIC with assigned severity weights that do not appear to make sense from an intuitive or safety standpoint. Your letter further suggests that all violation severity weights should be reviewed by a panel that includes safety experts from within the motor carrier industry.

**FMCSA Response:**

One of the principal goals of the CSMS is to identify patterns of poor performance across multiple inspections. The roadside violation severity weights assigned are designed to help fine tune the CSMS by differentiating varying degrees of crash risk associated with specific violations. However, FMCSA has observed that the level of precision of the severity weights is not a major factor in identifying motor carriers with safety problems. In other words, regardless of the severity weights assigned to individual violations on an individual inspection, motor carriers with systemic safety problems across multiple inspections tend to rise to the top in the CSMS.

The FMCSA understands, however, that the individual violation weights assigned at this time have drawn considerable attention and focus from both motor carriers and individual drivers, and that they warrant further explanation of how they were derived. First, applicable safety-based violations of the Federal Motor Carrier Safety Regulations and the Hazardous Materials Regulations were distributed into the appropriate BASIC. For example, tire violations were put in the Vehicle BASIC and driver medical qualification violations were put into the Driver Fitness BASIC. Next, similar violations in each BASIC were grouped together. For example, the Vehicle BASIC has Tire and Brake groupings, among others. Within each BASIC the violation groups are assigned severity weights that reflect the violation group's statistical association with crash occurrence. The stronger the relationship between a violation group and crash risk, the higher its assigned weight. The violation severity weights for each violation group have been converted into a scale from 1 to 10, where 1 represents the lowest crash risk and 10 represents the highest crash risk relative to the other violations in the BASIC. Since the weights reflect the relative importance of each violation within each particular BASIC, they cannot be compared meaningfully across the various BASICs. In other words, a rating of 5 in one BASIC is not equivalent to a rating of 5 in another BASIC, but it does represent the midpoint between a crash risk of 1 and 10 within the same BASIC. This statistical analysis was then supplemented by crash consequence analysis (i.e. putting additional weight on violations that increase crash consequence rather than risk), effectiveness testing, and input from subject matter experts.

Irrespective of the approach used to assign severity weights to the roadside violation groups, the overall response to the CSMS from Federal and State enforcement personnel in the CSA 2010 Operational Model Test States has been positive. Put simply, the CSMS is a significant improvement over the current SafeStat system and is directing enforcement resources to motor carriers with patterns of safety violations across multiple inspections using the current severity weights.

The FMCSA, however, also readily acknowledges that other approaches to determining violation severity weights may yield results that are just as effective, or potentially more effective, in terms of identifying motor carriers with systemic safety problems. As a result, FMCSA would be very interested in the results of an independent review of the violation severity weights by a motor carrier and/or State roadside enforcement group.

### *Hazardous Materials as a Distinct BASIC*

The MTA's CSA 2010 Task Force noted that the vast majority of regulatory violations that potentially contribute to a motor carrier's assessment in the Cargo-Related BASIC are hazardous materials (HM) related.  And, your letter suggested that a separate Hazardous Materials BASIC be developed and added to the CSMS based, in part, on the significant percentage of potential roadside violations that are related to hazardous materials.

**FMSCA Response:**

The FMCSA developed the BASICs under the premise that commercial motor vehicle crashes can ultimately be traced to the behavior of motor carriers and drivers.  In other words, a premise of the BASICs is that they are "behavioral" areas that lead to crashes.  During early deliberations, FMCSA considered the development of a separate HM BASIC, as suggested by MTA, rather than including HM violations in the Cargo-Related BASIC.  Ultimately, however, FMCSA deployed the CSMS for testing purposes without an HM BASIC.  The FMCSA's rationale for this approach was that HM violations generally do not increase the risk of a crash but instead contribute to the consequences if a crash occurs.  Furthermore, testing of the CSMS revealed that motor carriers with a pattern of roadside HM violations would still be identified for intervention as deficient in the Cargo-Related BASIC. And, due to the potential impact on public safety, FMCSA has lowered the intervention threshold for HM carriers in all BASICs thereby holding HM carriers to a higher standard of performance.

Moving forward after national implementation, FMCSA will revisit the merits of a separate HM BASIC to perhaps better account for the inherent risk associated with transporting HM.

### *Motor Carrier Efforts in Disqualifying Poor Performing Drivers*

The MTA's CSA 2010 Task Force noted that roadside violations are considered by the CSMS for a full 24 months and expressed the opinion that motor carriers should receive credit in the CSMS when they terminate an unsafe driver who has adversely contributed to their safety assessments.  To emphasize this point, your letter stated that drivers should take their record with them and not leave it with the motor carrier.  Additionally, your letter asked broad questions about the driver safety measurement system (DSMS), the potential application of interventions to individual drivers, and whether DSMS scores could lead to disqualification of a driver by FMCSA.  Finally, your letter indicated that the MTA believes CSA 2010 should not be deployed unless the DSMS is available to motor carriers.

### **FMCSA Response:**

The issue of violations remaining on a motor carrier's record after a driver has been terminated is not new or unique to the CSMS or to CSA 2010.  In fact, the current SafeStat System keeps violations on a motor carrier's record for a full 30 months without regard to whether the driver has been terminated or has otherwise left the employment of the motor carrier.  The FMCSA believes disciplinary action by motor carriers with their drivers can result in improvements in highway safety, and routinely encourages motor carriers to implement progressive company disciplinary policies, and may use carriers' actions to discipline drivers when making enforcement decisions.  However, FMCSA's ultimate goal is for motor carriers to have safety

management controls that prevent the violations from occurring in the first place. At this time, the FMCSA does not envision departing from its longstanding policy of using a carrier's driver violations for assessment purposes even if the driver has been terminated by the motor carrier.

With respect to your broad questions about the DSMS and driver enforcement, the DSMS is not used to prioritize or target individual drivers for intervention by FMCSA. At this time, DSMS is an internal tool used by FMCSA and its State partners during compliance investigations of motor carriers to assist in determining which of the motor carriers' drivers to examine. Monetary fines and other interventions against an individual driver can be, and sometimes are, levied, based upon violations discovered during a motor carrier investigation. However, the fines and other interventions are generally limited to driver-based violations, such as operating after testing positive for controlled substances and knowingly and willfully exceeding the hours-of-service regulations. This approach to individual driver enforcement is a longstanding FMCSA policy and is not new or unique to CSA 2010 initiative. Under CSA 2010, however, stronger enforcement on individual drivers has been encouraged. The advent of the DSMS provides a tool for enforcement staff to more easily identify a motor carrier's drivers for closer examination, but the DSMS results do not impact upon disqualification of drivers by FMCSA or the States.

Finally, FMCSA respectfully disagrees with your position that CSA 2010 should not be deployed unless the DSMS results are made available to the motor carrier industry. The same underlying data that contribute to the internal DSMS scores are currently available through the new PSP program for pre-employment qualification purposes. In other words, a PSP request on an individual driver for pre-employment qualification purposes would show an inquiring motor carrier the exact same crash and inspection history that the DSMS provides. The difference, however, is that the PSP does not provide a ranking or assessment by FMCSA. This allows motor carriers to make their own informed hiring decisions based upon their own standards of safety.